In the

# United States District Court

for the

# District of Columbia

Washington Alliance of
Technology Workers;
21520 30th Drive SE Suite 102
Bothell, WA 98021

*Plaintiff,*

*v.*

U.S. Dep't of Homeland Security, Secretary of
Homeland Security, U.S. Immigration and
Customs Enforcement, Director of U.S.
Immigration and Customs Enforcement, U.S.
Citizenship and Immigration Services, Director
of U.S. Citizenship and Immigration Services;
Office of General Counsel
Washington, DC 20258.

*Defendant.*

Civil Action No. 1:16-cv-1170

**COMPLAINT**

## Introduction

1. This action by Washington Alliance of Technology Workers, Local 37083 of the Communication Workers of America, the AFL-CIO ("Washtech"), challenges administrative actions taken by the United States Department of Homeland Security ("DHS") that permit non-student aliens to remain and work in the United States on student visas (8 U.S.C. § 1101(a)(15)(F)(i)).

2. Specifically, this action addresses DHS's Post Completion Optional Practical Training Program ("OPT"), a regulatory program that authorizes former students to remain in the United States after completing school to perform labor or seek employment.[1]

3. The OPT Regulations at issue that authorize non-student aliens to perform labor on F-1 student visas are 8 C.F.R. §§ 214.2(f)(5), 214.2(f)(10)(ii) and 274a(b)(6)(iv), (c)(3)(B).

4. These regulations exceed the authority of DHS and are in direct contravention to several provisions of the Immigration and Nationality Act ("INA") of 1952 as amended: 8 U.S.C. §§ 1101(a)(15)(F)(i) (requirements for F-1 student visa), 1101(a)(15)(H)(i)(b) (requirements for H-1B guest worker visas), 1182(a)(5)(A), 1182(n) (protections from foreign labor), 1184(a) (regulations must ensure aliens leave the country when they do not conform to their admission status), 1184(g) (numeric limitations on foreign labor), 1227(a)(1)(C)(i) (making aliens

---

[1] DHS also has a pre-completion Optional Practical Training program that applies to F-1 aliens working while enrolled in school. 8 C.F.R. § 214.2(f)(10)(ii)(A)(1)–(2). That program, authorizing actual students to work, is not at issue in the complaint. For brevity, the complaint shortens *post-completion Optional Practical Training* to *OPT*. The usage in the complaint is consistent with industry practice where *OPT* invariably means *post-completion Optional Practical Training*. 8 C.F.R. § 214.2(f)(10)(ii)(A)(3). This complaint does not address the other regulations that authorize aliens to work on student visas when they actually are students.

deportable when they do not conform to their admission status), and 1324b (employment discrimination based on citizenship status).

5. This case arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq*.; and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.

## Jurisdiction and Venue

6. Jurisdiction of the Court is based upon 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (United States defendant); 8 U.S.C. 1329; the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*. (declaratory and injunctive relief); and the APA, 5 U.S.C. §§ 702 *et seq*.

7. Venue is properly vested in this Court as the Defendant is located in Washington, D.C. Venue is also proper within this judicial district pursuant to 28 U.S.C. § 1391.

## Parties

8. Plaintiff Washington Alliance of Technology Workers is Local 37083 of the Communication Workers of America, the AFL-CIO. Plaintiff is known in the computer industry as *Washtech*. Washtech was formed in 1998 by contract employees of Microsoft to build economic security and fair working conditions through collective action, bargaining, and legislative advocacy. Washtech is an influential union that represents American Science / Technology / Engineering / Mathematics ("STEM") workers throughout the United States.

9. Government and academic publications frequently use the terms *STEM* and *Science & Engineering* ("S&E") to refer to what the public and trade call *technology workers*.

10. Defendant U.S. Dep't of Homeland Security is the agency under whose auspices the regulations in question are promulgated. DHS is the successor to the Immigration and Naturalization Service ("INS") and the Department of Justice ("DOJ") in immigration matters.

11. Defendant Secretary of Homeland Security is the executive in charge of the U.S. Dep't of Homeland Security. This individual is currently the Hon. Jeh Johnson.

12. Defendant U.S Immigration and Customs Enforcement ("ICE") is the agency with in DHS that administrators the OPT program at issue.

13. Defendant Director of U.S. Immigration and Customs Enforcement is the executive in charge of ICE. This individual is currently the Hon. Sarah R. Saldana.

14. Defendant U.S Citizenship and Immigration Services ("USCIS") is responsible for processing student visa petitions and administers some aspects of the OPT, including the processing of F-1 student visas, the processing of H-1B visas, and the E-Verify program.

15. Defendant Director of U.S. Citizenship and Immigration Services is the executive in charge of USCIS. This individual is currently the Hon. Leon Rodriguez.

### The F-1 Student Visa

16. Congress permits the entry into the United States for certain non-immigrant aliens under Title 8, Section 15 of the United States Code. 8 U.S.C. § 1101(a)(15) lists the non-immigrant visas. Each subsection letter is a separate non-immigrant visa.

17. The F-1 non-immigrant student visa is one of the non-immigrant visas at issue in this case. 8 U.S.C. § 1101(a)(15)(F)(1).

18. Under 8 U.S.C. § 1101(a)(15)(F)(i), DHS is authorized to admit for-
    eign students under the following terms:

> [] an alien having a residence in a foreign country which he *has
> no intention of abandoning*, who is a *bona fide* student qualified
> to pursue a full course of study and who *seeks to enter the Unit-
> ed States temporarily and solely for the purpose of pursuing such
> a course of study* consistent with section 214(l) at an established
> college, university, . . . or other academic institution . . . in the
> United States, particularly designated by him and approved by
> the Attorney General after consultation with the Secretary of
> Education, which institution or place of study shall have agreed
> to *report to the Attorney General the termination of attendance*
> of each nonimmigrant student . . . .

(Emphasis added).

## The H-1B Visa

19. The H-1B nonimmigrant visa (hereinafter "H-1B visa") is the other
    non-immigrant visa at issue in this case. 8 U.S.C.
    § 1101(a)(15)(H)(i)(b).

20. The H-1B visa is the normal mechanism for foreign, college-educated
    aliens to be admitted temporarily into the United States to perform
    labor in STEM fields. 8 U.S.C. § 1101(a)(15)(H)(i)(b).

21. The statutory H-1B program applies to the same class of labor as the
    regulatory OPT program.

22. Congress established the H-1B program in the Immigration Act of
    1990, Pub. L. 101-649, § 205, 104 Stat. 4978 (codified at 8 U.S.C.
    §§ 1101(a)(15)(H)(i)(b), 1184(g) and 1182(n)).

23. H-1B visas are available to aliens who work in *specialty occupations*,
    that is, occupations that require a college degree or equivalent.
    8 U.S.C. § 1184(i)(2).

24. The H-1B visa is primarily used for STEM workers. In FY 2013, about 74% of new H-1B visas went to STEM workers.

25. In FY 2014, 77% of H-1B visas went to STEM workers.

26. An H-1B visa permits the applicant to work and reside in the United States for up to 36 months. 8 C.F.R. § 214.2 (h)(9)(iii)(A).

27. An H-1B visa is renewable for up to 72 months. 8 U.S.C. § 1184(g)(4).

28. In creating the H-1B program, Congress established protections for domestic workers, such as Washtech members.

29. These protections include quotas on admissions, 8 U.S.C. § 1184(g), and labor certification requirements. 8 U.S.C. § 1182(n).

30. For many years, the statutory quotas on H-1B visas protecting domestic labor have been exhausted.

31. In 2004, Congress addressed the issue of aliens on F-1 visas not being able to get an H-1B visa after graduation due to the quotas.

32. In 2004, Congress created a separate pool of 20,000 H-1B visas dedicated to aliens on F-1 (student) visas. Consolidated Appropriations Act of 2005. Pub. L. 108-447, 118 Stat. 2809, § 425 (codified at 8 U.S.C. § 1184(g)(5)(c)).

### The OPT Program

33. 8 C.F.R. § 214.2(f)(5) provides—

> Duration of status is defined as the time during which an F-1 student is pursuing a full course of study at an educational institution approved by the Service for attendance by foreign students, *or engaging in authorized practical training following completion of studies*, . . . .

(emphasis added). This regulation expanded the statutory definition of student visa status by adding practical training (*i.e.,*

work) after completion of studies as an alternative.

34. The only statutory authorization for aliens to work in the United States while on F-1 student visas was a three-year trial program created in the Immigration Act of 1990, Pub. L. 101–649, 104 Stat. 4978, § 122, that has since expired.

35. Although no statute currently permits F-1 student visa holders to work, DHS and its predecessors have permitted and progressively expanded work authorization under F-1 student visas through regulation since the creation of the current F-1 student visa in 1952.

36. When the current F-1 student visa was created, Immigration and Nationality Act of 1952, Pub. L. 82-414, 66 Stat. 163, regulations authorized aliens to work on student visas for "practical training" only when such work was "required or recommended by the school." 8 C.F.R. § 125.15(b)(1948).

37. The authorized work period in 1952 was six months and could be extended only when the school and training agency certified that that the practical training could not be completed in a shorter period of time. 8 C.F.R. § 125.15(b)(1948).

38. A 1977 regulation permitted aliens to work for a year for "practical training" if it "would not be available to the student in the country of his foreign residence." 42 Fed. Reg. 26,413.

39. Now, DHS has created several extra-statutory regulatory F-1 student visa work programs, including the *Post Completion Optional Practical Training* program at issue here.

40. The OPT program allows aliens admitted on F-1 student visas to remain in the United States, work, or be unemployed seeking work after they have graduated from an academic institution.

41. The term *Optional Practical Training* (OPT) first appears in a 1992 INS interim rule. Pre-Completion Interval Training; F-1 Student Work Authorization, 57 Fed. Reg. 31,954 (proposed July 20, 1992) (8 C.F.R. § 214.2) ("1992 OPT Rule").

42. These 1992 regulations authorized an alien on an F-1 student visa to work for up to twelve months after graduation or completion of studies under Post Completion OPT. *Id*.

43. The 1992 OPT Rule was promulgated without notice and comment.

44. In 2002, DHS changed 8 C.F.R. § 214.2 (F)(10)(ii)(A)(3)) to remove the requirement that aliens on OPT be enrolled at a school. Retention and Reporting of Information for F, J, and M Nonimmigrants; Student and Exchange Visitor Information System (SEVIS), 67 Fed. Reg. 76,256 (proposed Dec. 11, 2002) (codified at 8 C.F.R. § 212.1, 212.2, 212.3) ("Continued enrollment, for the school's administrative purposes, after all requirements for the degree have been met does not preclude eligibility for optional practical training.").

45. DHS declared that the statutory limits Congress imposed on the number of H-1B guest worker visas that protect Washtech and its members from foreign labor create a "competitive disadvantage" for United States employers. 73 Fed. Reg. 18,946.

46. To remedy this alleged "competitive disadvantage," DHS devised regulations designed to circumvent the statutory H-1B quotas and significantly expand the number of alien STEM workers that could be employed in the United States.  73 Fed. Reg. 18,953. . Extending Period of Optional Practical Training by 17-Months for F-1 nonimmigrant Students with STEM (Science, Technology, Mathematics, and Engineering) Degrees and Expanding CapGap Relief for All F-1 Stu-

dents with Pending H-1B Petitions, 73 Fed. Reg. 18,944–56 (proposed Apr. 8, 2008) (codified at 8 C.F.R. §§ 214, 274a) (The "2008 OPT Rule").

47. The 2008 OPT Rule authorized aliens who had graduated from postsecondary schools with degrees in STEM fields and who were unable to obtain an H-1B visa to remain in the United States on F-1 student visas and work for 29–35 months

48. In 2015, this Court vacated the 2008 OPT Rule, finding that DHS did not comply with the APA when it bypassed the public notice and comment process mandated by the APA.

49. As a result, DHS recently promulgated a new rule, Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students With STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students, 81 Fed. Reg. 13,040 (Mar. 11, 2016) (codified at 8 C.F.R. §§ 214 and 274a) ("2016 OPT Rule").

50. The 2016 OPT Rule revives the 2008 OPT Rule's Optional Practical Training ("OPT") extension granted to aliens with pending H-1B petitions with minor wording changes and a longer work period. 81 Fed. Reg. 13,117.

51. The 2016 OPT Rule replaces the former 17-month work extension for graduates in STEM fields with a 24-month extension. 81 Fed. Reg. 13,117–19.

52. The 1992 OPT Rule put in place a 12-month work period for non-student aliens working on student visas that remains in effect. The 2016 OPT Rule put in place a 24-month work extension for aliens in STEM fields. The 2016 OPT Rule also put in place a work extension for all aliens working on OPT lasting from the time the employer files

an H-1B petition until the petition is rejected or the Oct 1 visa effective date. These combine to allow nonstudent aliens in STEM fields to work on student visas for 42-months or nonstudent aliens in other fields to work for 18-months.

53. An alien must work under the 1992 OPT Rule before working on an extension under the 2016 OPT Rule.

**Count I: The policy of allowing non-student aliens to remain in the United States and work on student visas exceeds DHS authority under 8 US.C. § 1101(a)(15)(F)(i).**

54. All prior allegations are incorporated by reference.

55. The 2016 OPT Rule constructively reopens the policy of allowing aliens to work after graduation to a challenge that the policy is contrary to law because previous regulations establishing such a policy were made without giving public notice.

56. The 2016 OPT Rule reiterates the policy of allowing aliens to work after graduation on student visas making it subject to a challenge that the policy is contrary to law.

57. The question of whether the authorization of aliens to work after graduation on student visas under the 2016 OPT Rule is within DHS statutory authority is inseparable from the question of whether the policy of allowing aliens to work on student visas after graduation is within DHS statutory authority because the question of whether a non-student alien may work on a student visa is the same regardless of the duration of time the alien is permitted to work.

58. A petition for rulemaking asking DHS to reconsider the policy of allowing aliens to work after graduation would be futile because DHS rejected such requests in the 2016 OPT Rule. 81 Fed. Reg. 13,058–62.

59. DHS explicitly reopened the question of whether the policy of allowing aliens to work on student visas after graduation is lawful in the 2016 OPT Rule. 81 Fed. Reg. 13,044–46, 13,057–61.

60. Therefore, a challenge to the policy of allowing aliens to work on student visas after completion of their course of study is not time-barred.

61. DHS's policy of allowing aliens to remain in the United States after completion of the course of study to work or be unemployed is in excess of DHS authority to admit academic students under 8 U.S.C. § 1101(a)(15)(F)(i) and conflicts with the statutory provisions of 8 U.S.C. §§ 1182(a)(5), 1182(n), 1184(a)(1), 1184(g), and 1227(a)(1)(C)(i), and must be set aside under 5 U.S.C. § 706(2)(C).

**Count II. The 2016 OPT Rule is in excess of DHS authority.**

62. All prior allegations are incorporated by reference.

63. DHS policy of allowing aliens to remain in the United States after completion of the course of study to work or be unemployed is in excess of DHS authority to admit academic students under 8 U.S.C. § 1101(a)(15)(F)(i) and conflicts with the statutory provisions of 8 U.S.C. §§ 1182(a)(5), 1182(n), 1184(a)(1), 1184(g), and 1227(a)(1)(C)(i), and must be set aside under 5 U.S.C. § 706(2)(C).

**Count III: The 2016 OPT Rule was promulgated without following the procedures required by law.**

64. All prior allegations are incorporated by reference.

**Failure to Comply with the Congressional Review Act**

65. Under the Congressional Review Act, Pub. L. No. 104–121, § 251, 110 Stat. 847, 868, a final rule may not got into effect until at least

sixty days after publication in the Federal Register or receipt of the rule by Congress. 5 U.S.C. § 801(a)(3)(A). The 2016 OPT Rule had an effective date of May 10, 2016. 81 Fed. Reg. 13,040. The 2016 OPT Rule was received by the House of Representatives on March 14, 2016, by the Senate during an adjournment of the Senate on March 11, 2016, and published in the *Federal Register* on March 11, 2016.  162 Cong. Rec. H1417 (March 16, 2016); 162 Cong. Rec. S1542 (March 16, 2016). Therefore, the 2016 OPT Rule does not have the required 60-day delay in its effective date.

66. As a result, DHS did not properly give notice and comment to the question of whether aliens should be allowed to work beyond one year under the OPT program.

### Failure to Provide Notice and Comment

67. DHS has failed to subject the question of whether the OPT program should be expanded beyond a year to actual notice and comment.

68. Thus, DHS's 2016 OPT rule was promulgated without observance of the procedures required by law and must be set aside under 5 U.S.C. § 706(2)(D).

### Failure to Comply with Incorporation by Reference Requirements

69.  Congress granted the Administrative Committee of the Federal Register the authority to promulgate regulations in the Federal Register. 44 U.S.C. § 1506.

70.  Under its Congressionally granted authority, the Administrative Committee of the Federal Register has promulgated regulations gov-

erning the procedure for agencies to incorporate documents by reference in their own regulations. 1 C.F.R. part 51.

71.   The 2016 OPT Rule promulgated regulations at 81 Fed. Reg. 13,119 (codified at 8 C.F.R. § 214.2 (f)(10)(ii)(C)(2)(ii)) providing—

> (ii) The Secretary, or his or her designee, will maintain the STEM Designated Degree Program List, which will be a complete list of qualifying degree program categories, published on the Student and Exchange Visitor Program Web site at http://www.ice.gov/sevis. Changes that are made to the Designated Degree Program List may also be published in a notice in the Federal Register. All program categories included on the list must be consistent with the definition set forth in paragraph (f)(10)(ii)(C)(2)(i) of this section.

72.   8 C.F.R. § 214.2 (f)(10)(ii)(C)(2)(ii) incorporates by reference a list published on the agency's web site: http://www.ice.gov/sevis.

73.   However, DHS did not follow the requirements of 1 C.F.R. part 51. Specifically, DHS's use of an external list on a web site violates the incorporation by reference requirements for regulations in 1 C.F.R. part 51 in at least five ways.

74.   First, the use of an external list was not approved by the Director of the Federal Register as required by 1 C.F.R § 51.1.

75.   Second, the use of an external list is not a type of material eligible for incorporation by reference under 1 C.F.R. § 51.7.

76.   Third, the use of an external list fails to use the words "incorporated by reference" as required by 1 C.F.R. § 51.9(b)(1).

77.   Fourth, the use of an external list fails to state "the title, date, edition, author, publisher, and identification number of the publication" as required by 1 C.F.R. § 51.9(b)(1).

78.   Fifth, the use of an external list fails to refer to 5 U.S.C. § 552(a) as required by 1 C.F.R. § 51.9(b)(5).

79. Furthermore, incorporating this list on its website is in direct contradiction to the published guidance from the Director of the Federal Register that states, "Agencies are not authorized to incorporate by reference material on their web sites as a substitute for Federal Register publication." http://www.archives.gov/federal-register/cfr/ibr-locations.html (last visited June 3, 2016).

80. In promulgating the 2016 OPT Rule, DHS failed to comply with the incorporation by reference requirements of 1 C.F.R. part 51, in violation of the requirement to follow procedures required by law, so it should be set aside under 5 U.S.C. § 706(2)(D).

**Count IV: The 2016 OPT Rule was implemented arbitrarily and capriciously.**

81. All prior allegations are incorporated by reference.

82. The 2016 OPT Rule requires employers to provide foreign guest-workers OPT mentoring programs without requiring that such program be provided to American workers, including Washtech members.

83. The 2016 OPT Rule singles out STEM occupations for an increase in foreign labor through longer worker periods with no justification.

84. As such, the 2016 OPT rule is arbitrary and capricious and should be set aside pursuant to 5 U.S.C. § 706(2)(D).

**Injury to Washtech and its Members**

85. First, OPT deprives Washtech members of statutory labor protective arrangements.

86. Second, OPT allows increased competition with Washtech Members with foreign workers.

87. Third, OPT injures Washtech members by creating unfair competition with foreign workers.

88. Fourth, in promulgating the 2016 OPT Rule, DHS deprived Washtech members of their procedural right to proper notice and comment.

89. Fifth, the 2016 OPT Rule discriminates against Washtech members because it requires employers to provide mentoring programs to OPT participants that are not available to Washtech members.

90. Washtech members are STEM workers as defined by DHS.

91. Washtech members are specialty occupation workers as defined by statute.

92. DHS's OPT regulations allow aliens to work in the specific occupations represented by Washtech members.

93. DHS's predecessor (DoJ) has acknowledged that Congress intended to protect domestic workers (including Washtech members) from foreign labor working on F-1 student visas. DoJ stated,

> The F-1 student employment program in the final rule represents a careful balance between the [Immigration and Naturalization] Service's desire to allow foreign students every opportunity to further their educational objectives in this country and the need to avoid adversely affecting the domestic labor market. The House Judiciary Committee report on HR 4300 . . . demonstrated a clear Congressional concern about the Service's plan to expand student employment authorization without any built-in labor safeguards. 56 Fed. Reg. 55,610 (Oct. 29, 1991).

94. The only time Congress has ever authorized aliens to work on F-1 visas, it required that the aliens be paid the prevailing wage to protect domestic workers. The Immigration Act of 1990, Pub. L. 101–649, 104 Stat. 4978, § 122 (A three-year trial program that was allowed to expire).

95. The House of Representatives noted that its work program "sub-ject[ed] employers to an attestation requirement similar to that for other visas, requiring recruitment of United States workers and payment of prevailing wages." H.R. 101-723, 6746.

**Injury 1: Deprivation of Statutory Labor Protections**

96. Congress created the H-1B visas program for college educated labor. The H-1B program incorporates protections for American workers, including limits on the number of such workers. 8 U.S.C. § 1184(g); see also § 1182(n) (other domestic labor protections under the H-1B program).

97. DHS's OPT regulations allow college-educated labor in computer fields to work in the job market without complying with the statutory protections under the H-1B program, denying Washtech members of those protections.

**Injury 2: Allowing Increased Competition**

98. The OPT program allows additional foreign workers to compete with Washtech members that would not be in the job market but for DHS regulations.

99. The competition to Washtech and its members created by OPT is present and visible in the job market.

100. Many employers post job advertisements for STEM workers stating that they are seeking workers on OPT exclusively, excluding Washtech and its members from obtaining these jobs.

101. For example, on or about Sept. 26, 2013, IBM agreed to pay a $44,000 civil penalty to resolve allegations that the company violated the anti-discrimination provision of the INA when it placed online job post-

ings for application and software developers that contained citizenship status preferences for F-1 and H-1B temporary visa holders. Press Release, "Justice Department Settles Citizenship Status Discrimination Claim Against IBM," U.S. Department of Justice, Sept. 27, 2013, *available at* http://www.justice.gov/opa/pr/2013/September/13-crt-1091.html (last visited June 17, 2016).

102. IBM's advertisements, posted on its own corporate recruiting web site, specifically stated that applicants, "Should have a valid OPT work permit for legal work authorization in the US."

103. Foreign labor on OPT is only available to domestic employers through DHS's regulations.

104. Therefore, a favorable decision from the court would remove the injuries pled.

105. After promulgating the 2008 OPT Rule that expanded the duration of OPT beyond one year, the number of approvals to work on OPT has soared from 28,497 to 123,328 between FY 2008 and FY 2013. GAO, "Student and Exchange Visitor Program: DHS Needs to Assess Risks and Strengthen Oversight of Foreign Students with Employment Authorization," Feb. 2014, p. 14.

106. Rennie Sawade is a Washtech member with a degree in computer science. Since June 2015, Mr. Sawade has worked at a full-time job as a computer programmer.

107. Prior to June 2015, Mr. Sawade worked as a contract computer programmer for various employers on a temporary basis, receiving an hourly wage but no benefits. Because of the temporary nature of his work, he is constantly seeking new employment opportunities. Since 2003, Mr. Sawade has had to change jobs over 12 times.

108. Computer programming is one of the degrees DHS targeted for increasing the labor supply under the 2016 OPT Rule, making him an economic competitor with non-students working on OPT.

109. Since 2010, Mr. Sawade applied to Microsoft for computer programming jobs three times.

110. At least 100 applications for OPT extensions have been made to USCIS for workers at Microsoft.

111. Over a dozen contract labor companies that claim to supply labor to Microsoft have placed advertisements seeking OPT workers on various job boards.

112. On or about June 6, 2011, Mr. Sawade applied to Aerotek for a computer programming job.

113. At least 40 applications for OPT extensions have been made to USCIS for workers at Aerotek.

114. On or about Apr. 19, 2010, Mr. Sawade applied to Amazon.com for a computer programming job.

115. At least 19 applications for OPT extensions have been made to USCIS for workers at Amazon.com.

116. On or about Oct. 14, 2010, Mr. Sawade applied to Comsys for a contract computer programming position at Microsoft.

117. At least 20 applications for OPT extensions have been made to USCIS for workers at Comsys.

118. At least six companies that claim to supply workers to Comsys on their web sites have placed advertisements seeking OPT workers.

119. On or about Jan. 21, 2012, Mr. Sawade responded to an advertisement posted by Capsquare Systems on DICE.COM that stated, "OPTs are accepted." Mr. Sawade received no response from Capsquare Systems.

120.  At least 18 applications for OPT extensions have been made to USCIS for workers at Capsquare Systems.

121.  On the same day, Sawade applied to a job advertised on DICE.COM posted by People Tech Group stating "we need OPT/CPT/H1/EAD/Green Card/Citizens with valid legal status."[2]

122.  As of Sept. 23, 2010, People Tech Group had at least one STEM Optional Practical Training extension approved by DHS.

123.  On or about Oct. 4, 2010, Mr. Sawade applied to Facebook for a STEM job.

124.  At least 8 applications for OPT extensions have been made to USCIS for workers at Facebook.

125.  Since July 2011, Mr. Sawade applied to 5 different computer programming jobs at Boeing.

126.  On or about May 3, 2011, the contract labor company Converse Technology Solutions posted an advertisement on DICE.COM for STEM workers. The advertisement states, "We are looking for candidates Local to Seattle, WA. preference can be given to qualified OPT candidates. [*sic*]"

127.  Converse's web site states that Boeing is one of its clients.

128.  At least 2 applications for OPT extensions have been made to USCIS for workers at Converse.

129.  On or about May 26, 2010, June 3, 2010, and June 17, 2010, the contract labor company Info Targets placed job advertisements on DICE.COM stating that OPT was a requirement. Info Targets' web site states that Boeing is a client.

---

[2] Optional Practical Training (OPT), Circular Practical Training (CPT), Employment Authorization Document (EAD), H1 (H-1B Visa).

130. At least 4 applications for OPT extensions have been made to USCIS for workers at Info Targets.

131. In Jan. 2012, Mr. Sawade responded to a programming job advertisement posted by People Tech Group that stated it was looking for people on OPT.

132. In Jan. 2012, Mr. Sawade responded to a programmer job advertisement posted by CapSquare Systems seeking workers on OPT.

133. In Oct. 2013, Mr. Sawade applied for a programming job at Premera.

134. In April 2014, Mr. Sawade applied for a programming job at Expedia.

135. In June 2014, Mr. Sawade applied for a programming job a Disney.

136. In June 2014, Mr. Sawade applied for a programming job at Amazon.

137. Douglas Blatt is a Washtech member. Mr. Blatt has a degree in Information Technology. When Mr. Blatt is unable to find permanent employment, he works as a contract programmer. Mr. Blatt is currently working as a contract computer programmer and is seeking a permanent position. He is an economic competitor with aliens on OPT. Information Technology is a degree DHS has targeted for increasing the labor supply under the 2016 OPT Rule, making him an economic competitor with non-students working on OPT.

138. In 2010, Mr. Blatt applied for programming jobs at JP Morgan Chase four times.

139. At least 9 applications for OPT extensions have been made to USCIS for workers at JP Morgan Chase.

140. At least 20 contract computer labor companies that claim to supply workers to JP Morgan Chase have placed job advertisements seeking workers on OPT.

141. On or about June 2, 2010, Mr. Blatt applied for a computer job at Ernst & Young.

142. At least one contract computer labor company that claims to supply workers to Ernst & Young has placed advertisements seeking workers on OPT.

143. At least 4 applications for OPT extensions have been made to USCIS for workers at Ernst & Young.

144. On or about Sept. 20, 2010, Mr. Blatt applied for a programming and database job at IBM.

145. IBM has posted at least eight advertisements for computer jobs located in the United States on its corporate recruiting website that include the requirements that the applicant must be on OPT and have Indian work authorization. Several of these advertisements state that the work could be located anywhere in the U.S.

146. IBM has applied to USCIS for at least 30 OPT extensions for computer workers.

147. At least 25 applications for OPT extensions have been made to USCIS for workers at IBM.

148. On order about Feb. 25, 2011, Mr. Blatt applied to a programming job at Hewlett Packard.

149. At least nine contract computer labor companies that claim to supply workers to Hewlett Packard have placed advertisements seeking workers on OPT.

150. At least 19 applications for OPT extensions have been made to USCIS for workers at Hewlett Packard.

151. On or about July 7, 2011, Mr. Blatt applied for a programming job at CSC (Computer Sciences Corporation).

152. At least 5 contract computer labor companies that claim to supply workers to CSC have placed advertisements seeking workers on OPT.

153. At least 6 applications for OPT extensions have been made to USCIS for workers at CSC.

154. On or about Oct. 24, 2011, Mr. Blatt applied for a temporary database programming job at Continental Airlines.

155. At least 4 applications for OPT extensions have been made to USCIS for workers at Continental Airlines.

156. On or about June 11, 2012, Mr. Blatt applied for a programming job at Sabre Holdings.

157. At least 4 applications for OPT extensions have been made to USCIS for workers at Sabre Holdings.

158. At least four contract computer labor companies that claim to supply workers to Sabre Holdings have placed advertisements seeking workers on OPT.

159. In January 2016, Mr. Blatt applied for a web developer job at Penwick Realtime Systems.

160. In January 2016, Mr. Blatt applied for a data modeler job at KPIT.

161. In January 2016, Mr. Blatt applied for an applications developer job at MIDCOM.

162. In January 2016, Mr. Blatt applied for a business systems analyst job at Modis.

163. In January 2016, Mr. Blatt applied for a business analyst job at Sunnova Energy.

164. In February 2016, Mr. Blatt applied for a Java developer job at KBM Group.

165. In February 2016, Mr. Blatt applied for a Java developer job at Wise Men Consultants.

166. In February 2016, Mr. Blatt applied for a Systems Analyst job at Eifer Software Solutions.

167. In February 2016, Mr. Blatt applied for a software engineer job at Next Step Systems.

168. In February 2016, Mr. Blatt applied for a web developer job and programmer analyst job at American National Insurance.

169. In February 2016, Mr. Blatt applied for an Oracle developer job at JP Morgan Chase.

170. In February 2016, Mr. Blatt applied for a Java developer job and Oracle developer job at MPhasis.

171. In February 2016, Mr. Blatt applied for a software engineer job at LexisNexis.

172. In February 2016, Mr. Blatt applied for an application consultant job and a software developer job at IBM.

173. In February 2016, Mr. Blatt applied for an application developer job at Oracle.

174. In February 2016, Mr. Blatt applied for a business analyst job at DHL.

175. In February 2016, Mr. Blatt applied for a database architect job at UnitedHealth.

176. In February 2016, Mr. Blatt applied for a systems analyst job at Pegasystems.

177. In February 2016, Mr. Blatt applied for an applications support job at AIG.

178. In February 2016, Mr. Blatt applied for a programmer analyst job at UT Health.

179. In February 2016, Mr. Blatt applied for a Java architect job at Deloitte.

180. In February 2016, Mr Blatt applied for a Java developer job at ABB.

181. In February 2016, Mr. Blatt applied for a business analyst job at KForce.

182. In March 2016, Mr. Blatt applied for a systems analyst job at Accenture.

183. In March 2016, Mr. Blatt applied for a Java developer job at Cognizant.

184. Ceasar Smith is a computer systems and networking administrator and Washtech member. He has a degree in Business Administration. Smith is a temporary employee so his job search is continuous.

185. Network and computer systems administrators are fields specifically targeted for increasing the labor supply by the 2016 OPT Rule, making Smith an economic competitor with nonstudents working on OPT.

186. As with Mr. Blatt, Mr. Smith applied for computer systems services positions at IBM in Apr. 2008 and May 2008.

187. As with Mr. Blatt, Mr. Smith applied for computer field technical support positions at Hewlett Packard in Apr. 2009 and Apr. 2010.

188. Mr. Smith applied for computer technician positions at FedEx in Apr. 2008, June 2008, Oct. 2011, and May 2012.

189. At least 2 applications for OPT extensions have been made to USCIS for workers at FedEx

190. At least six contract computer labor companies that claim to supply labor to FedEx have placed job advertisements seeking OPT workers.

191. In May 2008, Mr. Smith applied for a computer integrated POS systems technician job at American Airlines.

192. At least 2 applications for OPT extensions have been made to USCIS for workers at American Airlines

193. At least 2 contract computer labor companies that claim to supply labor to American Airlines have placed job advertisements seeking workers on OPT.

194. In July 2008, Mr. Smith applied for a computer project coordinator job at Genesis Networks.

195. At least 3 applications for OPT extensions have been made to USCIS for workers at Genesis Networks

196. In Jan. 2009 and Dec. 2011, Mr. Smith applied for computer client technical support jobs at Dell.

197. At least 15 applications for OPT extensions have been made to USCIS for workers at Dell.

198. At least five computer contract labor companies that claim to supply labor to Dell have placed job advertisements seeking workers on OPT.

199. In Jan. 2009 and Nov. 2011, Mr. Smith applied for computer operator specialist jobs at Lockheed Martin.

200. At least 2 applications for OPT extensions have been made to USCIS for workers at Lockheed Martin.

201. The computer contract labor company Spendtek has placed at least two advertisements seeking computer workers on OPT that have specified Lockheed Martin as an end client.

202. As with Mr. Blatt, Mr. Smith applied to CSC for a computer system administrator job in Apr. 2009.

203. In Jan. 2010, Mr. Smith applied for a computer field service technician job at Affiliated Computer Services.

204. At least 5 applications for OPT extensions have been made to USCIS for workers at Affiliated Computer Services.

205. In Oct. 2011, Mr. Smith applied to AT&T for a computer field technician job.

206. At least 5 applications for OPT extensions have been made to USCIS for workers at AT&T.

207. At least twelve contract computer labor companies that claim to supply workers to AT&T have placed advertisements seeking workers on OPT.

208. As with Mr. Sawade, Mr. Smith applied to Microsoft for a computer support technician manager job in Nov. 2011.

209. In Jan. 2012 and May 2014, Mr. Smith applied to NCR for computer retail technician jobs.

210. At least 6 applications for OPT extensions have been made to USCIS for workers at NCR.

211. In May 2012, Mr. Smith applied to Sprint for a computer project administrator job.

212. At least 15 applications for OPT extensions have been made to USCIS for workers at Sprint.

213. At least six computer contract labor companies that claim to supply labor to Sprint have placed job advertisements seeking workers on OPT.

214. In May 2012, Mr. Smith applied for a computer technical subcontract manager job at SAIC.

215. At least 4 applications have been made to USCIS for OPT extensions for workers at SAIC.

216. In July 2014, Mr. Smith applied for an IT Analyst position at Amtrak.

217. Since January 2015, Mr. Smith has worked as a computer systems and network administrator at CSX on a temporary, contract basis.

218. In March 2015, Mr. Smith applied for an analyst position at BNSF.

219. In May 2015, Mr. Smith applied for a Network Load Analyst position at AT&T.

### Injury 3: Unfair Competition

220. Aliens on F-1 visas are classified as Non-Resident Aliens so that they and their employers do not pay Medicare and Social Security taxes as is required for Washtech members. 26 U.S.C. § 3121.

221. This taxation treatment makes workers on OPT inherently cheaper to employ than Washtech members.

222. Some domestic universities tout on their websites that it is cheaper to hire F-1 student visa holders than American citizens, like Washtech members.

223. For example, the San Francisco State University's web site states, "In fact, a company may save money by hiring international students because the majority of them are exempt from Social Security (FICA) and Medicare tax requirements." What Employers Should Know about Hiring International Students, *available at* http://www.sfsu.edu/~sicc/documents/handouts/employers/HiringIntlStudents.pdf (last visited May. 23, 2016).

### Injury 4: Employment Discrimination

224. The 2016 OPT Rule requires employers and universities to provide foreign workers under the OPT program mentoring programs without requiring such programs be made available to Washtech members and other American workers.

225. Washtech members face discrimination by employers seeking OPT workers to the exclusion of Americans.

### Injury 5: Deprivation of Procedural Rights

226. DHS has violated the procedural rights of Washtech by failing to put the question of whether the OPT program should be expanded beyond a year to notice and comment.

### Prayer for Relief

Plaintiffs pray that this Court:

1. Enter a declaratory judgment that Defendant exceeded its statutory authority when it allowed F-1 student visa holders to work after completing their course of study under the OPT Program;

2. Vacate those actions that are unlawful including 8 C.F.R. §§ 214.2(f)(10)(ii) and 274a(b)(6)(iv), (c)(3)(B);

3. Award Plaintiffs their costs and expenses, including reasonable attorney's fees and expert witness fees;

4. Award any other relief the court deems just and proper.

Dated: June 17, 2016

Respectfully Submitted,

_____

John M. Miano
D.C. #1003068
Attorney of Record for
Washington Alliance of
Technology Workers

Dale Wilcox
D.C. Bar No. 1029412
Michael Hethmon
D.C. Bar No. 1019386
Immigration Reform Law Insti-
tute
25 Massachusetts Ave., N.W.
Suite 335
Washington, D.C. 20001
(202) 232-5590

**Certificate required by LCvR 7.1**
**of the Local Rules of the**
**United States District Court**
**for the**
**District of Columbia**

Washington Alliance of Technology Workers v.

U.S. Dep't of Homeland Security, *et al.*;

Civil Action No. 1:16-cv-1170

I, the undersigned, counsel of record for Washington Alliance of Technology Workers, certify that to the best of my knowledge and belief, the following are parent companies, subsidiaries or affiliates of Washington Alliance of Technology Workers which have any outstanding securities in the hands of the public:

None

These representations are made in order that judges of this court may determine the need for recusal.

John M. Miano
D.C. #1003068
Attorney of Record for Washington
Alliance of Technology Workers

**Certificate required by LCvR 26.1**
**of the Local Rules of the**
**United States District Court**
**for the**
**District of Columbia**

Washington Alliance of Technology Workers v.

U.S. Dep't of Homeland Security, *et al.*;

Civil Action No. 1:16-cv-1170

I, the undersigned, counsel of record for Washington Alliance of Technology Workers, certify that to the best of my knowledge and belief, the following are parent companies, subsidiaries, affiliates, or companies which own at least 10% of the stock of Washington Alliance of Technology Workers which have any outstanding securities in the hands of the public:

None

These representations are made in order that judges of this court may determine the need for recusal.

_____

John M. Miano
D.C. #1003068
Attorney of Record for Washington
Alliance of Technology Workers