## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                      )
WASHINGTON ALLIANCE OF    )
TECHNOLOGY WORKERS,       )
                      )
      Plaintiff,          )
                      )      Civil Action No. 16-1170 (RBW)
      v.              )
                      )
U.S. DEPARTMENT OF        )
HOMELAND SECURITY, et al.,   )
                      )
      Defendants.      )
_____ )

## MEMORANDUM OPINION

The plaintiff, the Washington Alliance of Technology Workers ("Washtech"), a collective-bargaining organization representing science, technology, engineering, and mathematics ("STEM") workers, brought this action against the defendants, the United States Department of Homeland Security ("DHS"), the Secretary of Homeland Security, the United States Immigration and Customs Enforcement ("ICE"), the Director of ICE, the United States Citizenship and Immigration Services ("Citizenship and Immigration Services"), and the Director of Citizenship and Immigration Services (collectively, the "Government") challenging, pursuant to the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 701–06 (2012), DHS's 1992 regulation creating a twelve-month optional practical training program ("OPT or OPT Program") for nonimmigrant foreign nationals on F-1 student visas (the "1992 OPT Program Rule"), see 8 C.F.R. § 214.2(f)(10)(ii)(1992), and DHS's 2016 regulation extending the OPT Program by an additional twenty-four months for eligible STEM students (the "2016 OPT Program Rule"), see Complaint ("Compl.") ¶¶ 1–5, 8; see also 81 Fed. Reg. 13,040 (Mar. 11,

2016) (codified at 8 C.F.R. §§ 214 and 274a).  Currently pending before the Court is the

Defendants' Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and (6)

("Gov't Mot."), ECF No. 18, which seeks dismissal of the Complaint on the grounds that this

Court lacks subject matter jurisdiction to adjudicate Washtech's complaint; Washtech lacks

standing to pursue this action; Washtech's challenge to the 1992 OPT Program Rule is

time-barred; and Washtech has failed to state a claim upon which relief may be granted.  Upon

careful consideration of the parties' submissions,[1] the Court concludes that it must deny in part

and grant in part the Government's motion to dismiss.

## I.  BACKGROUND

### A.  Statutory and Legal Background

An F-1 visa provides foreign national students valid immigration status for the duration

of a full course of study at an approved academic institution in the United States.  See 8 U.S.C.

§ 1101(a)(15)(F)(i).  Since 1947, F-1 visa students, in conjunction with pursuing a course of

study, have been able to engage in some version of OPT during their studies or on a temporary

basis after the completion of their studies.  See 8 C.F.R. § 125.15(b) (1947).  And since 1992,

F-1 visa students have been allowed to apply for up to twelve months of OPT, to be used either

during or following the completion of their degree requirements.  See 8 C.F.R. § 214.2(f)(10)

(2016).

"In April 2008, DHS issued an interim final rule with request for comments extending the

[twelve]-month OPT [P]rogram by an additional [seventeen] months for F-1 [visa]

nonimmigrants with qualifying STEM degrees, to a total of [twenty-nine] months."  Gov't

---

[1] In addition to the filings already identified, the Court considered the following submissions in reaching its decision: (1) the Defendants' Memorandum and Points of Authorities in Support of the Motion to Dismiss ("Gov't Mem."); (2) the Plaintiff's Response to Defendant[s'] Motion to Dismiss ("Washtech's Opp'n"); and (3) the Defendants' Reply in Support of the Motion to Dismiss ("Gov't Reply").

Mem. at 4 (citing Extending Period of Optional Practical Training by 17 Months for F-1 Nonimmigrant Students with STEM Degrees, 73 Fed. Reg. 18,944 (Apr. 8, 2008) (the "2008 OPT Program Rule")); see also Washtech's Opp'n at 3. The goal of this extension was to help alleviate a "competitive disadvantage" for United States employers recruiting STEM-skilled workers educated in the United States under the H-1B visa program. 73 Fed. Reg. 18,944. H-1B visas are temporary employment visas granted annually to foreign nationals in "specialty occupations," including many occupations in the STEM field. 8 C.F.R. § 214.2(h)(1)(ii)(B). The number of H-1B visas issued on an annual basis is limited, and the program is oversubscribed. See 73 Fed. Reg. at 18,946. The extension provided by the 2008 OPT Program Rule sought to "expand the number of alien STEM workers that could be employed in the [United States]," Compl. ¶ 46; see also 73 Fed. Reg. at 18,953, and explicitly referenced the specific concern regarding the rigidity of the H-1B visa program, see 73 Fed. Reg. at 18,946–47.

In 2014, Washtech filed suit, challenging on procedural and substantive grounds, both the underlying twelve-month 1992 OPT Program Rule and the seventeen-month extension added by the 2008 OPT Program Rule. See Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec. ("Washtech I"), 74 F. Supp. 3d 247, 251–52 (D.D.C. 2014). There, another member of this Court found that Washtech lacked standing to challenge the 1992 OPT Program Rule, see id. at 252–53, but did have standing to challenge the 2008 OPT Program Rule, see id. at 253. The Court, however, vacated the 2008 OPT Program Rule because it had been promulgated without notice and comment, see Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec. ("Washtech II"), 156 F. Supp. 3d 123, 149 (D.D.C. 2015), judgment vacated, appeal dismissed, 650 Fed. App'x 13 (D.C. Cir. 2016), and stayed vacatur of the rule to allow DHS to promulgate a new rule, id. On appeal of that decision to the District of Columbia Circuit, Washtech alleged

that the court "had improperly allowed DHS to continue the policies unlawfully put in place in the 2008 OPT Rule . . . [and that] the OPT program was [not] within DHS['s] authority." Washtech's Opp'n at 4.

In response to this Court's colleague's ruling, DHS issued a notice of proposed rulemaking on October 19, 2015, requesting the submission of public comments prior to November 18, 2015. See Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees, 80 Fed. Reg. 63,376 (Oct. 19, 2015). Whereas the 2008 OPT Program Rule had extended the OPT Program tenure by seventeen months for eligible STEM students, this notice instead proposed extending the OPT Program tenure by twenty-four months. See id. (explaining that "[t]his [twenty-four] month extension would effectively replace the [seventeen] month STEM OPT [Program] extension currently available to certain STEM students"). The notice also deviated from the 2008 OPT Program Rule in several other respects. See id. at 63,379–94 (discussing the proposed changes in detail). Namely, the notice contained a distinct change in tone—it dropped all references to the H-1B visa program that had been in the 2008 OPT Program Rule and instead explained that its purpose was to "better ensure that students gain valuable practical STEM experience that supplements knowledge gained through their academic studies, while preventing adverse effects to [United States] workers." Id. at 63,376.

On March 11, 2016, after the expiration of the public notice and comment period, DHS issued the final version of the 2016 OPT Program Rule. See Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees, 81 Fed. Reg. 13,040 (Mar. 11, 2016) (codified at 8 C.F.R. §§ 214 and 274a). The District of Columbia Circuit then dismissed as moot Washtech's appeal challenging the 2008 OPT Program Rule and vacated this

Court's colleague's judgment in its entirety.  See Washtech II, 650 Fed. App'x. at 14.  On June

17, 2016, Washtech initiated this action.

**B.  Current Posture of Washtech's Challenges to the OPT Program**

Washtech alleges that the 1992 OPT Program Rule and 2016 OPT Program Rule "exceed

the authority of DHS [under] several provisions of the Immigration and Nationality Act

('INA')," Compl. ¶ 4, (Counts I and II); that the 2016 OPT Program Rule was issued in violation

of the Congressional Review Act (the "CRA") because of non-compliance with the notice and

comment and incorporation by reference requirements of the statute (Count III), see id. ¶¶ 64–

80; and that the 2016 OPT Program Rule is arbitrary and capricious (Count IV), see id. ¶¶ 81–84.

Also in its Complaint, Washtech names three of its members that have allegedly suffered injury

as a result of the 1992 and 2016 OPT Program Rules—Rennie Sawade, Douglas Blatt, and

Ceasar Smith (collectively, the "Named Washtech Members").  See id. ¶¶ 106, 137, 184.

Sawade and Blatt work in computer programming, and Smith is a computer systems and

networking administrator—all fields that fall within the STEM designation.[2]  Id.  Between April

2008 and March 2016, the Named Washtech Members unsuccessfully applied for several jobs in

the STEM field with companies that either "placed job advertisements seeking workers on OPT,"

see id. ¶ 140, or sought multiple OPT extension applications for their current workers, see id. ¶¶

186–219.  Washtech alleges that all three named members were unable to obtain the jobs for

which they had applied because "the 2016 OPT [Program] Rule and the 1992 OPT [Program]

Rule allow additional competitors into Washtech members' job market," thereby forcing

---

[2] Although STEM has no standard definition, the fields in which Washtech members work are commonly considered part of the same job market.  Indeed, the 2016 OPT Program Rule consistently refers to the "STEM field" to describe the job market in question, and DHS maintains a list of fields within the STEM umbrella on its website pursuant to 81 Fed. Reg. 13,118.  See Washtech's Opp'n at 8, 13; see also STEM Designated Degree Program List, U.S. Immigration Customs and Enforcement, https://www.ice.gov/sites/default/files/documents/Document/2016/stem-list.pdf.  Sawade, Blatt, and Smith all work in professions that are on DHS's list, see Compl. ¶¶ 106, 137, 184, therefore qualifying them as STEM workers.

Washtech members to compete with foreign labor for employment opportunities. Washtech's Opp'n at 15.

In response to Washtech's Complaint, the Government has filed a motion to dismiss, arguing that Washtech lacks standing to challenge both the 1992 and 2016 OPT Program Rules, that Washtech's "challenge to the 1992 Rule is time-barred," and that Washtech "fails to allege any plausible claim for relief as to all counts as [Washtech] is not within the zone-of-interests protected by [the F-1 visa statute] and because [Washtech] fails to plead facts satisfying Rule 12(b)(6)'s plausibility standard." Gov't's Mot. at 2. The Court will address each of the Government's arguments in turn.

## II. STANDARDS OF REVIEW

### A. Rule 12(b)(1) Motion to Dismiss

Federal district courts are courts of limited jurisdiction, Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994), and "[a] motion for dismissal under [Federal Rule of Civil Procedure] 12(b)(1) 'presents a threshold challenge to the court's jurisdiction . . . .'" Morrow v. United States, 723 F. Supp. 2d 71, 75 (D.D.C. 2010) (Walton, J.) (quoting Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)). Thus, a district court is obligated to dismiss a claim if it "lack[s] . . . subject matter jurisdiction[.]" Fed. R. Civ. P. 12(b)(1). Because "it is presumed that a cause lies outside [a federal court's] limited jurisdiction," Kokkonen, 511 U.S. at 377, the plaintiff bears the burden of establishing by a preponderance of the evidence that a district court has subject matter jurisdiction, see Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).

In deciding a motion to dismiss based upon lack of subject matter jurisdiction, the district court "need not limit itself to the allegations of the complaint." Grand Lodge of the Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 14 (D.D.C. 2001). Rather, "a court may consider

such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005). Additionally, a district court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged.'" Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir. 2005)). However, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than resolving a 12(b)(6) motion for failure to state a claim." Grand Lodge, 185 F. Supp. 2d at 13–14 (citation and internal quotation marks omitted).

**B. Rule 12(b)(6) Motion to Dismiss**

A motion to dismiss under Rule 12(b)(6) tests whether the complaint properly "state[s] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 8(a) requires only that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But although "detailed factual allegations" are not required, Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)), a plaintiff must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," id. Rather, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint alleging "facts [that] are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility of entitlement

to relief.'"  Id. (quoting Twombly, 550 U.S. at 557).

"In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'"  Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)).  However, conclusory allegations are not entitled to an assumption of truth, and even allegations pleaded with factual support need only be accepted insofar as "they plausibly give rise to an entitlement to relief."  Iqbal, 556 U.S. at 679. Along with the allegations made within the four corners of the complaint, the court can consider "any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice."  EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

### III.     ANALYSIS

#### A.  Constitutional Standing

As the starting point of its analysis, the Court must "begin . . . with the question of subject matter jurisdiction."  Am. Freedom Law Ctr. v. Obama, 106 F. Supp. 3d 104, 108 (D.D.C. 2015) (Walton, J.) (quoting Aamer v. Obama, 742 F.3d 1023, 1028 (D.C. Cir. 2014)); see also NO Gas Pipeline v. Fed. Energy Regulator Comm'n, 756 F.3d 764, 767 (D.C. Cir. 2014) ("It is fundamental to federal jurisprudence that Article III courts such as ours are courts of limited jurisdiction.  Therefore, 'we must examine our authority to hear a case before we can determine the merits.'" (quoting Wyo. Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 47 (D.C. Cir. 1999))).  "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"  Susan B. Anthony List v. Driehaus, __ U.S. __, __, 134 S. Ct. 2334, 2341 (2014) (quoting U.S. Const., art. III, § 2).  "The doctrine of standing gives meaning

to these constitutional limits of Article III by identify[ing] those disputes which are appropriately resolved through the judicial process." Id. (quoting Lujan, 504 U.S. at 560). "Indeed, the Court 'need not delve into [a plaintiff's] myriad constitutional and statutory claims [where] the [plaintiff] lacks Article III standing . . . .'" Am. Freedom Law Ctr., 106 F. Supp. 3d at 108 (quoting Crow Creek Sioux Tribe v. Brownlee, 331 F.3d 912, 915 (D.C. Cir. 2003)). "This is because a court may not 'resolve contested questions of law when its jurisdiction is in doubt,' as '[h]ypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by [the Supreme] Court from the beginning.'" Id. (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101 (1998)).

The irreducible constitutional minimum of standing contains three elements: (1) an injury in fact; (2) causation; and (3) the possibility of redress by a favorable decision. Lujan, 504 U.S. at 560–61. Furthermore, the doctrine of ripeness "shares the constitutional requirement of standing that an injury in fact be certainly impending." Chlorine Inst., Inc. v. Fed. R.R. Admin., 718 F.3d 922, 927 (D.C. Cir. 2013) (quoting Nat'l Treasury Emps. Union v. United States, 101 F.3d 1423, 1427 (D.C. Cir. 1996)). "'The party invoking federal jurisdiction bears the burden of establishing' standing," Clapper v. Amnesty Int'l USA, __ U.S. __, __, 133 S. Ct. 1138, 1148 (2013) (citations omitted), and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation," Susan B. Anthony List, __ U.S. at __, 134 S. Ct. at 2342 (quoting Lujan, 504 U.S. at 561). "In analyzing whether [a plaintiff] has standing at the dismissal stage," the Court must "assume that [the plaintiff] states a valid legal claim and 'must accept the factual allegations in the complaint as true.'" Info. Handling Servs., Inc. v. Def. Automated Printing Servs., 338 F.3d 1024, 1029 (D.C. Cir. 2003) (citations omitted)

(quoting Sturm, Ruger & Co. v. Chao, 300 F.3d 867, 871 (D.C. Cir. 2002)).

Furthermore, an association seeking to establish standing to sue on behalf of its members must further show that "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." Chamber of Commerce v. EPA, 642 F.3d 192, 199 (D.C. Cir. 2011) (quoting Sierra Club v. EPA, 292 F.3d 895, 898 (D.C. Cir. 2002)). Here, the focus of the parties' dispute is whether any of the Named Washtech Members would have standing to sue in his own right, therefore providing Washtech standing to pursue the claims it has asserted.

### 1. Washtech's Standing to Challenge the 1992 OPT Program Rule

Washtech first challenges the Government's 1992 OPT Program Rule, alleging in Count I of its Complaint that DHS's "policy of allowing non-student aliens to remain in the United States and work on student visas exceeds DHS authority under 8 U.S.C. § 1101(a)(15)(F)(i)." Compl. at ¶¶ 54–61. In moving to dismiss Count I of Washtech's Complaint, the Government contends that Washtech "fails to satisfy any element of Article III standing as to its challenge to the 1992 [OPT Program] Rule." Gov't Mem. at 34–35 ("[Washtech] has not identified a single member suffering a cognizable, let alone redressable, injury caused specifically by the pre-2008 OPT program . . . ."). Washtech, in its opposition, fails to address the Government's argument that it lacks standing to challenge the 1992 OPT Program Rule. See generally Washtech's Opp'n at 34–42 (addressing only the Government's argument that its challenge to the 1992 OPT Program Rule is time-barred, not the Government's arguments that its challenge to the 1992 OPT Program Rule is non-justiciable). Accordingly, the Court may treat the Government's position regarding Washtech's lack of standing to pursue its challenge to the 1992 OPT Program Rule as conceded.

See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (Walton, J.) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (citations omitted)), aff'd, 98 F. App'x 8 (D.C. Cir. 2004).

In any event, the Court concludes that Washtech has failed to establish "that at least one identified member ha[s] suffered or would suffer harm" resulting from the 1992 OPT Program Rule. Summers v. Earth Island Inst., 555 U.S. 488, 498 (2009). In its Complaint, Washtech represents that its named members applied for STEM jobs from April 2008 until March of 2016. See Compl. ¶¶ 106–219. During that period of time, the 2008 OPT Program Rule was in effect and remained in effect after August 12, 2015, when another member of this Court stayed vacatur of the 2008 OPT Program Rule until DHS promulgated the 2016 OPT Program Rule, see Washtech II, 156 F. Supp. 3d at 149, which DHS did not do until March 11, 2016, see 81 Fed. Reg. 13,040. Therefore, the Court assumes that Washtech's reliance on these job applications from its named members implicates the OPT Program extension provided by the 2008 OPT Program Rule, which is now defunct, and not the OPT Program established under the 1992 OPT Program Rule. Notwithstanding this assumption, Washtech's Complaint suggests that its named members were unable to obtain the jobs for which they had applied because those jobs were filled by beneficiaries of the extension provided by 2008 OPT Program Rule, rather than beneficiaries of the original 1992 OPT Program Rule. See, e.g., Compl. ¶¶ 109–10, 138–40 (alleging that a named member applied for a STEM job with a particular employer followed by the number of applications for OPT extensions made to the Citizenship and Immigration Services for workers already employed by that employer).

Consequently, the Government correctly notes that "[n]othing in [Washtech's] Complaint articulates factual matter connecting any alleged injury to the [1992] OPT [P]rogram." Gov't's Mot. at 35. Thus, because Washtech failed to address the Government's argument that its claims regarding the 1992 OPT Program Rule are non-justiciable, and because Washtech has not identified a member of its association who has suffered any injury arising from the 1992 OPT Program and who would have standing to sue in his or her own right, Washtech does not have standing to challenge the 1992 OPT Program Rule on behalf of its members.[3] Accordingly, the Court must dismiss Count I of Washtech's Complaint.[4]

### 2. Washtech's Standing to Challenge the 2016 OPT Program Rule

For Article III purposes, the injury-in-fact requirement "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" Susan B. Anthony List, __ U.S. at __, 134 S. Ct. at 2341 (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)). "An injury sufficient to satisfy Article III must be concrete and particularized and actual or imminent, not conjectural or

---

[3] The parties devote a significant portion of their submissions on whether Washtech's challenge to the 1992 OPT Program Rule is time-barred by the six-year statute of limitations period provided by 28 U.S.C. § 2401(a), or is exempt from this statute of limitations period based on the reopening doctrine, which permits pursuit of an otherwise time-barred challenge to a prior rule if "the agency has undertaken a serious, substantive reconsideration of the existing rule . . . [or] substantively chang[ed it]." Mendoza v. Perez, 754 F.3d 1002, 1019 n.12 (D.C. Cir. 2014) (internal quotation marks and citation omitted); see also Washtech's Opp'n at 34–42; Gov't's Reply at 15–18. Having concluded that Washtech does not have standing to challenge the 1992 OPT Program Rule, the Court deems it unnecessary to assess whether DHS's promulgation of the 2016 OPT Program Rule substantively changed the 1992 OPT Program Rule, such that it reopened the statute of limitations to challenge the 1992 OPT Program Rule.

[4] Washtech argues that "[a]n order dismissing Washtech's challenge to the entire OPT program would be inconsistent with the [District of Columbia] Circuit's holding in Washtech II that the issues with the 2008 OPT [Program] Rule are moot." Washtech's Opp'n at 42. In other words, Washtech claims that "[i]f [it] can only challenge the provisions of the 2016 OPT [Program] Rule (and not the entire policy of authorizing guest[-]workers on F-1 student visas), the only thing [it] can accomplish in this action is to invalidate the 2016 OPT [Program] Rule." Id. Therefore, Washtech contends that "[v]acating the 2016 OPT [Program] Rule would then restore the regulatory scheme that was previously in place: the 2008 OPT [Program] Rule that the [District of Columbia] Circuit held was moot." Id. However, this is not so because the Circuit, in dismissing the appeal of Washtech II as moot, stated that "the 2008 [OPT Program] Rule is no longer in effect." 650 Fed. App'x at 14. Thus, invalidating the 2016 OPT Program Rule would not leave in effect the 2008 OPT Program Rule, as that rule no longer exists; rather, the 1992 OPT Program Rule would remain in effect. Accordingly, the Court finds that this argument advanced by Washtech has no merit.

hypothetical.  An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."  Id. (citations and quotations omitted).  Furthermore, there must be "a sufficient causal connection between the injury and the conduct complained of, and [ ] a likelihood that the injury will be redressed by a favorable decision."  Id. (internal quotation marks and citation omitted).

To demonstrate standing to challenge the 2016 OPT Program Rule, Washtech alleges that its named members have suffered the following five injuries:  (1) a deprivation of "procedural right[s] to notice and comment [required by the APA]," Compl. ¶ 88, (2) "discrimination because [the 2016 OPT Program Rule] requires employers to provide mentoring programs to OPT participants that are not available to Washtech members," id. ¶ 89, (3) "unfair competition with foreign workers" due to taxation differences between the H-B1 visa program and the F-1 visa program, id. ¶ 87, (4) a deprivation of "statutory labor protective arrangements," id. ¶ 85, and (5) "increased competition [between] Washtech [m]embers [and] foreign workers," id. ¶ 86. Additionally, Washtech contends that these injuries are traceable to the 2016 OPT Program Rule and are redressable by a favorable decision from the Court.  See generally Compl.  The Court will address each of Washtech's alleged injuries to its named members in turn.

### a.  Deprivation of Procedural Rights Injury

Washtech alleges that "DHS . . . violated [its] procedural rights . . . by failing to put the question of whether the OPT [P]rogram should be expanded beyond a year to notice and comment."  Compl. ¶ 226.  The Government argues that Washtech's allegation is flawed because it has not "establish[ed] an injury-in-fact flowing from the 2016 [OPT Program] Rule under the procedural injury doctrine," and because "DHS explicitly sought notice and comment on precisely this issue, and many commenters commented on exactly this issue, including

[Washtech's] two counsel in this case." Gov't's Mem. at 32 (citing 80 Fed. Reg. at 63,382, 63,385, 63,394).

"Where [a] plaintiff[ ] allege[s] [an] injury resulting from [the] violation of a <u>procedural</u> right afforded to [him or her] by statute and designed to protect [his or her] threatened concrete interest, the courts relax—while not wholly eliminating—the issues of imminence and redressability but not the issues of injury in fact or causation." <u>Ctr. for Law & Educ. v. Dep't of Educ.</u>, 396 F.3d 1152, 1157 (D.C. Cir. 2005). Therefore, a plaintiff will "have standing only if . . . (1) the government violated [his or her] procedural rights designed to protect [his or her] threatened concrete interest, and (2) the violation resulted in injury to [his or her] concrete, particularized interest." <u>Id.</u>; <u>see also</u> <u>Fla. Audubon Soc'y v. Bentsen</u>, 94 F.3d 658, 664–65 (D.C. Cir. 1996) ("[A] procedural-rights plaintiff must show not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest.").

Washtech stumbles at the outset in its attempt to establish a procedural injury because it has "failed to show that a procedural right <u>sufficient for standing</u> has been violated." <u>Ctr. for Law & Educ.</u>, 396 F.3d at 1157. Washtech cannot genuinely demonstrate that DHS omitted or failed to subject the question of whether the OPT Program should be expanded beyond twelve months to notice and comment because DHS explicitly submitted this question for notice and comment. <u>See</u> 80 Fed. Reg. at 63,385–86 (explaining the proposed increase of the STEM OPT extension period to twenty-four months, requesting "public comment on the proposed [twenty-four]-month STEM OPT extension," and noting a "particular[ ] interest[ ] in public input regarding whether [twenty-four] months is the appropriate duration . . . or whether a shorter or longer duration is preferable, and why").

Despite this critical oversight, Washtech argues that "DHS's reliance in the 2016 OPT [Program] Rule on its conclusions made without public notice and comment in the 2008 OPT [Program R]ule deprived Washtech of its procedural right to proper public notice and comment." Washtech Opp'n at 19–20 (citing Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv., 281 F. Supp. 2d 1, 37 (D.D.C. 2003) for the proposition that "[i]f an agency relies on substantive conclusions made in a rule vacated for failure to give notice and comment in subsequent rulemaking, it deprives the plaintiff of its procedural rights."). However, in Haw. Longline Ass'n, another member of this Court held that an agency's subsequent rule was arbitrary and capricious because the rule "rested on the conclusions of the vacated and unlawful [prior rule] without reevaluating the merits of its analysis." 281 F. Supp. 2d at 31. Here, DHS did not rely on its conclusions regarding the prior 2008 OPT Program Rule. Rather, as it relates to the question of whether the OPT Program should be expanded beyond twelve months, the 2008 OPT Program Rule permitted an extension of seventeen months, whereas the 2016 OPT Program Rule provides for a twenty-four month extension, which was adopted after consideration of numerous comments. See 81 Fed. Reg. at 13040. Consequently, because Washtech is unable to demonstrate that DHS denied Washtech's procedural right to notice and comment, and because DHS did not rely on its conclusions regarding the prior 2008 OPT Program Rule, the Court finds that Washtech has not demonstrated a cognizable injury caused by the deprivation of a procedural right sufficient to confer standing to challenge the 2016 OPT Program Rule.

### b. Employment Discrimination Injury

Additionally, Washtech alleges that its members face employment discrimination because the "2016 OPT [Program] Rule requires employers and universities to provide foreign workers under the OPT [P]rogram mentoring programs without requiring such programs be made

available to Washtech members and other American workers," and because "employers seek[ ] OPT workers to the exclusion of Americans." Compl. ¶ 224–25. The Government responds that Washtech's members do not have a "legally protected interest in receiving mentoring programs simply because someone else in the population benefits from such programs." Gov't Mem. at 30 (internal quotation marks omitted) (citing Lujan, 504 U.S. at 560). The Government also argues that "the alleged illegal acts of third parties do not create Article III standing to challenge a rule that does not permit the acts to occur." Id. at 31. The Court agrees with the Government.

Washtech's "mere assertion that something unlawful benefited [its] competitor[s]," Already, LLC v. Nike, Inc., __ U.S. __, __, 133 S. Ct. 721, 731 (2013) (citations omitted), and allegedly constitutes employment discrimination is not sufficient to demonstrate a legal cognizable injury that is particularized and concrete, see id. Nonetheless, Washtech asserts that "the 2016 OPT [Program] Rule effectively mandates disparate treatment for American workers" because "DHS did not require that employers make the same [training] programs available to American workers." Washtech's Opp'n at 20. However, the theory that "a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful . . . [is] a boundless theory of standing" that has "never [been] accepted." Nike, Inc., __ U.S. at __, 133 S. Ct. at 731. This Court therefore declines this theory of standing now.[5]

Furthermore, in promulgating the 2016 OPT Program Rule, DHS received several

---

[5] Washtech cites various cases for the proposition that "disparate treatment is an injury in fact." Washtech's Opp'n at 21 (citing Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656 (1993); Davis v. Guam, 785 F.3d 1311 (9th Cir. 2015); Planned Parenthood of S.C. Inc. v. Rose, 361 F.3d 786 (4th Cir. 2004); Peyote Way Church of God, Inc. v. Thornburgh, 922 F.2d 1210 (5th Cir. 1991)). But, Washtech's reliance on these cases is of no avail because standing in each of those cases "was based on an injury more particularized and more concrete than the mere assertion that something [purportedly] unlawful benefited the plaintiff's competitor." Nike, Inc., __ U.S. at __, 133 S. Ct. at 731. Moreover, each of the cases cited involved the alleged denial of equal protection in violation of the Equal Protection Clause of the United States Constitution. In this case, Washtech does not assert an equal protection violation, but rather claims that the 2016 OPT Program Rule is arbitrary and capricious because it "requires employers to provide foreign guest-workers OPT mentoring programs without requiring that such program be provided to American workers." Compl. ¶ 82.

comments which suggested that the 2016 OPT Program Rule's Training Plan "would induce employers and universities to discriminate against [United States] workers" and would also "discriminate against [United States] citizen and lawful permanent resident students because it would not require employers to offer an identical 'program' to such students." 81 Fed. Reg. at 13097. In response, DHS noted that the Training Plan established by the 2016 OPT Program Rule "requires an employer to certify that the training conducted pursuant to the plan complies with all applicable Federal and State requirements relating to employment." 81 Fed. Reg. at 13098. Also, DHS stated that

> [n]either the rule nor the Training Plan . . . requires or encourages employers to exclude any of their employees from participating in training programs. And insofar as an employer may decide to offer training required by the regulation only to STEM OPT students, doing so does not relieve that employer of any culpability for violations of . . . any . . . federal or state law related to employment. Moreover, the training plan requirement is not motivated by any intention on the part of DHS to encourage employers to treat STEM OPT students preferentially. Rather DHS is requiring the Training Plan to obtain sufficient information to ensure that any extension of F-1 student status under this rule is intended to augment the student's academic learning through practical experience and equip the student with a broader understanding of the selected area of study.

81 Fed. Reg. at 13098. Thus, contrary to Washtech's assertion, see Washtech's Opp'n at 20, the Court does not find that the 2016 OPT Program Rule "mandates disparate treatment for American workers vis-à-vis OPT [Program] guest[-]workers by requiring the latter to receive the benefit of mentoring," id. Accordingly, the Court does not find Washtech's allegation of employment discrimination to constitute an injury sufficient to confer standing to challenge the 2016 OPT Program Rule.

### c. Unfair Competition Injury

Washtech also asserts that its "members suffer an injury in fact from the OPT regulations because they create unfair competition from alien guest[-]workers." Washtech's Opp'n at 17

(citing Compl. ¶ 87). Specifically, Washtech asserts that "[a]liens on F-1 visas are classified as [n]on-[r]esident [a]liens so that they and their employers do not pay Medicare and Social Security taxes as required for Washtech members [and t]his taxation treatment makes workers on OPT inherently cheaper to employ than Washtech members." Compl. ¶¶ 220–21. The Government argues in response that "it is [the] specific, explicit Acts of Congress, not the 2016 Rule, which create[] any differential tax treatment," Gov't's Reply at 12, and such third party acts are not sufficient to confer Washtech standing to challenge the 2016 OPT rule, see Gov't's Mem. at 27–28. The Court agrees.

"[T]he Supreme Court has made clear that a plaintiff's standing fails where it is purely speculative that a requested change in government policy will alter the behavior of regulated third parties that are the direct cause of the plaintiff's injuries." Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 938 (D.C. Cir. 2004), abrogated on other grounds by Perry Capital LLC v. Mnuchin, 848 F.3d 1072 (D.C. Cir. 2017). For instance, in Simon v. Eastern Kentucky Welfare Rights Organization, the plaintiffs, which were organizations that represented the interests of low-income individuals, challenged an IRS "Revenue Ruling [that] allow[ed] favorable tax treatment to a nonprofit hospital that offered only emergency-room services to indigents." 426 U.S. 26, 28 (1976). In holding that the plaintiffs lacked standing, the Supreme Court concluded that the regulated hospitals, not the IRS Revenue Ruling, caused the plaintiffs' asserted injury of being denied access to certain hospital services. See id. at 40–46. The Court also determined that the plaintiffs' theory that the IRS's policy encouraged hospitals to provide fewer services to indigents was "speculative [as to] whether the desired exercise of the court's remedial powers . . . would result in the availability to [the plaintiffs] of such services." Id. at 43.

Similarly, Washtech's "unadorned speculation," id. at 44, that DHS's 2016 OPT Program Rule creates unfair competition because of the taxation differences between foreign labor employed under the F-1 visa provision and domestic labor is too speculative to confer Washtech standing. Washtech argues that its "members do not have to show any job loss or that they would have (or might have) obtained a job absent this unequal [tax] treatment. [Rather, it contends that it] only needs to demonstrate that DHS's rule creates unequal treatment, which the unequal rates of taxation plainly provides." Washtech's Opp'n at 18 (citing Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 211 (1995)). However, Washtech's reliance on Pena as support for its position is misplaced. In Pena, the plaintiff argued that "the Federal Government's practice of giving general contractors on Government projects a financial incentive to hire subcontractors controlled by 'socially and economically disadvantaged individuals,' and in particular, the Government's use of race-based presumptions in identifying such individuals," was unconstitutional under the Fifth Amendment's Due Process and Equal Protection Clauses. 515 U.S. at 204. The Supreme Court noted that the plaintiff's "claim that the Government's use of subcontractor compensation clauses denies it equal protection of the laws of course alleges an invasion of a legally protected interest, and it does so in a manner that is 'particularized' as to [the plaintiff]." Id. at 211 ("The injury in cases of this kind is that a discriminatory classification prevents[s] the plaintiff from competing on an equal footing. The aggrieved party need not allege that he would have obtained the benefit but for the barrier in order to establish standing." (internal quotation marks and citations omitted)). Here, Washtech has not alleged any equal protection or due process violations, and it has not alleged that the 2016 OPT Program Rule provides financial incentives to employers to discriminate based on race or some other impermissible form of discrimination. See Compl. ¶¶ 220–23. Rather,

Washtech asserts that the taxation treatment for F-1 visas "makes workers on OPT inherently cheaper to employ than Washtech members." Id. ¶ 221. Thus, because the facts in Pena are not parallel to the facts here, and because the interest at issue in Pena—the constitutional prohibition against racial discrimination—greatly exceeds Washtech's concerns, Pena does not support Washtech's proposition that it only needs to demonstrate that its members suffer unequal treatment to show an injury in fact sufficient for standing.

Washtech also contends that the tax differences stemming from the 2016 OPT Program Rule create a "powerful incentive for employers to violate the discrimination provisions of the [Immigration and Nationality Act (the 'INA')]," Washtech's Opp'n at 19, and to "place [unlawful] job advertisement[s] seeking alien guest[-]workers on the OPT [P]rogram to the exclusion of American workers," id. at 18. However, nothing in the 2016 OPT Program Rule "permits or authorizes," Nat'l Wrestling Coaches Ass'n, 366 F.3d at 940, employers to discriminatorily act in violation of the INA, see generally 81 Fed. Reg. at 13,040. In any event, Washtech's position is flawed because the 2016 OPT Program Rule does not itself create the unequal tax treatment that Washtech identifies. As the Government correctly notes, Congress enacted the tax exemptions for F-1 visa holders more than fifty years before DHS implemented the OPT Program. See Gov't Mem at 27–28. Thus, Washtech cannot demonstrate that its alleged unfair competition injury was caused by or is traceable to the 2016 OPT Program Rule, or that a favorable decision by this Court invalidating the 2016 OPT Program Rule would redress its alleged injury, as the taxation treatment for F-1 visa holders would still remain. As the Supreme Court has noted, "the 'case or controversy' limitation of [Article] III still requires that a federal court act only to redress [an] injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not

before the court." Simon, 426 U.S. at 41–42.

Simply, Washtech invites the Court to speculate as to the "myriad [of] economical, social, and political realities," Arpaio v. Obama, 797 F.3d 11, 21 (D.C. Cir. 2015), cert. denied, 136 S. Ct. 900 (2016), reh'g denied, 136 S. Ct. 1250 (2016), relating to the complexities of the tax code that either benefits or disadvantages employers,[6] how third party employers select and hire employees, and whether these third party employers are engaging in unlawful actions. The Court declines that invitation, as it is too speculative and attenuated for the Court to infer that Washtech members have suffered an injury resulting from unfair competition due to differential taxation treatment purportedly created by the 2016 OPT Program Rule. Accordingly, the Court concludes that Washtech does not have standing based on the alleged injury of unfair competition to challenge the 2016 OPT Program Rule.

### d. Deprivation of Statutory Labor Protective Arrangements Injury

Washtech next alleges that "DHS's OPT regulations allow college-educated labor in computer fields to work in the job market without complying with the statutory protections under the H-1B program, denying [its] members [ ] those protections." Compl. ¶ 97. Through its opposition, Washtech appears to argue that it has union status standing due to the loss of labor-protective arrangements for its members to challenge the 2016 OPT Program Rule. See Washtech's Opp'n at 9–10, 13. The Government contends that the cases Washtech relies upon are distinguishable from the facts in this case because "they arise in the context of labor-protective arrangements governing unions and the Interstate Commerce Commission, a

---

[6] In the 2016 OPT Program Rule, DHS noted the receipt of voluminous comments regarding taxation issues. See 81 Fed. Reg. at 13056–58. Among those comments were observations that "any employer savings related to tax laws are at least in part offset by administrative costs, legal fees, and staff time related to securing the authority under [United States] immigration law to employ the foreign-born worker," and that some F-1 visa holders "eligible for STEM OPT extensions, may not be exempt [from taxes] because they have already been in the United States for parts of five calendar years." Id. at 13058.

unique body of administrative law inapplicable here." Gov't's Reply at 11 (noting that

Washtech failed to cite any cases applying this reasoning to the INA). The Government also

argues that

> the fact that the H-1B visa provision, which governs the admission of
> nonimmigrants for <u>employment</u> purposes, contains explicit domestic labor
> protections, in no way creates a labor protection requirement for a separate,
> unrelated statute, the F-1 provision, which contains no such explicit requirement,
> and governs the entire different statutory purpose of the admission of
> nonimmigrant[ ] for <u>educational</u> purposes.

<u>Id.</u> at 11–12 (citations omitted).[7]

Here, Washtech has not met the standard required to establish an injury to itself or its

members sufficient for Article III purposes. Washtech contends that "it is the denial of the

statutory protection itself that is the injury in fact, not the secondary question of whether that

denial causes a harm, such as being hired for a specific job or winning a contract." Washtech's

Opp'n at 10; <u>see also</u> <u>id.</u> at 11 ("The injury here is that DHS OPT regulations deprive Washtech

members—and American STEM workers generally—of numerous statutory protections that

should rightly be applied to such foreign labor."). As support, Washtech relies upon <u>Warth v.

Seldin</u>, 422 U.S. 490, 514 (1975), for the proposition that "Congress may create a statutory right

or entitlement the alleged deprivation of which can confer [judicial] standing to sue even where

the plaintiff would have suffered no judicially cognizable injury in the absence of [a] statute."

<u>Id.</u> at 10. In addition, Washtech cites <u>Brotherhood of Locomotive Engineers v. United States</u>,

101 F.3d 718 (D.C. Cir. 1996), which observed that this Circuit has "repeatedly held that the loss

---

[7] Additionally, the Government argues that Washtech's "claim alleging deprivation of alleged statutory protections
'goes to the merits,' and cannot serve as the basis of [Washtech's] injury theory" for the purposes of establishing
standing. Gov't's Reply at 10 (citing <u>Sherley v. Sebelius</u>, 610 F.3d 69, 73–74 (D.C. Cir. 2010)). However, in
noting this limitation, the Circuit was referring to "[t]he requirement of a protected competitive interest." <u>Sherley</u>,
610 F.3d at 72. Thus, because Washtech's allegations of denial of statutory protections is not synonymous with the
requirement of a protected competitive interest, it is unnecessary for the Court to consider this argument.

of labor-protective arrangements may by itself afford a basis for standing." Id. at 9 (quoting Bhd. of Locomotive Eng'rs, 101 F.3d at 724 (noting that "as long as there is a reasonable possibility that union members will receive and benefit from labor-protective arrangements, the loss of those arrangements stemming from [government action] provides a sufficient basis for union standing")); see also id. at 10 (citing Nat'l Treasury Emps. Union v. Chertoff, 452 F.3d 839, 852–55 (D.C. Cir. 2006), and Simmons v. Interstate Commerce Comm'n, 934 F.2d 363, 367 (D.C. Cir. 1991)).

The Court finds that Washtech's reliance on these two cases is to no avail because the circumstances in both Seldin and Brotherhood of Locomotive Engineers are distinguishable from the facts presented in this case. In Seldin, the plaintiffs challenged a "town's zoning ordinance . . . [that] effectively excluded persons of low and moderate income from living in the town, in contravention of" their constitutional rights. 422 U.S. at 493. Particularly, one of the organizational plaintiffs argued that a select group of its members were "deprived of the benefits of living in a racially and ethnically integrated community . . . as a result of the persistent pattern of exclusionary zoning practiced," and therefore, "such deprivation is sufficiently palpable injury to satisfy the Art[icle] III case or controversy requirement." Id. at 512. The Supreme Court, however, held that this organizational plaintiff did not have standing because it did "not assert on behalf of its members any right of action under the 1968 Civil Rights Act." Id. at 513. And, although the Court "observed [that] Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of [the] statute," the Court observed that "[n]o such statue [was] applicable." Id. at 514.

Also, in Brotherhood of Locomotive Engineers, the union plaintiffs "petition[ed] for

review of three Interstate Commerce Commission decisions in which the Commission found it lacked jurisdiction over several railroad transactions." 101 F.3d at 719–20. At the outset, the Circuit noted that "[t]he injury at issue is not the job loss resulting from the transactions, but rather the loss of coverage by labor-protective arrangements flowing from the [Commission's] determination that the transactions fall outside its jurisdiction." Id. at 723–24. In determining that the union plaintiffs "ha[d] demonstrated [an] injury-in-fact" with respect to only two of the Commission's decisions, the Circuit concluded that "the labor-protective provisions at stake [were] mandatory," which "create[d] an extremely strong presumption that Union members suffered a concrete and immediate injury when the [Commission] found it lacked jurisdiction." Id. at 724 (analyzing the effect of Simmons on the facts presented to the court). The Circuit also determined that "because a reasonable possibility of job dislocation exits, labor-protective arrangements would have been meaningful and valuable." Id.; see also id. at 725 ("In mandatory-protection cases, denial of jurisdiction necessarily entails a loss of labor protection; as long as there is any reasonable possibility of economic dislocation that would make such labor protection meaningful, workers who would have been protected suffer concrete and immediate injury when the [Commission] refuses jurisdiction.").

In this case, Washtech has not asserted any right of action under a statute established by Congress that creates "a statutory right or entitlement the alleged deprivation of which can confer standing," Seldin, 422 U.S. at 514, nor has Washtech shown that there are "labor-protective provisions at stake [that] are mandatory," Bhd. of Locomotive Eng'rs, 101 F.3d at 724. Washtech argues that "Congress established the H-1B visa program to admit college-educated foreign labor, the very type of guest[-]worker labor allowed to enter the [United States] job market under OPT." Washtech's Opp'n at 11. And, "[t]he H-1B visa program requires foreign

labor to respect domestic labor protections prescribed by Congress." Id. (citations omitted). According to Washtech, "the 2016 OPT [Program] Rule . . . allows alien guest[-]workers to enter Washtech members' job market without complying with the statutory protections established for such labor." Id. at 12; see also id. at 12 ("DHS's cancellation of statutory protections (by using the OPT [P]rogram to circumvent the labor protections under the H-1B program) confers standing on those whom Congress intended to protect: American workers including [its] members."). But, while the H-1B visa program targets foreign labor already in the workforce, Congress specifically created the F-1 visa program as an additional program that "authorizes admission [into the United States] to bona fide students, who are solely pursuing a course of study, at an approved academic institution that will report termination of attendance." Id. at 1 (citing 8 U.S.C. § 1101(a)(15)(F)(i)). In so doing, Congress elected not to include language providing for domestic labor protections or to condition entry into the United States on the entry having no impact on domestic labor. See § 1101(a)(15)(F). In fact, throughout the long history of the F-1 visa program, including amendments and revisions, Congress has repeatedly declined to include any provision that requires analogous domestic labor protections. Simply, Washtech cannot compel the Court to infer that Congress intended to provide domestic laborers, such as Washtech's members, labor protections under the F-1 visa program, when Congress itself had multiple opportunities to do so, but chose not to. Thus, the Court finds that the actual complaint of Washtech's alleged deprivation of statutory protections injury is not against DHS, but rather against Congress, who is not a party in this case.[8]

---

[8] Washtech also cites Clinton v. New York, 524 U.S. 417, 433 (1998) as additional support for its proposition that the deprivation of a statutory right confers standing. See Washtech's Opp'n at 11–12. In Clinton, the Court noted its prior ruling which held that plaintiffs have standing when the injury alleged is harm resulting from the deprivation of a benefit in the negotiation process and "not the ultimate inability to obtain the benefit." 524 U.S. at 433 n.22 (citation omitted). However, the Court finds that Clinton does not weigh in Washtech's favor because Washtech has not alleged, and is most likely unable to show, that its members engage in any negotiation processes with respect to applying for and obtaining available jobs in the STEM labor market.

Consequently, Washtech has not demonstrated that it has a statutory right or entitlement to statutory labor protections or that any such labor protection provisions are mandatory under the F-1 visa provision. Therefore, the Court concludes that Washtech has not demonstrated that its members have suffered an injury-in-fact based on alleged deprivation of statutory protections sufficient to confer standing to challenge the 2016 OPT Program Rule.

### e. Increased Competition Injury

Finally, Washtech asserts that its members have suffered an injury-in-fact due to increased competition because the 2016 OPT Program Rule "allows additional foreign workers to compete with [its] members that would not be in the job market but for DHS regulations." Compl. ¶ 98. Invoking the requirements for the doctrine of competitor standing, the Government argues that Washtech fails to show an actual or imminent injury resulting from the 2016 OPT Program Rule because its allegations "are <u>backward</u> looking, focusing exclusively on events that precede the existence of the 2016 [OPT Program] Rule, that arise entirely under the now-defunct 2008 regime." Gov't's Reply at 4. The Government also argues that Washtech's named members are not "direct and current" competitors with STEM OPT recipients because, as employees with over thirty years of experience in the STEM field, they do not compete with students applying for entry-level jobs. Gov't's Reply at 3.

"The doctrine of competitor standing addresses the first requirement [of standing] by recognizing that economic actors 'suffer [an] injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition' against them." <u>Sherley v. Sebelius</u>, 610 F.3d 69, 72 (D.C. Cir. 2010) (alterations in original) (quoting <u>La. Energy & Power Auth. v. Fed. Energy Regulatory Comm'n</u>, 141 F.3d 364, 367 (D.C. Cir. 1998)). To establish competitor standing, a party in a particular market must "show an actual or

imminent increase in competition" in the relevant market, <u>Sherley</u>, 610 F.3d at 73; <u>see also</u>

<u>Mendoza</u>, 754 F.3d at 1011, and "demonstrate that it is a <u>direct</u> and <u>current</u> competitor whose

bottom line may be adversely affected by the challenged government action," <u>Mendoza</u>, 754

F.3d at 1013 (quoting <u>KERM, Inc. v. FCC</u>, 353 F.3d 57, 60 (D.C. Cir. 2004) (emphasis in

original)); <u>see also</u> <u>Arpaio</u>, 797 F.3d at 23 ("Plaintiffs may claim predictable economic harms

from the lifting of a regulatory restriction on a 'direct and current competitor,' or regulatory

action that enlarges the pool of competitors, which will 'almost certainly cause an injury in fact'

to participants in the same market. But [this Circuit] ha[s] not hesitated to find competitor

standing lacking where the plaintiff's factual allegations raised only 'some vague probability'

that increased competition would occur." (internal citations omitted)).

Washtech asserts that its "injury in fact is the mere 'exposure to competition' created by

[the] regulatory actions." Washtech's Opp'n at 14 (citing <u>Tozzi v. U.S. Dep't of Health &</u>

<u>Human Servs.</u>, 271 F.3d 301, 308 (D.C. Cir. 2001)). And, Washtech notes that"[a] plaintiff does

not have to demonstrate specific lost sales to establish an injury in fact from increased

competition; only that the agency action permits a competitor to enter the market." <u>Id.</u> Indeed,

"an individual in the labor market for [STEM] jobs would have standing to challenge [the]

Department of [Homeland Security's] rules that lead to an increased supply of labor—and thus

competition—in that market." <u>Mendoza</u>, 754 F.3d at 1011 (discussing prior case law). It cannot

be credibly argued that DHS's 2016 OPT Program Rule has not led to an influx of employees in

the STEM labor market, and thus, an increase in competition. <u>See</u> Press Release, Impact Report:

100 Examples of President Obama's Leadership in Science, Technology, and Innovation, The

White House (June 21, 2016), https://www.whitehouse.gov/the-press-office/2016/06/21/impact-

report-100-examples-president-obamas-leadership-science (last visited Jan. 26, 2016) (noting

that, as of June 2016, DHS estimated that there were 34,000 STEM students already participating

in the OPT Program as a result of the now-defunct 2008 OPT Program Rule and expected an

estimated growth to 92,000 participants within ten years).[9] Therefore, Washtech does have

standing to challenge the 2016 OPT Program Rule under the doctrine of competitor standing, if it

can identify members who are "direct and current competitor[s]" in the STEM labor market who

"may be adversely affected by" the 2016 OPT Program Rule. Mendoza, 754 F.3d at 1011.

To this end, Washtech argues that its named members are direct and current competitors

with beneficiaries of the 2016 OPT Program Rule because, even though currently employed,

they remain "active participants in the programming and system administration job market."

Washtech's Opp'n at 23. Nonetheless, the Government contends that Washtech "provide[s] no

basis for concluding [that its named members] 'personally compete[] in the same arena' as

beneficiaries of the 2016 [OPT Program] Rule, . . . let alone that they do so directly and

currently." Gov't Mem. at 16 (citations omitted) (first alteration in original). In assessing this

issue, the Court finds the District of Columbia Circuit's decision in Mendoza to be particularly

instructive.

In Mendoza, the Circuit found that former sheepherders had standing to challenge

Department of Labor regulations affecting the wages and working conditions in the herding

market because the former herders sought to return to the market, but were prevented from doing

so by increased competition from foreign labor as a result of the regulations. See 754 F.3d at

---

[9] "In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." Abhe & Svoboda, Inc. v. Chao, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (citation omitted). And, "public records and government documents available from reliable sources," Detroit Int'l Bridge Co. v. Gov't of Canada, 133 F. Supp. 3d 70, 85 (D.D.C. 2015) (citing Hamilton v. Paulson, 542 F. Supp. 2d 37, 52 n.15 (D.D.C. 2008), rev'd on other grounds, 666 F.3d 1344 (D.C. Cir. 2012)), are "among the documents 'subject to judicial notice on a motion to dismiss,'" Latson v. Holder, 82 F. Supp. 3d 377, 382 (D.D.C. 2015) (citation omitted). Accordingly, the Court takes judicial notice of this governmental document.

1011–14.  In its assessment, the Circuit concluded that the plaintiffs, who "averred [that] they

[were] experienced and qualified herders" and "ha[d] not worked as herders since 2011 and may

not have applied for specific herder jobs since that time," made a clear affirmation of "their

desire to work as herders and . . . their intention to do so if wages and working conditions

improve."  Id. at 1013.  The Circuit noted that

> "[t]he plaintiffs are not removed from the herder labor market simply because they
> do not currently work as herders and have not filled out formal job applications.  A
> person can involve himself in a job market by means other than submitting formal
> applications.  Job searches are not such rigid processes.  The plaintiffs continue to
> monitor the herder job market with the intention of applying for work in the
> industry if conditions improve . . . .  And because the plaintiffs retained ties to the
> industry, it was reasonable for them to conclude that formally applying for jobs
> would be futile when they would not accept a job offering the prevailing wage and
> working conditions.

Id. at 1014 (internal citations omitted).  In sum, the Circuit concluded that the Mendoza plaintiffs

"presented more than 'general averments' and 'conclusory allegations.'"  Id.  Rather, they

"attested to specific experience that qualifies them to work as herders; the particular working

conditions that led them to leave the industry; the specific wages and conditions they would

require to accept new employment as workers; [and] the manner in which they have kept abreast

of conditions in the industry."  Id.

In light of the Circuit's reasoning in Mendoza, the Court finds for the following reasons

Washtech's allegations, albeit not in significant depth, sufficient to demonstrate that its named

members are in direct and current competition with beneficiaries of the 2016 OPT Program Rule.

In its Complaint, Washtech proffers evidence of its named members applying for STEM jobs and

evidence of those employers seeking extensions of its current OPT employees.  See Compl. ¶¶

106–219.  But, unlike the plaintiffs in Mendoza, Washtech has not provided the Court with any

affidavits from its named members that indicate their involvement in the STEM labor market.

Nonetheless, Washtech asserts that its named members "are members of a labor union, . . . are currently working in specific fields in which aliens with degrees under the 2016 OPT [Program] Rule are authorized for extended work periods, and frequently apply for jobs in those fields." Washtech's Opp'n at 22–23 (citing Compl. ¶¶ 106–209). Given the broad interpretation of what amounts to participating in the relevant market under the Circuit's decision in <u>Mendoza</u>, <u>see</u> 754 F.3d at 1013 ("We believe the district court took too narrow a view of what qualifies as participating in the herding labor market."), Washtech has clearly identified members that actively participate in the STEM labor market, and therefore, are in direct and current competition with beneficiaries of the 2016 OPT Program Rule.

Even on this record, the Government attempts to distinguish the facts in <u>Mendoza</u> from those at issue in this case. The Government argues that the <u>Mendoza</u> plaintiffs "were 'willing and available to work as herders' in the precise <u>types</u> of jobs foreign laborers had <u>already taken</u> at depressed wages." Gov't's Reply at 7 (quoting <u>Mendoza</u>, 754 F.3d at 1014). Washtech's named members, the Government continues, have more experience than entry-level STEM OPT participants and thus, would not accept the same types of jobs. <u>See id.</u> at 6 ("[I]t is impossible to conclude, even at the motion to dismiss stage, that three extremely <u>experienced</u> STEM workers are in fact <u>direct</u> and <u>current</u> competitors with recent graduates of [United States] educational program engaged in on-the-job training, either as STEM OPT participants, or as OPT participants generally." (footnote omitted)). But, even though the Circuit in <u>Mendoza</u> recognized that the plaintiffs there were "experienced and qualified" and chose not to apply for sheep herding jobs at the depressed wages and working conditions, it did not consider the plaintiffs' experience level in assessing their "<u>direct</u> and <u>current</u> competitor" status in the sheep herding labor market. 754 F.3d at 1013. The Government's argument overextends the requirements

articulated in <u>Mendoza</u>, and taking Washtech's factual allegations to be true, as the Court must at this stage in litigation, it is clear from Washtech's Complaint that its named members have applied on multiple occasions for jobs at companies either specifically seeking OPT recipients and/or filing OPT extensions on behalf of current employees.  <u>See, e.g.</u>, Compl. ¶¶ 109–10, 138–40.

In addition, the Government argues that since Washtech's named members were not seeking employment as of the date of the Complaint, their "claims of past job applications do 'nothing to establish a real and immediate threat that [Washtech's members] would again be [injured in the future.]'"  Gov't's Mem. at 18 (quoting <u>Los Angeles v. Lyons</u>, 461 U.S. 95, 105 (1983)).  Although the three named members were employed at the time, the Complaint sufficiently alleges that all three remain members of the STEM job market, noting the temporary nature of their work and the fact that their "job search is continuous," such that they are "constantly seeking new employment opportunities."  <u>See, e.g.,</u> Compl. ¶¶ 107, 184.  This is directly parallel to the circumstances in <u>Mendoza</u>, which held that the plaintiffs were still members of the sheep herding market because they "continue[d] to monitor the herder job market with the intention of applying for work in the industry if conditions improve[d]," even though they had not worked in or applied for positions in that market for several years.  754 F.3d at 1014.  The Circuit therefore considered the sheep herders' current employment status (or lack thereof) irrelevant to the standing inquiry.  <u>Id.</u>

Washtech has also pleaded facts sufficient to establish causation and redressability.  The Government argues that "[n]othing in [Washtech's] Complaint demonstrates that the 2016 [OPT Program] Rule is responsible for [Washtech's named] members' underemployment," Gov't's Mem. at 22, which "can be attributed to [a] myriad [of] potential and interlocking causes," such

as "their insufficient qualifications or skills, macroeconomic trends, increased industry demand for entry-level rather than experienced computer programmers or other factors," id. at 23. The Government also argues that Washtech's purported competitive injury is "unlikely to be redressed by a favorable decision, asserting that invalidating the 2016 [OPT Program Rule] would neither eliminate competition for computer jobs, nor guarantee improved economic conditions or job opportunities." Id.; see also Gov't's Reply at 9–10 (citing cases for its proposition that Washtech's traceability and redressability arguments "depend on a 'chain of events' of speculative, future conduct by third parties").

However, in the competitor standing context, the causation requirement is satisfied when an agency allows competitors into the plaintiff's market, and the redressability requirement is met when vacating a regulation would remove those competitors. See Honeywell Intern. Inc. v. EPA, 374 F.3d 1363, 1369 (D.C. Cir. 2004) (rejecting agency's argument that traceability was not satisfied because "doing so would require speculation about the purchasing decisions of third parties not before the court"), withdrawn in part on other grounds, 393 F.3d 1315 (D.C. Cir. 2005); see also Bristol-Myers Squibb Co. v. Shalala, 91 F.3d 1493, 1499 (D.C. Cir. 1996) (finding the traceability requirement satisfied because, under the competitor standing doctrine, the plaintiff's injury was "exposure to competition as a result of the [agency's action]"). Here, Washtech has alleged that the 2016 OPT Program Rule permits increased competition by foreign labor in the STEM labor market where its named members compete, see Washtech's. Opp'n. at 17, and that "a favorable decision from the [C]ourt would remove the [increased competition]," Compl. ¶ 104. Consequently, the Court does not find that Washtech's allegations regarding traceability and redressability are speculative, as the 2016 OPT Program Rule undoubtedly increases competition in the STEM labor market. See Bristol-Myers Squibb Co., 91 F.3d at

1499 (noting that the focus for the causation element of standing as it relates to the plaintiff's injury for competitor standing purposes was not the "lost sales, per se," rather the focus is on the increased "exposure to competition").  Accordingly, the Court finds that Washtech has satisfied all three elements required for constitutional standing as it relates to its alleged injury due to increased competition to challenge the 2016 OPT Program Rule.  See Permapost Prods., Inc. v. McHugh, 55 F. Supp. 3d 14, 21–22 (D.D.C. 2014) ("[T]he [District of Columbia] Circuit has found all three elements of standing to be met by plaintiffs where an agency . . . passed rules that led to an increased number of market participants." (citing Mendoza, 754 F.3d at 1010–12)).

## B.  Zone of Interests

Even though the Court has determined that Washtech has satisfied the constitutional requirements for standing, the Court's inquiry does not end here; the Court "must also inquire whether [Washtech] fall[s] within the class of persons whom Congress has authorized to sue under the [APA]."  Mendoza, 754 F.3d at 1016.  For this inquiry, the Court must decide "whether '[Washtech's] grievance . . . arguably fall[s] within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit.'"  Id. (quoting Bennett v. Spear, 520 U.S. 154, 162 (1997)); see also Lexmark Int'l, Inc. v. Static Control Components, Inc., __ U.S. __, __, 134 S. Ct. 1377, 1387 (2014) (holding that although "zone of interests" has traditionally been referred to as "prudential standing," that "is a misnomer," and the proper analysis asks "whether 'this particular class of persons ha[s] a right to sue under this substantive statute.'" (quoting Ass'n of Battery Recyclers, Inc. v. EPA, 716 F.3d 667, 675–76 (D.C. Cir. 2013) (J. Silberman, concurring))).  Although the parties agree that the relevant statute is the Immigration and Nationality Act (the "INA"), see Gov't's Mem. at 37; see also Washtech's Opp'n at 26, they disagree on the precise provisions of the INA that can be

considered in making the zone of interests determination.

"[I]n considering whether [Washtech is] authorized to sue under [the applicable statute, the Court] look[s] to whether [it] fall[s] within the zone of interests sought to be protected by the substantive statute pursuant to which the Department of [Homeland Security] acted." Mendoza, 754 F.3d at 1016. The zone of interests test "is not meant to be especially demanding," as courts "apply the test in keeping with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable.'" Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 132 S. Ct. 2199, 2210 (2012) (quoting Clarke v. Secs. Indus. Ass'n, 479 U.S. 388, 399 (1987)). The Supreme Court has "often conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff," Lexmark Intern., Inc., __ U.S. at __, 134 S. Ct. at 1389, and "[t]he test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit,'" Patchak, 567 U.S. 209, 132 S. Ct. at 2199. In analyzing congressional intent, the District of Columbia Circuit has looked to both the language of the specific statutory provision in question and the broader history of the statute as a whole. See Int'l Union of Bricklayers & Allied Craftsmen v. Meese, 761 F.2d 798, 804 (D.C. Cir. 1985) (finding the zone of interests test satisfied where "the wording of the statute gives a clear indication of the interests which [the challenged INA provision] was meant to protect . . . [and] [t]he background of the statute reinforces this conclusion"); Mendoza, 754 F.3d at 1017–18 (finding the zone of interests test satisfied upon review of the statutory language in question and the legislative history of the INA).

The Government alleges that Washtech "fails to satisfy the zone of interest test with

respect to section 1101(a)(15)(F)(i)" of the INA relating to the F-1 visa status provision. Gov't's Reply at 19. Specifically, the Government contends that the "protection of domestic workers was not among Congress's concern in enacting and re-enacting the F-1 status provision." Gov't Mem. at 40 (quoting Programmers Guild, Inc. v. Chertoff, 338 Fed. App'x. 239, 244 (3d Cir. 2009)). Washtech, however, contends that the protection of American workers is arguably within the zone of interests of section 1101(a)(15)(F)(i), because DHS has recognized this interest under this particular provision, see Washtech's Opp'n at 27, and because Congress, the Supreme Court, and several lower courts have recognized this interest in its assessment of the INA, see id. at 28–30.

Washtech's interest in protecting American workers is one that arguably falls within the zone of interests protected by section 1101(a)(15)(F)(i), and therefore, Washtech has prudential standing to challenge the 2016 OPT Program Rule. Broadly speaking, Washtech argues that DHS used the F-1 visa provision in promulgating the 2016 OPT Program Rule to circumvent Congressional restrictions imposed on H-1B visas. In its Complaint, Washtech asserts that the 2016 OPT Program Rule exceeds DHS's authority because it "conflicts with the statutory provisions of 8 U.S.C. §§ 1182(a)(5), 1182(n), 1184(a)(1), 1184(g), and 1127(a)(1)(C)(i)," which impose limitations on H-1B visas, see Compl. ¶ 63; see also Washtech's Opp'n at 26–27 (citing Compl. ¶ 4). Despite these allegations, the Government seeks to confine Washtech's allegations solely to violations of the F-1 visa program. See Gov't's Mem. at 37–42. But, "[i]n determining whether a petitioner falls within the 'zone of interests' to be protected by a statute, [the Court can] not 'look [only] at the specific provision said to have been violated in complete isolation[,]' but rather in combination with other provisions to which it bears an 'integral relationship.'" Nat'l Petrochemical & Refiners Ass'n v. EPA, 287 F.3d 1130, 1127 (D.C. Cir. 2002) (quoting

Fed'n for Am. Immigration Reform, Inc. v. Reno ("FAIR"), 93 F.3d 897, 903 (D.C. Cir. 1996));

see also Grocery Mfrs. Ass'n v. EPA, 693 F.3d 169, 179 (D.C. Cir. 2012).  Therefore, it is proper

for the Court to examine the zone of interests protected by the H-1B visa provision also, and

there is little doubt that Washtech's interest in protecting American workers is clearly within the

zone of interests of this visa provision and its related statutes.  See 8 U.S.C. § 1182(n) (requiring

employer certification that the H-1B nonimmigrant will be paid prevailing market wages, that the

employer will provide working conditions for the nonimmigrant employee that will not adversely

affect working conditions for the other workers, and that there is not a strike at the location of the

employment); id. § 1184(g) (setting caps on the number of H–1B visas).

    The Government contends that the H-1B visa provision and its related statutes are not

integrally related to the F-1 visa provision.  See Gov't's Reply at 21–22 (opining that "[n]one of

these provisions [cited by Washtech] are related to section 1101(a)(15)(F)(i)," but are rather

"integrally related to each other").  As support for its position, the Government argues that

Congress had ample opportunities to subject the F-1 visa provision to the same domestic labor

protections as the H-1B visa provision, but elected not to, which "suggests 'that protection of

domestic workers was not among Congress's concerns in enacting and re-enacting the F-1 status

provision, and it tends to suggest that Congress [ ] was concerned with increasing the country's

pool of available STEM workers.'"  Id. at 24 (quoting Programmers, 338 Fed. App'x. at 244).

However, Congress's election to not extend certain domestic labor protections provided to H-1B

visa holders to F-1 visa holders does not necessarily imply that the two statutory provisions are

not integrally related.  Rather, a review of the codification scheme of the F-1 and H-1B visa

provisions' and the class of individuals targeted by the two visa provisions suggests that they are

integrally related.  As another member of this Court reasoned,

> [t]he provisions are part of the same statute; indeed, they are contained within a single subsection of the statute. Even more important than the statute's codification scheme, though, is the substantive relationship between the provisions. F-1 is directed at students studying at an American academic institution, including colleges and universities. H-1B is limited to individuals who have completed their bachelor's degree. As such, F-1 and H-1B perform the interlocking task of recruiting students to pursue a course of study in the United States and retaining at least a portion of those individuals to work in the American economy.

Washtech II, 156 F. Supp. 3d at 135 (internal citations omitted). The Court agrees with its colleague's analysis, and consequently, finds that the H-1B and the F-1 visa provisions are integrally related, and thus, consideration of the zone of interests protected by the H-1B provision is appropriate. Therefore, because Washtech's interest of protecting American workers arguably falls within the zone of interests protected by the H-1B provision, it has prudential standing to challenge the 2016 OPT Program Rule.

## C. Ripeness

In addition to challenging Washtech's standing to contest the 2016 OPT Program Rule, the Government contends that this "case is not fit for review because it requires too much conjecture and speculation by the Court given [Washtech's] sparse and unconvincing allegations concerning injury that fail to allege any cognizable harm." Gov't Mem. at 33. The Government also asserts that Washtech's "challenge 'depends on future events that may never come to pass, or that may not occur in the form forecasted,'" Gov't Reply at 6 n.5, and therefore, Washtech's "challenge is not ripe for adjudication," Gov't Mem at 32. In response, Washtech argues that its "plead[ed] injuries occur at this very moment and the case is ripe for review" because

> the 2016 OPT [Program] Rule . . . has been allowing competitors into Washtech's market since, May 10, 2016. . . . Furthermore, the 2016 OPT [Program] Rule explicitly authorizes aliens working prior to that date under the 2008 OPT [Program] Rule's [seventeen]-month extension to continue to work under the 2016 OPT [Program] Rule and to extend the work period to [twenty-four] months.

Washtech's Opp'n at 22.

The ripeness doctrine, which "generally deals with when a federal court can or should decide a case," Am. Petroleum Inst. v. EPA, 683 F.3d 382, 386 (D.C. Cir. 2012), is "designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties,'" Chlorine Inst., Inc., 718 F.3d at 927 (quoting Nat'l Park Hosp. Ass'n v. U.S. Dep't of Interior, 538 U.S. 803, 807–08 (2003)).  "Part of the doctrine is subsumed into the Article III requirement of standing, which requires a petitioner to allege inter alia an injury-in-fact that is 'imminent' or 'certainly impending.'" Am. Petroleum Inst., 683 F.3d at 386 (citations omitted); see also Nat'l Treasury Emps. Union v. United States, 101 F.3d 1423, 1427 (D.C. Cir. 1996) ("Ripeness, while often spoken of as a justiciability doctrine distinct from standing, in fact shares the constitutional requirement of standing that an injury in fact be certainly impending.").  "Even if a case is 'constitutionally ripe,' though, there may also be 'prudential reasons for refusing to exercise jurisdiction.'" Am. Petroleum Inst., 683 F.3d at 386 (quoting Nat'l Park Hosp. Ass'n, 538 U.S. at 808).  Moreover, "[d]etermining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." Nat'l Park Hosp. Ass'n, 538 U.S. at 808 (citing Abbott Labs. v. Gardner, 387 U.S. 136, 148–49 (1967)).

Here, Washtech has demonstrated an "injury to its members of sufficient immediacy and ripeness to warrant judicial intervention." Seldin, 422 U.S. at 516.  Having found that Washtech's alleged injury of increased competition in the STEM labor market is not

"conjectural" or "speculative," but rather "actual and imminent," see supra Part III.A.2.v (noting

the White House Press Report that acknowledged the significant number of extensions that have

already been granted pursuant to the 2008 OPT Program Rule and DHS's estimation of

continued increased growth of foreign labor based on the extensions granted under the 2016 OPT

Program Rule), the Court focuses its present analysis on the prudential aspects of the ripeness

doctrine.[10]  From this perspective, Washtech's challenge to the 2016 OPT Program Rule will not

"benefit from a more concrete setting . . . [as] the agency's action is sufficiently final," Delta Air

Lines, Inc. v. Export-Import Bank of United States, 85 F. Supp. 3d 250, 269 (D.D.C. 2015)

(quoting Atl. States Legal Found. v. EPA, 325 F.3d 281, 284 (D.C. Cir. 2003)), as the 2016 OPT

Program Rule is a final agency action, the "effects [of which are being] felt in a concrete way by

[Washtech and its named members]," Abbott Labs., 387 U.S. at 148.

Although the Government argues that "reviewing the 2016 [OPT Program] Rule's

validity based on [Washtech's] non-existent record and speculative assertions would be

tantamount to expending 'resources on what amounts to shadow boxing,'" Gov't's Mem. at 34

(quoting Devia v. Nuclear Regulatory Comm'n, 492 F.3d 421, 425 (D.C. Cir. 2007)), the

evidence the Government seeks to have Washtech produce is not required at the motion to

dismiss stage, see id. ("The record is devoid of any allegations or evidence concerning job

applications, employers, or STEM OPT employees under the [2016 OPT Program] Rule, that,

even now, months after the rule went into effect, [Washtech's] members have had to engage in or

refrain from any conduct, including competing with beneficiaries of the STEM OPT

---

[10] The parties do not dispute the second element of the prudential ripeness doctrine, i.e., whether the parties will experience any hardship if the Court withheld consideration of Washtech's challenge to the 2016 OPT Program Rule.  See Gov't's Mem. at 32–34 (addressing only whether Washtech's challenge is judicially fit and ultimately ripe for review); see also Washtech's Opp'n at 22 (responding only to the Government's argument that its challenge was not ripe for judicial review).

extension."). Washtech's allegations in its Complaint are therefore sufficient to demonstrate that

its named members are injured in a manner that render judicial review appropriate at this time.

Accordingly, the Court concludes that Washtech's challenge to the 2016 OPT Program Rule is

both fit and ripe for judicial review.

### D. Washtech's Claims under Rule 12(b)(6)

Having concluded that Washtech has standing to pursue its challenges to the 2016 OPT

Program Rule, i.e., Counts II-IV of the Complaint, the Court now considers whether Washtech

has pleaded sufficient facts that plausibly demonstrate entitlement to the relief requested. The

Government contends that Washtech has not satisfied its pleading burden to "satisfy[ ] Rule

12(b)(6)'s plausibility standard as to [its] APA claims," and therefore, dismissal of its APA

claims is warranted. Gov't Mem. at 2. The Court will address the Government's arguments

regarding the alleged procedural APA violations first, and then turn to an analysis of the

Government's arguments with respect to the alleged substantive APA violations.

### 1. Washtech's Procedural Violations Claims

Count III of Washtech's Complaint asserts that the 2016 OPT Program Rule was

promulgated without complying with the requirement of the Congressional Review Act ("CRA")

for proper notice and comment as to "whether aliens should be allowed to work beyond one year

under the OPT program." Compl. ¶ 66. Additionally, Washtech alleges that "DHS failed to

comply with the incorporation by reference requirements of 1 C.F.R. part 51," Compl. ¶ 80,

when it incorporated into the rule "an external list"[11] published on its website, Compl. ¶ 73. The

Government argues that "the CRA explicitly bars any claim or relief premised on a

---

[11] This external list is "the STEM Designated Degree Program List, which [is] a complete list of qualifying degree program categories, published on the Student and Exchange Visitor Program Web site at http://www.ice.gov/sevis." Compl. ¶ 71.

'determination, finding, action, or omission' of any CRA requirement, and flatly bars any 'judicial review' of such issues." Gov't Mem. at 42 (citing 5 U.S.C. § 805). The Government also contends that Washtech's allegation that DHS "failed to subject the question of whether the OPT program should be expanded beyond a year to actual notice and comment as part of the 2016 [OPT Program] Rule is facially absurd [because] DHS explicitly sought notice and comment on this issue, and responded to comments on it." Id. (internal quotation marks and citations omitted). Lastly, with respect to Washtech's allegation that the 2016 OPT Program Rule does not comport with the incorporation by reference requirements, the Government argues that this claim must fail because Washtech's Complaint does not allege that "(1) the STEM list is required to be published in full in the Federal Register (which it is not), (2) Washtech lacked actual and timely notice of the STEM list (which it had), or (3) how Washtech's members have been adversely affected by DHS's inserting a weblink into its Rule." Id. at 43 (footnote and citation omitted).

Despite the extensive arguments the Government advanced in its motion to dismiss, Washtech failed to substantively address any of these arguments in its opposition and its responses to the Government's arguments are woefully inadequate to avoid dismissal pursuant to Rule 12(b)(6). See generally Washtech's Opp'n at 43–44. Thus, the Court may treat the Government's position with respect to Count III as conceded. See Hopkins, 284 F. Supp. 2d at 25 ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (citations omitted)).[12] In any event, Washtech's Count III procedural allegations fail to state a claim sufficient to demonstrate

---

[12] As previously noted, this Court's prior decision in Hopkins was affirmed by the Circuit. See Hopkins, 98 F. App'x at 8.

entitlement to relief. First, the CRA "denies courts the power to void rules on the basis of agency noncompliance with the [CRA as t]he language of [section] 805 is unequivocal and precludes review of [such] claim." Montanans for Multiple Use v. Barbouletos, 568 F.3d 225, 229 (D.C. Cir. 2009). Also, as the Court previously noted, DHS did subject the question of whether the OPT program should be expanded beyond a year to actual notice and comment. See supra Part III.A.2.a. Lastly, with respect to the alleged incorporation by reference violations, Washtech has not alleged that the list was required to be published in the Federal Register, that it did not receive actual or timely notice of the list, or that it was "adversely affected" by the inclusion of the weblink to the list in the 2016 OPT Program Rule. See § 552(a)(1); see also Am. Soc'y for Testing & Materials v. Public.Resource.org, Inc., No. 13-cv-1215 (TSC), 14-cv-0857 (TSC), 2017 WL 473822, at *1, slip op. at 3 (D.D.C. Feb. 2, 2017) (discussing the procedures for incorporation by reference requirements and their correlation with § 552(a)(1)). Accordingly, because Washtech failed to address the Government's challenges to the alleged APA procedural violations asserted in Count III of its Complaint, and because Washtech's allegations do not allow the Court to draw a reasonable inference that DHS is liable for the alleged misconduct, the Court must dismiss Count III of Washtech's Complaint.

### 2. Washtech's Substantive APA Claims

Through Count II of its Complaint, Washtech asserts that the 2016 OPT Program Rule exceeds DHS's authority. The Government argues that Washtech's "single, conclusory sentence in paragraph [sixty-three] asserting [that] the Final Rule exceeds DHS's statutory authority (Count II) without more is facially implausible given the absence of any alleged facts supporting this conclusory legal claim." Gov't Mem. at 45. Washtech failed to address the Government's arguments regarding Count II in its opposition. See generally Washtech's Opp'n. Therefore, as

previously indicated, the Court may treat the Government's position regarding Count II as conceded, see supra Part III.2.D.1, which it deems appropriate to do.

In regards to Count IV of its Complaint, Washtech contends that the 2016 OPT Program Rule was implemented arbitrarily and capriciously because it "requires employers to provide foreign-guest workers OPT mentoring without requiring that such program be provided to American workers" and "singles out STEM occupations for an increase in foreign labor through longer work periods with no justification." Compl. ¶¶ 82–83. The Government argues that Washtech's disagreement "with DHS's policy choices, without more, does not make those choices inconsistent with the discretion vested in it by law, let alone actionable under the APA." Gov't's Mem. at 44 (citation omitted). In addition, the Government asserts that Washtech has not "provide[d] some notice of why a court might find it arbitrary and capricious for DHS to require F-1 students to plan, document, and engage in training as a condition of receiving a benefit, without guaranteeing the same training to the entire [United States] worker population." Id. at 44–45; see also id. at 45 ("[Washtech's] failure to allege a single 'justification' that is somehow unreasonable renders this claim implausible on its face . . . ."). In response, Washtech argues that its Complaint includes the allegation that the "2016 OPT [Program] Rule singles out STEM occupations for an increase in foreign labor through longer worker periods with no justification," Washtech's Opp'n at 43 (citing Compl. ¶ 83), and that it "has not yet received a copy of the full administrative record necessary to determine the full extent of arbitrary and capricious action," id. at 44.

Washtech's conclusory allegations do not meet the pleading standard required under Iqbal, and therefore, it has not alleged a claim of entitlement to relief. To demonstrate that it has proffered sufficient allegations to support its proposition that the 2016 OPT Program Rule is

arbitrary and capricious, Washtech cites only one allegation it its Complaint. See id. at 43 (noting that the Complaint alleges that "[t]he 2016 OPT [Program] Rule singles out STEM occupations for an increase in foreign labor through longer worker periods with no justification"). But, this response is of no avail to Washtech because this allegation does not provide the Court with the ability to reasonably infer that the 2016 OPT Program Rule is somehow arbitrary and capricious; this allegation simply states that DHS provided no justification for implementing the 2016 OPT Rule. Thus, despite the extensive explanations provided in the 2016 OPT Program Rule, including the explanations provided in the notice of proposed rulemaking on which Washtech publicly commented, Washtech has not alleged any facts from which the Court can plausibly conclude that the 2016 OPT Program Rule is arbitrary and capricious. And, although Washtech claims that it has yet to receive the full administrative record, it has not identified, nor has the Court been able to identify, any legal authority that relaxes a plaintiff's pleading burden due to the fact that the plaintiff has not received the complete administrative record. Accordingly, because Washtech's threadbare legal conclusions are not sufficient "to permit the [C]ourt to infer more than the mere possibility of misconduct," Iqbal, 556 U.S. at 679, the Court must dismiss Washtech's APA claims.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that it must grant in part and deny in part the Government's motion to dismiss Washtech's claims. Specifically, the Court must grant the Government's motion to dismiss pursuant to Rule 12(b)(1) with respect to Count I of Washtech's Complaint for lack of standing to challenge the 1992 OPT Program Rule, but it must deny the Government's motion to dismiss pursuant to Rule 12(b)(1) in all other respects because Washtech has demonstrated that it has standing to challenge the 2016 OPT Program Rule, and

because the Court has concluded that Washtech's challenge is ripe for judicial review. However, because Washtech has not alleged facts sufficient to survive the Government's Rule 12(b)(6) motion to dismiss, the Court must grant the Government's motion due to Washtech's failure to plausibly state claims that are entitled to relief.

      **SO ORDERED** this 19th day of April, 2017.[13]

REGGIE WALTON
United States District Judge

---

[13] An Order consistent with this Memorandum Opinion is issued simultaneously with this opinion.