**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WASHINGTON ALLIANCE OF TECHNOLOGY WORKERS, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) )    Civil Action No. 16-cv-1170 (RBW) |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| NATIONAL ASSOCIATION OF MANUFACTURERS, *et al.*, | ) ) ) |
| Intervenors-Defendants. | ) ) |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
OPPOSITION AND CROSS-MOTION FOR SUMMARY JUDGMENT**

JOSEPH H. HUNT
Assistant Attorney General

WILLIAM C. PEACHEY
Director

GLENN M. GIRDHARRY
Assistant Director

JOSHUA S. PRESS
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section

*Attorneys for Defendants*

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................................1

BACKGROUND ................................................................................................................2

Statutory and Regulatory Background........................................................................2

The 2016 OPT Rule ...................................................................................................6

This Lawsuit................................................................................................................6

STANDARD OF REVIEW ...............................................................................................9

ARGUMENT......................................................................................................................10

I.      Washtech Fails to Establish Article III Standing.........................................10

II.     DHS Had Statutory Authority to Issue the 2016 OPT Rule .......................18

CONCLUSION ..................................................................................................................29

# TABLE OF AUTHORITIES

## CASE LAW

*Already, LLC v. Nike, Inc.*,
    133 S. Ct. 721 (2013).................................................................................................. 18

*Am. Bioscience, Inc. v. Thompson*,
    269 F.3d 1077 (D.C. Cir. 2001)................................................................................ 10

*Ariz. Christian Sch. Tuition Org. v. Winn*,
    563 U.S. 125 (2011).................................................................................................... 9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................................... 9

*Barnhart v. Walton*,
    535 U.S. 212 (2002)............................................................................................ 20, 24

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013).................................................................................................. 13

*Clark v. Martinez*,
    543 U.S. 371 (2005).................................................................................................... 2

*Confederated Tribes of Grand Ronde Cmty. v. Jewell*,
    830 F.3d 552 (D.C. Cir. 2016).................................................................................. 10

*Creekstone Farms Premium Beef, L.L.C. v. Dep't of Agric.*,
    539 F.3d 492 (D.C. Cir. 2008).................................................................................. 24

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981).................................................................................................. 23

*Dearth v. Lynch*,
    791 F.3d 32 (D.C. Cir. 2015).............................................................................. 10, 11

*DEK Energy Co. v. FERC*,
    248 F.3d 1192 (D.C. Cir. 2001)................................................................................ 16

*Delta Air Lines, Inc. v. Export-Import Bank*,
    85 F. Supp. 3d 250 (D.D.C. 2015)............................................................................ 11

*Ex parte Tsiang Hsi Tseng,*,
    24 F.2d 213 (N.D. Cal. 1928) ............................................................................ 26, 27

*Fleming Companies, Inc. v. Dep't of Agric.*,
    322 F. Supp. 2d 744 (E.D. Tex. 2004) ........................................................................ 20, 24

*Gottlieb v. FEC*,
    143 F.3d 618 (D.C. Cir. 1998) ............................................................................................. 14

*Hancock v. Urban Outfitters, Inc.*,
    830 F.3d 511 (D.C. Cir. 2016) ............................................................................................... 9

*Honeywell Int'l, Inc. v. EPA*,
    374 F.3d 1363 (D.C. 2004) ................................................................................................... 14

*Humane Soc'y of the U.S. v. Perdue*,
    935 F.3d 598 (D.C. Cir. 2019) ........................................................................................ 1, 15

*Humane Soc'y v. Vilsack*,
    797 F.3d 4 (D.C. Cir. 2015) ................................................................................................. 15

*Int'l Union of Bricklayers & Allied Craftsmen v. Meese*,
    761 F.2d 798 (D.C. Cir. 1985) .............................................................................. 12, 14, 18

*Jama v. ICE*,
    543 U.S. 335 (2005) ............................................................................................................. 23

*KERM, Inc. v. FCC*,
    353 F.3d 57 (D.C. Cir. 2004) ............................................................................................... 17

*La. Energy & Power Auth. v. FERC*,
    141 F.3d 364 (D.C. Cir. 1998) ............................................................................................. 11

*Lorillard v. Pons*,
    434 U.S. 575 (1978) ............................................................................................................. 23

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 (1992) ......................................................................................................... 9, 12

*Mashi v. INS*,
    585 F.2d 1309 (5th Cir. 1978) ............................................................................................. 27

*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014) .................................................................................. *passim*

*Nat'l Ass'n of Home Builders v. EPA*,
    667 F.3d 6 (D.C. Cir. 2011) ................................................................................................. 10

*New World Radio, Inc. v. FCC*,
    294 F.3d 164 (D.C. Cir. 2002) ............................................................... 11

*Northeast Hosp. Corp. v. Sebelius*,
    657 F.3d 9 (D.C. Cir. 2011) ................................................................... 29

*Programmers Guild, Inc. v. Chertoff*,
    338 F. App'x 239 (3d Cir. 2009) .............................................................. 3

*Public Citizen, Inc. v. NHTSA*,
    489 F.3d 1279 (D.C. Cir. 2007) ....................................................... 11, 13

*Scenic Am., Inc. v. DOT*,
    836 F.3d 42 (D.C. Cir. 2016) ................................................................... 9

*Sherley v. Sebelius*,
    610 F.3d 69 (D.C. Cir. 2010) ................................................................. 11

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ............................................................................ 9

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) .............................................................................. 16

*Swanson Grp. Mfg. LLC v. Jewell*,
    790 F.3d 235 (D.C. Cir. 2015) .............................................................. 16

*United States ex rel. Antonini v. Curran*,
    15 F.2d 266 (2d Cir. 1926) .................................................................... 27

*United States v. Midwest Oil Co.*,
    236 U.S. 459 (1915) .............................................................................. 23

*United States v. Richardson*,
    418 U.S. 166 (1974) .............................................................................. 18

*Van Hollen, Jr. v. FEC*,
    811 F.3d 486 (D.C. Cir. 2016) .............................................................. 10

*Wash. All. of Tech. Workers v. DHS*,
    249 F. Supp. 3d 524 (D.D.C. 2017) ........................................................ 7

*Wash. All. of Tech. Workers v. DHS*,
    650 F. App'x 13 (D.C. Cir. 2016) ............................................................ 6

*Wash. All. of Tech. Workers v. DHS*,
   892 F.3d 332 (D.C. Cir. 2018) ............................................................................. 8

*Wash. Alliance of Tech. Workers v. DHS*,
   156 F. Supp. 3d 123 (D.D.C. 2015) ............................................................ 2, 5, 24

*Whitman v. Am. Trucking Assns. Inc.*,
   531 U.S. 457 (2001) .............................................................................. 18, 26

## ADMINISTRATIVE DECSIONS

*Matter of Ibarra*,
   13 I. & N. Dec. 277 (B.I.A. 1986) ......................................................................... 19

*Matter of T*,
   7 I. & N. Dec. 682 (B.I.A. 1958) ..................................................................... 4, 19

## FEDERAL STATUTES

5 U.S.C. § 706(2) ............................................................................................... 10

8 U.S.C. § 1101(a) ............................................................................................. 26

8 U.S.C. § 1101(a)(15)(B) .................................................................................. 29

8 U.S.C. § 1101(a)(15)(F) ............................................................................. 22, 26

8 U.S.C. § 1101(a)(15)(F)(i) ......................................................................... *passim*

8 U.S.C. § 1101(a)(15)(H)(i)(b) ......................................................................... 28

8 U.S.C. § 1101(a)(15)(H)(ii) ............................................................................. 28

8 U.S.C. § 1103(a)(1) ......................................................................................... 20

8 U.S.C. § 1103(a)(3) ............................................................................. 2, 20, 26

8 U.S.C. § 1184(a) ............................................................................................. 26

8 U.S.C. § 1182(a)(9)(B)(ii) ............................................................................... 26

8 U.S.C. § 1184(i)(1)(A) .................................................................................... 28

## FEDERAL REGULATIONS

8 C.F.R. § 214.2(f)(5)(i)................................................................................... 3

8 C.F.R. § 214.2(f)(10)(ii)(C) ......................................................................... 6

8 C.F.R. § 214.2(h)(4) ................................................................................... 28

## FEDERAL REGISTER

12 Fed. Reg. 5,355 ..................................................................................... 4, 21

12 Fed. Reg. 5,355–56 ................................................................................ 4, 21

12 Fed. Reg. 5,357 ......................................................................................... 21

34 Fed. Reg. 18,085 .......................................................................................... 4

38 Fed. Reg. 35,425 ........................................................................................ 21

38 Fed. Reg. 35,425–26 ........................................................................... 3, 4, 21

42 Fed. Reg. 26,411 .......................................................................................... 4

42 Fed. Reg. 26,413 .......................................................................................... 4

48 Fed. Reg. 14,575 ................................................................................. 3, 4, 21

48 Fed. Reg. 14,575-86 .................................................................................. 21

48 Fed. Reg. 14,577 .......................................................................................... 3

48 Fed. Reg. 14,578 .......................................................................................... 4

52 Fed. Reg. 13,223 ........................................................................................ 21

52 Fed. Reg. 13,225 ........................................................................................ 21

55 Fed. Reg. 28,767 ........................................................................................ 21

55 Fed. Reg. 28,768 ........................................................................................ 21

57 Fed. Reg. 31,954 .................................................................................... 4, 21

57 Fed. Reg. 31,956 .................................................................................... 4, 21

73 Fed. Reg. 18,944 .................................................................................. 5, 21

81 Fed. Reg. 13,040 .............................................................................. 1, 6, 21

81 Fed. Reg. 13,045 ................................................................................ 21, 28

## FEDERAL RULES FOR CIVIL PROCEDURE

Fed. R. Civ. P. 56(c)(1)(A) ........................................................................... 9

## PUBLIC LAWS

Pub. L. No. 82-414.................................................................................. 4, 21

Pub. L. No. 101-649................................................................................ 5, 24

Pub. L. No. 104-208..................................................................................... 5

Pub. L. No. 105-277.................................................................................... 24

Pub. L. No. 106-313.................................................................................... 24

Pub. L. No. 107-296...................................................................................... 2

Pub. L. No. 107-173...................................................................................... 5

Pub. L. No. 108-447.................................................................................... 24

Pub. L. No. 111-5....................................................................................... 24

Pub. L. No. 111-306................................................................................. 4, 24

## LEGISLATIVE HISTORY

*Immigration Policy: An Overview: Hearing Before the Subcomm. on Immigration of the S. Comm. on the Judiciary*, 107th Cong. 15–16 (2001);................................................. 5

*Immigration Reform: Hearing Before the Subcomm. on Immigration and Refugee Affairs of the S. Comm. on the Judiciary on S. 358 and S. 448*, 101st Cong. 485–86 (1989) ......................... 6

*Immigration Reform and Control Act of 1983: Hearings Before the Subcomm. on Immigration, Refugees, and Int'l Law of the H. Comm. on the Judiciary on H.R. 1510,* 98th Cong. 687, 695, 698 (1983).................................................................................................. 6

*Illegal Aliens: Hearings Before Subcomm. No. 1 of the H. Comm. on the Judiciary,* 92d Cong. 265–66 (1971)................................................................................................ 6

S. Rep. No. 81-1515 at 803 .......................................................................................... 22

## MISCELLANEOUS

*Occupational Information Network, Computer Programmer, Job Zone 4 Definition,*
    http://www.onetonline.org/link/summary/15-1131.00 (visited Nov. 25, 2019) ...................... 19

## INTRODUCTION

This Court should grant summary judgment to the government.  Plaintiff Washington Alliance of Technology Workers (Washtech) challenges as *ultra vires* the Department of Homeland Security's 2016 regulation that provides F-1 students with post-graduation temporary work authorization through the F-1 student-visa optional practical training (OPT) program.  *See* Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students With STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students, 81 Fed. Reg. 13,040 (Mar. 11, 2016) (the "2016 OPT Rule").  Two separate grounds establish that the government is entitled to summary judgment.

To start, Washtech lacks Article III standing to challenge the 2016 OPT Rule.  "[O]n summary judgment, the plaintiffs must prove injury in fact with 'specific facts' in the record." *Humane Soc'y of the U.S. v. Perdue*, 935 F.3d 598, 602 (D.C. Cir. 2019).  Whatever could be said of Washtech's standing showing at the motion-to-dismiss stage, Washtech has failed to make a sufficient showing of competitive harm to maintain this lawsuit at the summary-judgment stage. In particular, Washtech has not marshaled evidence of "specific facts" demonstrating that its members' claims of purported injury from over a year ago (at the latest) have carried forward to the present.  *Id.*  The Court should grant summary judgment to the government on this ground alone.

Even if Washtech had standing to proceed at the summary-judgment stage, its remaining claim fails on the merits.  The 2016 OPT Rule is not *ultra vires*.  Congress delegated broad authority to the Department of Homeland Security to administer and enforce the Immigration and Nationality Act (INA), including by setting the terms and conditions for the admission of nonimmigrant students.  Exercising this delegated authority, DHS has long interpreted the

ambiguous F-1 student provisions of the INA to permit temporary employment under the F-1 practical-training program, and Congress has ratified—or at least acquiesced to—the agency's interpretation. Judge Huvelle thus previously concluded that DHS possesses statutory authority to authorize post-graduation optional practical training for F-1 students. *See Wash. Alliance of Tech. Workers v. DHS*, 156 F. Supp. 3d 123, 140–45 (D.D.C. 2015) (Huvelle, J.). This Court should likewise hold that DHS possesses this authority, grant summary judgment to the government, and deny Washtech's summary-judgment motion.

## BACKGROUND

Statutory and Regulatory Background. Since 1952, Congress has authorized DHS or its predecessor, the Immigration and Naturalization Service (INS), to establish regulations to implement and administer the Immigration and Nationality Act. *See* 8 U.S.C. § 1103(a)(3). Among the Secretary of Homeland Security's delegated duties is determining the conditions upon which designated classes of nonimmigrant aliens—foreign nationals who enter the United States for specified purposes and for temporary periods of time—may be admitted and allowed to maintain nonimmigrant status within the United States. *See id.*; *see also* § 1184(a)(1) ("The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the [Secretary] may by regulations prescribe.").[1]

DHS has established such conditions for the many types of nonimmigrant aliens, including foreign students. Relevant here, certain foreign students may come to the United States to study as nonimmigrants receiving "F-1" nonimmigrant status for a timeframe authorized by the Secretary. 8 U.S.C. § 1101(a)(15)(F)(i). F-1 nonimmigrant student status is available to a "bona

---

[1] In 2002, Congress passed the Homeland Security Act, Pub. L. No. 107-296, 116 Stat. 2135, which abolished the INS (which had been housed in the Department of Justice) and transferred many of the INS's functions to DHS. *See, e.g.*, *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study ... at an established ... academic institution." *Id.*; *see also* 8 C.F.R. § 214.2(f)(5)(i).  The F-1 program aims to attract the world's brightest students and provide them the opportunity to develop knowledge and expertise in their chosen fields.  Consistent with that purpose, practical training provides F-1 students with a "full course of study" by allowing students to have a complete educational experience where they can apply their theoretical knowledge from the classroom to real-world settings.  *See, e.g.*, Special Requirements for Admission, Extension, and Maintenance of Status, 38 Fed. Reg. 35,425–26 (Dec. 28, 1973) (allowing foreign students to participate in practical training in their field of study if that training was not available in the student's country of origin).

DHS and its predecessor have long permitted F-1 students to engage in optional practical training as part of their course of study, including after graduation.  "[A]t least since 1947, federal agencies dealing with immigration have interpreted § 1101(a)(15)(F)(i) to allow a student to engage in on-the-job training to supplement his in-the-classroom training."  *Programmers Guild, Inc. v. Chertoff*, 338 F. App'x 239, 244 (3d Cir. 2009).  Such practical training is meant to enhance F-1 students' educational experience by allowing students to develop the additional "knowledge and skills" that "occurs through meaningful practical training experiences."  48 Fed. Reg. 14,575, 14,577 (Apr. 5, 1983).  To account for post-graduation OPT, DHS and the INS have long defined a nonimmigrant student's duration of F-1 status in the United States as "the time during which an F-1 student is pursuing a full course of study at an educational institution approved by the [agency] for attendance by foreign students, or engaging in authorized practical training following completion of studies."  *Id.* at 14,583–84; *see also* 8 C.F.R. § 214.2(f)(5)(i).

3

As noted, DHS and its predecessor have authorized practical training for F-1 students for at least 70 years. In 1947, INS authorized practical training for up to 18 months, with no specific designation of when during a course of study the training could occur. 12 Fed. Reg. 5,355–56 (Aug. 7, 1947). After Congress enacted the INA in 1952, *see* Pub. L. No. 82-414, § 101(a)(15)(F), 66 Stat. 163, 168 (1952), the agency understood that statute as allowing for practical training after a student's formal studies, *see Matter of T*, 7 I. & N. Dec. 682 (B.I.A. 1958). The INS continued to interpret the INA to permit foreign students to engage in post-graduation practical training and promulgated a regulation in 1969 permitting students to request initial or continued employment for practical training in 6-month increments not to exceed a total of 18 months. *See* 34 Fed. Reg. 18,085 (Nov. 8,1969). Regulations promulgated in 1973 authorized identical periods of practical training. 38 Fed. Reg. 35,425–26 (Dec. 28, 1973). The INS promulgated additional regulations in 1977 that permitted students engaged in certain fields to participate in practical training "[a]fter completion of a course of study or courses of study" for 3-month increments for each year of a student's past academic coursework. 42 Fed. Reg. 26,411, 26,413 (May 24, 1977). Similar regulations were published in 1983 allowing for practical training "after the completion of a course of study" regardless of the student's degree program. 48 Fed. Reg. 14,575, 14,578 (Apr. 5, 1983). And regulations issued in 1992 permitted practical training directly related to a student's major area of study for a period of up to 12 months after completion of a course of study. 57 Fed. Reg. 31,954, 31,956 (July 20, 1992).

During this time, Congress frequently returned to the issue of foreign students in the United States without altering the basic contours of the F classification or regulatory program and without amending its provision for post-graduation practical training. *See* Pub. L. No. 111-306, § 1, 124 Stat. 3280, 3280 (Dec. 14, 2010); Enhanced Border Security and Visa Entry Reform Act of 2002,

Pub. L. No. 107-173, §§ 501–502, 116 Stat. 543, 560–63; Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, § 625, 110 Stat. 3009-546, 699–700; Immigration Act of 1990 § 221(a), Pub. L. No. 101-649.  Congress has also frequently recognized and discussed the practical-training component of the F-1 program.[2]

In 2008, DHS issued an interim final rule, with a request for comments, that expanded the 12-month post-graduation practical-training period for certain students.  *See Extending Period of Optional Practical Training by 17 Months for F-1 Nonimmigrant Students With STEM Degrees and Expanding Cap-Gap Relief for All F-1 Students With Pending H-1B Petitions*, 73 Fed. Reg. 18,944 (2008) (the "2008 OPT Rule").  The 2008 rule allowed certain students with qualifying Science, Technology, Engineering, and Mathematics (STEM) degrees to apply for a 17-month extension of optional practical training.  *Id.*

The 2008 OPT Rule prompted a lawsuit in this District, claiming that DHS lacked statutory authority to allow OPT and that DHS unlawfully bypassed notice-and-comment procedures.  *See Wash. Alliance of Tech. Workers v. DHS* ("*Washtech I*"), 156 F. Supp. 3d 123 (D.D.C. 2015) (Huvelle, J.).  Judge Huvelle concluded that DHS had statutory authority to issue the 2008 OPT Rule because, in the face of the ambiguous F-1 statute, the agency had adopted a reasonable and longstanding interpretation of the statute—allowing post-graduation OPT—and Congress had acquiesced to that interpretation.  *See id.* at 140–46.  Judge Huvelle invalidated the 2008 rule, however, for failure to comply with notice-and-comment procedures.  *Id.* at 147.  The court stayed

---

[2]   *See Immigration Policy: An Overview: Hearing Before the Subcomm. on Immigration of the S. Comm. on the Judiciary*, 107th Cong. 15–16 (2001); *Immigration Reform: Hearing Before the Subcomm. on Immigration and Refugee Affairs of the S. Comm. on the Judiciary on S. 358 and S. 448*, 101st Cong. 485–86 (1989); *Immigration Reform and Control Act of 1983: Hearings Before the Subcomm. on Immigration, Refugees, and Int'l Law of the H. Comm. on the Judiciary on H.R. 1510*, 98th Cong. 687, 695, 698 (1983); *Illegal Aliens: Hearings Before Subcomm. No. 1 of the H. Comm. on the Judiciary*, 92d Cong. 265–66 (1971).

vacatur to allow DHS to issue a new rule following notice and comment or take other corrective action.  *Id.* at 148–49.

The 2016 OPT Rule.  After notice and comment, in March 2016 DHS issued the final rule at issue here, *Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students With STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students*, 81 Fed. Reg. 13,040 (Mar. 11, 2016).  The 2016 OPT Rule provides:

> [A] qualified student may apply for an extension of OPT while in a valid period of post-[graduation] OPT ... .   An extension will be for 24 months for the first qualifying degree for which the student has completed all course requirements ... , including any qualifying degree ... .   If a student completes all such course requirements for another qualifying degree at a higher degree level than the first, the student may apply for a second 24-month extension of OPT while in a valid period of post-[graduation] OPT ... .   In no event may a student be authorized for more than two lifetime STEM OPT extensions.

*Id.* at 13,117–18; *see also* 8 C.F.R. § 214.2(f)(10)(ii)(C).  The 2016 OPT Rule amended the F-1 program for students with STEM degrees who are participating in 12 months of practical training to extend the practical period by 24 months.  This 24-month extension replaced the 17-month extension previously available to certain STEM students under the 2008 OPT Rule.  *See* 81 Fed. Reg. 13,040 (Mar. 11, 2016).  DHS explained that the rule aimed to secure the benefits of international students in the United States, account for the increased competition for international students globally, and improve the existing STEM OPT extension (the 2008 OPT Rule).  *Id.* at 13,047–49.  DHS devoted over 60 pages to explaining the basis and purpose of each feature of the 2016 OPT Rule and responding to the approximately 50,500 comments.  *Id.* at 13,049–109.

On May 13, 2016, the D.C. Circuit vacated the district court's decision on the 2008 OPT Rule as moot.  *Wash. All. of Tech. Workers v. DHS*, 650 F. App'x 13 (D.C. Cir. 2016).

This Lawsuit.  In June 2016, Washtech filed this suit challenging both the 1992 OPT Rule and the 2016 OPT Rule.  Washtech is a technology-workers union asserting associational standing

to challenge DHS's 2016 OPT Rule on behalf of its members. *See* Compl. ¶¶ 45, 85, 99–100. Washtech alleged that three of its members were injured by the OPT program because those members were in direct competition with F-1 students for technology-sector jobs offered by U.S. employers. *Id*. ¶¶ 106–219.

Washtech brought four claims.  Count I claimed that the 1992 OPT Rule exceeded the agency's statutory authority under the INA.  *See* Compl. ¶¶ 54–61.  Count II claims that the 2016 OPT Rule exceeds DHS's statutory authority.  *See id.* ¶¶ 62–63.  Count III claimed that the 2016 OPT Rule was unlawfully issued in violation of the Congressional Review Act, without notice and comment, and without complying with incorporation-by-reference requirements.  *See id.* ¶¶ 64–80.  Count IV claimed that the 2016 OPT Rule is arbitrary and capricious.  *See id.* ¶¶ 81–84.  As noted, to support its claim for standing, Washtech relied on allegations of three of its members, who assert that they were computer programmers who had applied for computer jobs following issuance of the 2008 OPT Rule and pointing to job advertisements from technology employers soliciting OPT students, among other applicants.  *See id.* ¶¶ 106–219.

This Court granted the government's motion to dismiss all counts of Washtech's complaint. *See Wash. All. of Tech. Workers v. DHS* ("*Washtech II*"), 249 F. Supp. 3d 524 (D.D.C. 2017).  It dismissed Count I (the challenge to the 1992 OPT Rule's statutory authority) because Washtech "fail[ed] to address the Government's argument that it lacks standing" in its opposition to the motion to dismiss, *id.* at 536, and (alternatively) because Washtech did not have standing.  *Id*. at 536–37.  The Court dismissed Count II (the challenge to the 2016 OPT Rule's statutory authority) based on Washtech's same failure "to address the Government's arguments" that Washtech insufficiently pleaded the claim in its opposition to the motion to dismiss.  *Id*. at 555.  The Court

dismissed Count III on the same ground and for failure to plead a cause of action.  *Id*. at 555.  The

Court dismissed Count IV for failure to state a claim for relief.  *Id.* at 555–56.

The D.C. Circuit largely affirmed, except that it reversed the dismissal of Count II and

remanded with instructions that this Court consider in the first instance the question "whether

Washtech's challenge to the OPT program's statutory authority was reviewable under the

reopening doctrine."  *Wash. All. of Tech. Workers v. DHS*, 892 F.3d 332, 346 (D.C. Cir. 2018).

The court of appeals held that Washtech had made the showing required, under the competitor-

standing doctrine, to establish its standing to bring Count II at the motion-to-dismiss stage, to

challenge DHS's authority to promulgate the 2016 OPT Rule.  *Id.* at 339.  The court reached this

conclusion by presuming the truth of "Washtech's [members'] ... allegations that its members

compete with F-1 student visa holders who are working in the OPT program pursuant to the DHS's

regulations."  *Id.*  As noted, Washtech supported its allegations with declarations and U.S.

employers' job postings suggesting its members were in direct competition with F-1 students.  *See

id.*; *see also* ECF No. 1.  The court of appeals added, however, that "whether Count II"—a

challenge to DHS's authority to allow OPT—"may proceed remains in question" given that, unless

DHS had reopened the question of its statutory authority, "the six-year statute of limitations on

such a challenge closed in 1998."  *Id.* at 345.  The D.C. Circuit remanded the case on that basis.

*See id.*

On remand, this Court ruled that the 2016 OPT Rule reopened the question of DHS's

statutory authority to allow for post-graduation work authorization for F-1 nonimmigrants, and

thus that Count II was not barred by the statute of limitations.  ECF No. 50.  The Court concluded

that DHS "reconsidered its authority to implement the OPT Program, which supports that it

reopened the issue" for notice-and-comment rulemaking and thus Washtech's 2016 challenge on that issue was within the six-year statute of limitations.  ECF No. 50 at 15.

Thereafter, the parties proceeded to the present summary-judgment briefing.

## STANDARD OF REVIEW

Standing at Summary Judgment.  "To state a case or controversy under Article III, a plaintiff must establish standing." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011).  To establish standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  In *Lujan v. Defenders of Wildlife*, the Supreme Court explained that "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." 504 U.S. 555, 561 (1992).  At the pleading stage, the complaint must merely "'state a plausible claim' that each element of standing is satisfied."  *Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 513 (D.C. Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)).  But on summary judgment, "the plaintiff can no longer rest on such mere allegations." *Lujan*, 504 U.S. at 561 (quotation marks omitted); *see also Scenic Am., Inc. v. DOT*, 836 F.3d 42, 49 n.3 (D.C. Cir. 2016) ("[T]he plaintiff has the burden to establish the evidentiary basis for its standing at the summary judgment stage.").  Plaintiffs must therefore support factual assertions by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), and "must set forth by affidavit or other evidence specific facts" that prove their standing, *Lujan*, 504 U.S. at 561 (quotation marks omitted).

Review Under the APA.   In APA cases involving cross-motions for summary judgment, "the district judge sits as an appellate tribunal.  The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (collecting cases).  The APA provides that a court must "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).

The *Chevron* Framework.   Under *Chevron*, "[i]f Congress has directly spoken to [an] issue, that is the end of the matter."  *Confederated Tribes of Grand Ronde Cmty. v. Jewell*, 830 F.3d 552, 558 (D.C. Cir. 2016).  But if the statutory text is silent or ambiguous, courts must "determine if the agency's interpretation is permissible, and if so, defer to it."  *Id.*  "This inquiry, often called *Chevron* Step Two, does not require the best interpretation, only a reasonable one."  *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 492 (D.C. Cir. 2016) (internal quotation marks omitted).

## ARGUMENT

## I.     Washtech Fails to Establish Article III Standing.

The Court should grant summary judgment to DHS because Washtech has failed to establish, using the proof required at the summary-judgment stage, that it has standing to maintain this lawsuit.  Washtech has failed to provide specific, particularized evidence demonstrating that its three identified members are in direct and current competition for jobs with students engaged in OPT.  *See Dearth v. Lynch*, 791 F.3d 32, 34 (D.C. Cir. 2015).

As an association seeking to establish associational standing, Washtech must demonstrate that:  "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Nat'l Ass'n*

*of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (quotation marks omitted).  Washtech's associational-standing claim hinges on its assertion that its members were competitors with F-1 students on OPT.  To establish competitor standing, Washtech must show that the challenged rule will result in its members facing an "actual or imminent increase in competition."  *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010).  To do that, Washtech "must demonstrate that [its members are] direct and current competitor[s] whose bottom line may be adversely affected by the challenged government action."  *Mendoza v. Perez*, 754 F.3d 1002, 1013 (D.C. Cir. 2014).

And where, as here, competitor standing depends "on the independent actions of third parties," the case is not a "garden variety competitor standing case[ ]" and Washtech may not just ask the Court to "acknowledge a chain of causation firmly rooted in the basic law of economics."  *See New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002).  Washtech must instead affirmatively demonstrate such causation.  *See id.*  That is necessary to show that Washtech's alleged injury is concrete and "imminent," rather than merely premised on "speculat[ion]."  *Delta Air Lines, Inc. v. Export-Import Bank*, 85 F. Supp. 3d 250, 262 (D.D.C. 2015) (citing *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998)).  At summary judgment, moreover, Washtech must do so with "specific facts"—not "mere allegations."  *Dearth*, 791 F.3d at 34.  And when a party seeks direct review of agency action, it must provide support for each element of its claim to standing in its opening brief.  *See Public Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1289 (D.C. Cir. 2007).  Given these legal principles, Washtech must show that its members are in the same competitive market as F-1 students receiving OPT and that the challenged rule harms them.

Washtech has failed to make the showing needed to establish its standing at the summary-judgment stage.  Simply put, Washtech has not provided sufficient evidence to show that its members are currently competing with F-1 students receiving OPT.  Washtech presented two types

of evidence to support standing—declarations from three of its members, and job postings seeking OPT students.  Neither of those presents the necessary nexus between the 2016 OPT Rule's effect on non-party F-1 students and Washtech's members that would enable the Court to conclude that those members at least want to work in the *same* occupational category *today*, that they are willing to work the *same* jobs otherwise going to students engaged in practical training, and that they are qualified to do so.  *See, e.g.*, *Mendoza*, 754 F.3d at 1012–13; *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 800 (D.C. Cir. 1985) ("*Bricklayers*"); *accord Lujan*, 504 U.S. 561–62.  Washtech has not presented specific facts to show that its members are currently competing with F-1 students.

Washtech ignores this requirement outright and instead merely asserts that "[t]his Court held that Washtech had standing to bring this action" at the motion-to-dismiss stage and that "[t]he D.C. Circuit ... affirmed."  Pl.'s Mot. 9.  Washtech first relies on the declarations from three of its members—Douglas Blatt, Rennie Sawade, and Cesar Smith—who could purportedly bring this suit in their own right under the competitor-standing doctrine.  *See* Pl.'s Mot. 9.  Those declarations state that Mr. Sawade is a "Software Design Engineer" since "June 4th of 2018," a position with "decent benefits," ECF No. 56-7, that Mr. Smith is currently employed as a "computer systems and networking administrator," who last applied for a job in February 2017, ECF No. 56-6, and that Mr. Blatt is a "computer programmer at Rice University" who was hired on May 26, 2017, and last applied for a job earlier that same month, ECF No. 56-5.

Because those declarations' most recent factual attestation is from June 2018, they do not establish that Washtech's members are actually competing with F-1 students receiving OPT.  They do show that Washtech's members work in software engineering, computer systems and network administration, and computer programming, and that they have held jobs or previously applied for

12

jobs in these fields.  But Washtech has not connected these positions, or the employees' past applications, to any jobs in which F-1 students on OPT are engaged.  Washtech has not provided any evidence showing:  (1) the actual job titles of the positions open to students engaged in OPT; (2) the details of companies' vacancy announcements (*e.g.*, job locations, wages, working conditions); (3) the specific education, skills, and experience required for the open positions; (4) whether the members possessed the minimum education, skills, and experience required for the positions; or (5) whether any of the companies that were advertising positions for which Washtech members applied actually filled the open positions with students engaged in OPT.  *See* ECF Nos. 56-5–7.  Nor do Washtech's members' declarations indicate that they are still actively seeking such tech-sector positions.  Instead, the declarations simply mirror the allegations Washtech made at the motion-to-dismiss stage.  *Compare* ECF Nos. 56-5–7, *with* Compl. ¶¶ 85–95.  While these assertions may have previously given Washtech the fair inference of standing at the pleading stage, they fall well short of establishing any element of standing at summary judgment.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412–13 (2013); *Public Citizen, Inc.*, 489 F.3d at 1289.

The weakness of Washtech's standing proffer is clear when compared to cases where the D.C. Circuit found that a labor organization sufficiently alleged competitor standing for its members.  In *Mendoza*, for example, the D.C. Circuit found standing at summary judgment because the challenger American free-range herders competed directly with foreign-born herders for positions and could show that the presence of foreign labor affected wages and conditions in the market for free-range herding labor.  754 F.3d at 1012–13.  The D.C. Circuit observed that "plaintiffs [had] attested to specific experience that qualifie[d] them to work as herders; the particular working conditions that led them to leave the industry; the specific wages and conditions

they would require to accept new employment as workers; the manner in which they have kept abreast of conditions in the industry; and, at least with regard to Mendoza, a specific possible avenue for obtaining reemployment as a herder." *Id.* at 1014.  Similarly, in *Bricklayers*, the court of appeals found standing because the union member bricklayers demonstrated that they competed directly with foreign bricklayers and provided evidence that they were "ready, willing and able" to perform the *precise* jobs foreign-born workers were performing, *i.e.*, bricklaying on the *same* projects the foreign workers were working on.  761 F.2d at 800; *see also Honeywell Int'l, Inc. v. EPA*, 374 F.3d 1363, 1368–70 (D.C. Cir. 2004) (standing established where regulation "legalize[d] the entry of a product into a market in which [plaintiff] competes").

Washtech's proffer comes nowhere near those showings.  Washtech's declarations do not provide the clear and definite statements regarding present participation in the relevant labor market that were provided by the plaintiffs in *Mendoza* and *Bricklayers*.  *See Mendoza*, 754 F.3d at 1014; *Bricklayers*, 761 F.2d at 800.  Those declarations do not demonstrate any causal link between the 2016 OPT Rule's effect on F-1 nonimmigrants and Washtech's members that would enable the Court to conclude that they are in the same job category, that they are willing to work the same jobs going to OPT students, or that they are qualified to do so.

Even if Washtech's members competed against students in practical training in the past, "[a] party seeking to establish standing on the basis of the competitor standing doctrine must demonstrate that it is a *direct* and *current* competitor whose bottom line may be adversely affected by the challenged government action."  *Mendoza*, 754 F.3d at 1013 (emphasis in original, citation omitted).  None of Washtech's members' declarations indicates that they are *currently* searching for any new programmer-type job.  *See* ECF Nos. 56-5–7.  On this basis alone, they fail to show that any of them are in "current" competition with students engaged in OPT.  *See Gottlieb v. FEC*,

143 F.3d 618, 621 (D.C. Cir. 1998) (party must "show that he personally competes in the same arena with the same party to whom the government has bestowed the assertedly illegal benefit ... [f]or only then does the plaintiff satisfy the rule that he was personally disadvantaged").

Without such attestations, Washtech has run headlong into the same obstacle faced by the plaintiffs in *Humane Soc'y of the U.S. v. Perdue*, 935 F.3d 598 (D.C. Cir. 2019). In that case, the plaintiffs alleged that the government improperly used funds (known as "checkoffs") from assessments paid by pork producers to the National Pork Board, who then used those funds to promote pork products. *Id.* at 600–01. The Board eventually contracted with National Pork Producers Council, a private lobbying organization, agreeing to pay the pork producers' council $3 million annually for twenty years. *Id.* Years later, a pork producer filed suit alleging that this contract impermissibly diverted checkoff funds for lobbying. *Id.*

On appeal from summary judgment for the plaintiffs, the government argued that the plaintiffs lacked standing. As here, the D.C. Circuit had previously reversed the district court's Rule 12 dismissal for lack of standing. *See Humane Soc'y v. Vilsack*, 797 F.3d 4 (D.C. Cir. 2015). But (contrary to Washtech's argument, *see* Pl.'s Mot. 9) on the appeal from summary judgment, the court of appeals ruled that the same plaintiffs lacked standing because their summary-judgment declaration did not show how pork prices were affected by any misuse of checkoff funds. 935 F.3d at 602–04. That "declaration nowhere assert[ed] a diminished return on investment, a reduced bottom line, or any similar economic injury. ... Rather, [it] declare[d] that the misuse of checkoff funds rob[bed plaintiff] of the 'direct economic benefit of the lawful and effective promotions to which [he is] entitled as a statutory beneficiary.'" *Id.* at 602–03. But the court of appeals concluded showing of concrete harm was necessary: "courts cannot 'presume the missing facts necessary to establish an element of standing.'" *Id.* at 603. The D.C. Circuit therefore

"remand[ed] with instructions to dismiss the case for lack of standing." *Id.* at 603–04 (quoting *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015)).

Washtech's members' declarations at this stage are similarly deficient because their declarations do not contain any factual nexus between themselves and the 2016 OPT Rule they are challenging.  Without such facts, Washtech's members merely assert an "interest in the proper administration of the laws," which is "canonically 'nonconcrete.'"  *Id.* at 604 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009)).  None of the declarations "explain[s] how [the members are currently] harmed by" the 2016 OPT Rule.  *Id.*  Hence, no "concrete injury" has been shown at this stage and, much like *Humane Society*, the declarations simply "highlight [their] general opposition to the" 2016 OPT Rule.  *Id.*  The Court should reject the unsubstantiated claim of injury here as well.

Washtech's other exhibits to support its standing—other job listings, contained in Appendix B to its brief (ECF No. 56-2), that have no articulated connection to its members—are equally unhelpful to meet their burden to establish standing.  Washtech suggests that these listings "contain[ ] facts that support the allegations ... related to standing in the Complaint."  Pl.'s Mot. 9. At most, however, these job listings demonstrate that employers sought to employ OPT students in a variety of job categories with a broad set of job requirements, in different disciplines, and in different geographic locations across the country.  They do not demonstrate that these employers sought to employ computer programmers or software developers like Blatt, Sawade, and Smith as a general matter from a pool of *both* eligible employees *and* OPT students, as Washtech alleged. *See, e.g.*, *DEK Energy Co. v. FERC*, 248 F.3d 1192, 1195 (D.C. Cir. 2001) (party may establish competitor standing by showing "substantial probability" of economic injury and no such standing where party establishes only "some vague probability" of increased competition and "a still lower

probability" of injury stemming from that competition); *accord KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004) (a party may have competitor standing if it is "likely to be financially injured" by challenged government action and fails to establish standing where party did not introduce evidence of financial injury but merely purported to compete against party subject to challenged administrative decision).

Nor do the job advertisements of employers seeking student employees demonstrate, let alone with the required specificity, that Washtech's members are direct and current competitors with the students these advertisements solicit. For these advertisements to be relevant to standing, Washtech's members would have had to attest to more. For example, they could have attested that they wanted any of these jobs, that these jobs are an upgrade over their current position either because of a higher wage or better job quality, that they applied for these jobs, that they did not obtain the jobs, and that STEM OPT students obtained the jobs. Washtech also never explains how any of these jobs are interchangeable with Blatt's, Sawade's, or Smith's professed professions such that they are in *direct* and *current* competition with them to comply with *Mendoza*. 754 F.3d at 1011. Nor do Blatt's, Sawade's, and Smith's affidavits demonstrate they are in fact in direct and current competition with OPT students, because they neither demonstrate that they applied to any of these headhunters, that these headhunters were filling non-entry level positions in Plaintiffs' members' desired skill and experience level, that they were willing to relocate anywhere in the United States, as these jobs required, or that any of Washtech's members were willing to and applied for the many entry-level positions advertised. *See Mendoza*, 754 F.3d at 1013.

Washtech ignores these flaws and relies on the generalized theory that its members applied for jobs in the past, regardless of whether those jobs were the same as those in any of Washtech's evidence in Appendix B, whether its members were appropriately qualified, or whether its

members were willing to relocate anywhere in the United States.  This generalized theory is akin to "taxpayer standing," universally rejected by the courts, *see, e.g.*, *United States v. Richardson*, 418 U.S. 166, 171–80 (1974), in that it would provide standing to *every* U.S worker who had applied for *any* technology job and did not get, because the only explanation for not getting the job must be that the company hired *some* F-1 nonimmigrant instead.  That cannot be a viable theory, as it would establish standing for any aggrieved U.S. worker, rather than, as precedent requires, for U.S. workers who are "direct and current" competitors of foreign nationals with F-1 visas.  *See Already, LLC v. Nike, Inc*., 133 S. Ct. 721, 731 (2013) (rejecting "boundless theory of standing," and observing that "[t]aken to its logical conclusion, [plaintiff's] theory seems to be that a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful—whether a trademark, the awarding of a contract, a landlord-tenant arrangement, or so on").  An aggrieved party demonstrate, with specific evidence, that they compete directly and currently in the relevant job category.  *See, e.g.*, *Mendoza*, 754 F.3d at 1012–13; *Bricklayers*, 761 F.2d at 800.  Washtech has failed to do that at the summary-judgment stage.

Washtech lacks associational standing and the Court should dismiss this case on this basis.

## II.     DHS Had Statutory Authority to Issue the 2016 OPT Rule.

If this Court concludes that it has jurisdiction, then it should grant summary judgment to the government because DHS did not exceed its statutory authority in issuing the 2016 OPT Rule.  The 2016 OPT Rule accords with the agency's reasonable and longstanding interpretation of its statutory authority, and Congress has ratified—or at least acquiesced in—that interpretation.  Washtech's arguments to the contrary lack merit.

1.     The first step of the *Chevron* framework is whether the statutory language "unambiguously" answers the question at issue.  *Whitman v. Am. Trucking Assns., Inc.*, 531 U.S.

457, 471 n.4 (2001).   The statute at issue here, the INA's F-1 student provision, 8 U.S.C. § 1101(a)(15)(F)(i), leaves a gap for DHS to resolve on the question of whether an F-1 nonimmigrant may engage in practical training as part of his educational program while holding F-1 status in the United States.   Under the INA, the F-1 student provision allows DHS to provide F-1 nonimmigrant status to someone who is a "bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study ... at an established ... academic institution."   8 U.S.C. § 1101(a)(15)(F)(i).   The statute is silent as to the meaning of the terms "student" and "course of study."   And nothing else in the INA resolves the question whether an F-1 student's course of study can include a period of post-graduation practical training in the student's field of study.

The statutory language naturally lends itself to the reading that a student could be permitted to work as part of his "course of study."   Employment as part of a student's education (a "course of study") is common.   *See, e.g.*, *Matter of Ibarra*, 13 I. & N. Dec. 277, 277–78 (B.I.A. 1986) (noting that foreign students were allowed to participate in practical training after graduation); *Matter of T*, 7 I. & N. Dec. 682, 684 (B.I.A. 1958) (noting that the "length of authorized practical training should be reasonably proportionate to the period of formal study in the subject which has been completed by the student [and only in] unusual circumstances [is] practical training ... authorized before the beginning of or during a period of formal study").   And it is especially so in the high-skilled technology sector where jobs like computer programmer can require "several years of work-related experience, on-the-job training, and/or vocational training."   Occupational Information   Network,   Computer   Programmer,   Job   Zone   4   Definition, http://www.onetonline.org/link/summary/15-1131.00 (visited Nov. 25, 2019).   At the least, the statute's failure to speak to this leaves an ambiguity or gap for the agency to fill: "Congressional

silence 'normally creates ambiguity.  It does not resolve it.'"  *Fleming Companies, Inc. v. Dep't of Agric.*, 322 F. Supp. 2d 744, 758 (E.D. Tex. 2004) (quoting *Barnhart v. Walton*, 535 U.S. 212, 218 (2002)).  To be sure, the statute does require that F-1 students "seek[ ] to enter the United States temporarily and solely for the purpose of pursuing such a course of study ... at" an approved "academic institution."  8 U.S.C. § 1101(a)(15)(F)(i).  But this text is best read to impose an initial requirement for admission (particularly given the textual focus on the "purpose" for which one "seek[s] to enter") rather than a continuing requirement that persists throughout the nonimmigrant's time in the United States.  So the F-1 statute does not bar the agency from permitting post-graduation OPT.

2.  Faced with the statutory gap in the F-1 provision, in the 2016 OPT Rule, DHS adopted a reasonable and longstanding interpretation that the F-1 student provision allows for employment of students after graduation and during a period of practical training.  As noted above, employment as a means of educating someone is not unusual, even for graduate students.  And DHS enjoys significant authority to enforce the INA and a narrower directive to issue rules governing nonimmigrants.  *See* 8 U.S.C. § 1103(a)(1) ("The Secretary of Homeland Security shall be charged with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens[.]"); *id.* § 1103(a)(3) ("[The Secretary] shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of [the INA]."); *id.* § 1184(a)(1) ("The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the [Secretary] may by regulations prescribe.").  Given the reasonable option of providing practical training and DHS's

broad authority over nonimmigrants, DHS promulgated the 2016 OPT Rule to fill a gap in the statute, in keeping with this delegated authority.

The Rule's subject matter falls within the INA's ambit and the Rule invokes that statute in listing its sources of authority when it adopted the rule using notice-and-comment procedures. *See* 81 Fed. Reg. 13,040, 13,045–46 & n.9 (Mar. 11, 2016). And the agency's interpretation is longstanding. Practical training for students has been around since before the INA. *See* 12 Fed. Reg. 5,355, 5,357 (Aug. 7, 1947) ("[i]n cases where employment for practical training is required or recommended by the school, the district director may permit the student to engage in such employment for a six-month period subject to extension for not over two additional six-month periods"). And after Congress passed the INA in 1952, which created the modern category of nonimmigrant students, this understanding remained in place. *See* Pub. L. No. 82-414, § 101(a)(15)(F), 66 Stat. 163, 168 (1952); 38 Fed. Reg. 35,425, 35,425–26 (Dec. 28, 1973) (allowing a foreign student to secure employment "to obtain practical training ... in his field of study," if such training "would not be available to the student in the country of his foreign residence," for a maximum of 18 months). DHS and its predecessor, the INS, have allowed post-graduation practical training for decades. In 1983, INS explicitly authorized post-completion practical training in the *Federal Register. See* 48 Fed. Reg. 14,575, 14,575–86 (Apr. 5, 1983) (allowing students to engage in practical training "[a]fter completion of the course of study"). INS also authorized other periods of post-graduation practical training in 1987 and 1990. *See* 52 Fed. Reg. 13,223, 13,225 (Apr. 22, 1987); 55 Fed. Reg. 28,767, 28,768 (July 13, 1990). And of course, the challenged regulations issued in 1992 and 2008 all permitted practical training for at least 12 months after completion of a course of study. *See* 57 Fed. Reg. 31,954, 31,956 (1992); 73 Fed. Reg. 18,944 (Apr. 8, 2008).

3.   Congress has ratified—or at a minimum acquiesced to—the longstanding agency practice of extending work authorization for F-1 nonimmigrants, including those who have already graduated from an academic institution.

In a 1950 Senate Report, the Senate Judiciary Committee discussed the INS regulation allowing the district director to permit a student to engage in practical training for six months, with the possibility of two extensions, when such training is recommended or required by the school. *See* S. Rep. No. 81-1515, at 482 & n.43 (1950) (citing 8 C.F.R. § 125.15); *see id.* at 503 (stating that in the INS's implementation of the foreign-student provisions of the immigration laws, "practical training has been authorized for 6 months after completion of the student's regular course of study"). That Report, which formed an important part of the foundation of the INA's enactment in 1952, was an extensive study of the immigration laws by the Senate Judiciary Committee pursuant to a Senate Resolution directing the Committee "to make a full and complete investigation of our entire immigration system" and to submit a report "with such recommendations for changes in the immigration and naturalization laws as [the Committee] may deem advisable." S. Res. No. 137, 80th Cong., 1st Sess. (1947), *reproduced at* S. Rep. No. 81-1515, at 803. The Senate Committee that extensively studied the immigration laws before the enactment of the INA was thus aware of the practice under the regulation of allowing practical training for six months after a student completed his course of study. Although the Committee concluded that there were problems in the administration of the foreign-student provisions in certain respects, it did not criticize the practical-training provision and it specifically did not recommend any statutory changes to the immigration laws concerning the admission of foreign students generally. *See id.* at 506–07, 509. Congress then enacted the foreign-student provision of the INA, 8 U.S.C. § 1101(a)(15)(F), with the same basic parameters as Section 4(e) of the

Immigration Act of 1924.  This shows that Congress ratified the use of practical training.  *Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").  This rule applies when Congress re-enacts a provision in the face of a "consensus [as to its interpretation] so broad and unquestioned that [the Court] must presume Congress knew of and endorsed it."  *Jama v. ICE*, 543 U.S. 335, 349 (2005).

There is additional evidence of congressional acquiescence in the agency's longstanding practice of allowing students to engage in post-graduation occupational training.  *Cf. Dames & Moore v. Regan,* 453 U.S. 654, 686 (1981) (when an Executive practice is "known to and acquiesced in by Congress" over an extended period, "Congress may be considered to have consented to the President's action" (quotation omitted)).  In a 1975 statement to Congress on foreign students, the Commissioner of the INS noted that, although there "is no express provision in the law for an F-1 student to engage in employment," such a student could engage in practical training on a full-time basis for up to eighteen months.  *Review of Immigration Problems: Hearings Before the Subcomm. on Immigration, Citizenship, and Int'l Law of the H. Comm. on the Judiciary*, 94th Cong. 21, 23 (1975) (stmt. of Hon. Leonard F. Chapman, Jr., Comm'r of INS).  In 1990, the House Judiciary Committee characterized the ability of F-1 students to seek off-campus employment as a "minimal work program providing opportunities for both U.S. employers and students to achieve their respective goals."  H.R. Rep. No. 101-723, pt. 1; *cf. also United States v. Midwest Oil Co.,* 236 U.S. 459, 473–74 (1915) ("in determining the meaning of a statute ... the long-continued practice [of the Executive], known to and acquiesced in by Congress, would raise a presumption ... of its consent or of a recognized administrative power").  And in the Immigration Act of 1990, Congress acknowledged that it was expanding upon programs authorizing

employment of F-1 students and imposed additional requirements in the form of employer attestations only for F-1 students "employed in a position *unrelated* to the aliens' field of study and off-campus" for the three years following the enactment of the statutory requirement.  Pub. L. No. 101-649, § 221(a) (emphasis added).  Recognizing that these labor protections would not apply to the F-1 practical training program, Congress chose to leave unregulated the employment of F-1 students in practical training.  *Id.*

The agency's unbroken interpretation, when combined with congressional awareness of the F-1 OPT program and the lack of congressional action to change the agency's approach, confirms that the 2016 OPT Rule reflects a reasonable interpretation of the agency's authority. *See Creekstone Farms Premium Beef, L.L.C. v. Dep't of Agric.*, 539 F.3d 492, 500 (D.C. Cir. 2008) ("[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." (alteration in original; quotations omitted)).[3]

4.  The only court to have resolved the question here—whether DHS reasonably concluded that it possesses statutory authority to permit post-graduation OPT—concluded that DHS possessed statutory authority to allow post-graduation practical training.  *Washtech I*, 156 F. Supp.

---

[3]    Over several decades, Congress has had many opportunities to clarify whether the term "student" or "course of study" included any restrictions over practical training, including when Congress amended the statute in 2010.  *See* Pub. L. No. 111-306 (Dec. 14, 2010) (amending 8 U.S.C. § 1101(a)(15)(F)(i)).   Congress has also repeatedly made changes to the H-1B visa program, *see, e.g.*, Pl.'s Mot. 16, but has made no changes to the OPT program, *see, e.g.*, Pub. L. 105-277 (Oct. 21, 1998); Pub. L. 106-313 (Oct. 17, 2000); Pub. L. 108-447 (Dec. 8, 2004); Pub. L. 111-5 (Feb. 17, 2009).  Congress's repeated election not to provide clarification on any possible restrictions of an alien "student" in his "course of study" while holding F-1 status confirms the ambiguity within the provision.  *Fleming Companies, Inc.*, 322 F. Supp. 2d at 758; *Barnhart*, 535 U.S. at 218.

3d at 143.  In that case, Judge Huvelle concluded that DHS possessed statutory authority to "permit[ ] employment for training purposes without requiring ongoing school enrollment." *Id.* The court recognized that "Congress has delegated substantial authority to DHS to issue immigration regulations" and "agree[d] that the statute's lack of a definition for the term 'student' creates [an] ambiguity" for DHS to address. *Id.* at 139.  The court further concluded that "DHS's interpretation of F-1 clearly date[d] back to 1983, and likely to 1947," meaning that "[c]ongressional obliviousness of such an old interpretation of such a frequently amended statute ... [w]as unlikely," especially where there was "ample evidence [to] indicate[ ] congressional awareness." *Id.* at 143.  Given this "longstanding acquiescence," the court concluded that allowing for post-graduation OPT was a reasonable interpretation of the INA. *Id.* at 140.

Nothing relevant has changed since Judge Huvelle's assessment of DHS's authority to allow for post-graduation practical training in the F-1 program.  This Court should reach the same conclusion.

5.  Washtech's arguments against DHS's authority do not withstand scrutiny.

First, Washtech argues that the term "student" is not ambiguous, Pl.'s Mot. 11, emphasizing the F-1 statute's allowance only for "alien[s who are] *bona fide* student[s], solely pursuing a course of study at an approved academic institution that will report termination of attendance."  Pl.'s Mot. 9 (paraphrasing 8 U.S.C. § 1101(a)(15)(F)(i)); *see also* Pl.'s Mot. 16 (similar).  It is true that the statute says that the relevant "institution or place of study shall have agreed to report to the Attorney General the termination of attendance of each nonimmigrant student, and if any such institution of learning or place of study fails to make reports promptly the approval shall be withdrawn." 8 U.S.C. § 1101(a)(15)(F)(i).  But that text reflects congressionally mandated reporting requirements for schools certified to enrollment F-1 nonimmigrant and the

consequences for schools that fail to report that important data point.  So Congress directed the agency to keep track of that important data point.  But it does not follow that Congress imposed a continuing academic-institution-attendance requirement after entry and thereby barred any practical training that occurred after a student graduated from an academic institution.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress … does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").  Indeed, the INA does not define the term "student" as it relates to a permitted course of study, which may encompass both classroom education and practical training.  *See generally* 8 U.S.C. §§ 1101(a), (a)(15)(F).  Instead, the INA leaves to the discretion of DHS the determination as to what conduct a nonimmigrant student must comply with after admission to maintain F-1 status, along with the determination on the length of the student's period of authorized stay in the United States while he or she holds F-1 status.  *See, e.g.*, 8 U.S.C. §§ 1103(a)(3), 1184(a), 1182(a)(9)(B)(ii).

To the extent that Washtech suggests that the words "bona fide" in "bona fide student" mean only a student enrolled at an academic institution, Pl.'s Mot. 9, 16, it over-reads that phrase. "Bona fide" just reflects a basic requirement of good faith—that a foreign student must be in the United States truly to engage in learning.  *See, e.g.*, *Ex parte Tsiang Hsi Tseng*, 24 F.2d 213, 214 (N.D. Cal. 1928) (holding that a foreign student did not fail to maintain his status as a "*bona fide* student" under the Immigration Act of 1924 when his U.S. college provided him with two months of leave from his in-class studies to engage in full-time volunteer work at a newspaper, and was then forced, due to illness and his college's regulations, to drop out of school before being readmitted the next year).  Case law confirms that the term *bona fide* "cannot be construed to require [foreign students] to do more than in good faith to try to continue their studies until they

either complete them to their own satisfaction or confess defeat." *Id*. Indeed, the Second Circuit found that a foreign "student can ... alternat[e] ... periods of work outside of the college with periods of academic study within the college ... not only [as] a means of self-support during the college years, but [as] a fundamental principle of education" and that "[d]espite work of this kind during the time of study … the [foreign national] is and remains a bona fide student." *United States ex rel. Antonini v. Curran*, 15 F.2d 266, 267 (2d Cir. 1926); *accord Mashi v. INS*, 585 F.2d 1309, 1317 (5th Cir. 1978) (noting that "students who have quit school and are found out of status often are permitted to resume their student status, if a bona fide desire to complete their studies is demonstrated'" (quoting Gordon & Rosenfield, *Immigration Law and Procedure*, Section 4.9, 4-87 n.17 (1977))).

Washtech relatedly argues that "the definition of student visa status uses the qualifier 'solely' to exclude all other activities, including OPT, as qualifying an alien for student visa status." Pl.'s Mot. 11. This argument ignores the point—made above—that this text is appropriately read as imposing an initial-admission requirement (as reflected by the textual focus on the "purpose" for which one "seek[s] to enter") rather than a continuing requirement that persists throughout the foreign student's time of study in the United States for the purposes of his education. This text speaks to what is required for an alien to obtain F-1 student visa classification; it does not describe what forms of study might be valid after entering the United States. The INA does not define the parameters of a foreign student's permitted courses of study, or whether hands-on training or employment—such as a paid internship—may accompany or follow the course of study as practical part of the student's education in the United States. *See* 8 U.S.C. § 1101(a)(15)(F)(i).

Second, Washtech argues that allowing post-graduation practical training "circumvent[s] the statutory alien employment scheme" because there are other programs that allow for foreign workers with more rigorous restrictions or quotas applied to them. Pl.'s Mot. 15–17. Washtech suggests in particular that the 2016 OPT Rule blurs the line between the nonimmigrant classifications for F-1 students and H-1B temporary workers. *See id.* at 16. But even though the 2016 OPT Rule may result in some overlap with certain specialty occupations that might also be included in the H-1B program, *see* 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1184(i)(1)(A), such overlap does not make the 2016 OPT Rule unreasonable. Aliens falling into the separate F-1 and H-1B nonimmigrant classifications remain tied to independent temporal and subject-matter restrictions within the respective statutory parameters. *Compare* 81 Fed. Reg. at 13,045, *with* 8 C.F.R. § 214.2(h)(4). And, as explained, it is reasonable to permit post-graduation practical training for F-1 students.

Relying on *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, Washtech relatedly argues that "the OPT regulations ... violate both the terms of the F-1 visa ... being used to admit ... foreign labor and the provisions of the H-1B visa ... that should be used to admit such labor." Pl.'s Mot. 16 (citing 616 F. Supp. 1387, 1388–89 (N.D. Cal. 1985)). But that case does not support that argument. In *Bricklayers*, foreign workers relied on former INS Operations Instructions and entered the United States in B-1 "business visitor" status instead of the former "H-2" temporary worker status to perform manual labor, including the installation of components of a gold-ore processing system and certain brick-laying construction. 616 F. Supp. at 1392. The former H-2 provision permitted alien workers to enter the United States "to perform temporary services or labor" if unemployed U.S. workers capable of performing the services or labor could not be found. *Id.* at 1391 (citing 8 U.S.C. § 1101(a)(15)(H)(ii) (1985)). The B-1 visitor provision, however,

prohibited the admission of an alien as a visitor if he was "coming for the purpose of ... performing skilled or unskilled labor." *Id*. at 1390 (citing 8 U.S.C. § 1101(a)(15)(B)).  So the statutes by their terms barred any overlap of the two visa categories.  The F-1 and H-1B provisions do not present that issue.  The F-1 provision is silent on the parameters of a foreign student's permitted course of study, or whether hands-on training or employment may accompany or follow the academic-institution portion of a course of study as a practical part of the student's education in the United States.  *See* 8 U.S.C. § 1101(a)(15)(F)(i).  Nothing in the F-1 statute prohibits a foreign student from accepting employment in connection with his or her course of study while in the United States.  Accordingly, the agency's reasonable interpretation of the INA's F-1 provisions providing for the temporary limited employment of foreign students in occupations critical to the United States economy can validly overlap somewhat with the subject areas identified in the H-1B statute. *See Northeast Hosp. Corp.*, 657 F.3d at 9.  And consequently, the rules providing for employment authorization for F-1 students do not conflict with worker protections in place under the H-1B statute.  Washtech's assertion to the contrary ignores Congress' decades-long acquiescence to the agency's permitting foreign students to engage in post-graduation practical training.

## CONCLUSION

The Court should deny Plaintiffs' summary-judgment motion and grant summary judgment for the government.

Respectfully submitted this 25th day of November, 2019:

JOSEPH H. HUNT
Assistant Attorney General

WILLIAM C. PEACHEY
Director

GLENN GIRDHARRY
Assistant Director

By: _/s/ Joshua S. Press_
    JOSHUA S. PRESS
    Trial Attorney
    United States Department of Justice
    Civil Division
    Office of Immigration Litigation
    District Court Section
    P.O. Box 868, Ben Franklin Station
    Washington, DC 20044
    Tel: (202) 305-0106
    Fax: (202) 305-7000
    e-Mail: joshua.press@usdoj.gov

    *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on November 25, 2019, I electronically filed the foregoing with the Clerk of

Court by using the CM/ECF system, which will deliver a copy to all counsel of record.

By: */s/ Joshua S. Press*
JOSHUA S. PRESS
Trial Attorney
United States Department of Justice
Civil Division