**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Washington Alliance of Technology
Workers,

     *Plaintiff,*

  v.

United States Department of Homeland
Security, et al.,

     *Defendants,*

  v.

National Association of Manufacturers,
et al.,

     *Intervenors-Defendants.*

Civil Action No. 1:16-cv-01170 (RBW)

Hon. Reggie B. Walton

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
INTERVENORS' COMBINED MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

Peter C. Tolsdorf (D.C. Bar. No. 503476)
Manufacturers' Center for Legal Action
733 10th Street NW, Suite 700
Washington, DC 20001
(202) 637-3000

*Counsel for the National Association of
Manufacturers*

Steven P. Lehotsky (D.C. Bar. No. 992725)
U.S. Chamber Legal Center
1615 H Street NW
Washington, DC 20062
(202) 463-5337

*Counsel for the Chamber of Commerce of
the United States of America*

Paul W. Hughes (D.C. Bar. No. 997235)
  phughes@mwe.com
Michael B. Kimberly (D.C. Bar. No. 991549)
Andrew A. Lyons-Berg (D.C. Bar. No. 230182)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, D.C. 20001
(202) 756-8000 (office)
(202) 756-8087 (facsimile)

*Counsel for All Intervenors*

Jason Oxman (D.C. Bar. No. 460740)
Information Technology Industry Council
700 K Street NW, Suite 600
Washington, DC 20001
(202) 737-8888

*Counsel for the Information Technology
Industry Council*

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

Table of Authorities ......................................................................................................... ii

Glossary ........................................................................................................................... ix

Introduction ...................................................................................................................... 1

Background ....................................................................................................................... 2

    A.   Statutory background ....................................................................................... 2

    B.   The OPT program ............................................................................................ 2

    C.   Plaintiff's legal challenges ............................................................................. 5

        1.   Washtech I .......................................................................................... 5

        2.   The current lawsuit ............................................................................. 7

Argument .......................................................................................................................... 8

I.    The OPT program is a valid exercise of executive authority ................................. 8

    A.   Congress has accepted practical training as lawful agency action for more
        than 70 years. ................................................................................................... 9

    B.   OPT is a lawful exercise of the Executive's authority to grant noncitizens
        employment authorization. ............................................................................. 17

    C.   OPT is consistent with the F-1 statute. ........................................................ 25

        1.   OPT is consistent with the statute's plain text. ................................. 26

        2.   In any event, OPT is within the scope of DHS's lawful discretion. ................. 33

    D.   OPT does not unlawfully "circumvent" the H-1B program. ........................ 34

II.   OPT promotes American competitiveness and economic growth. ........................ 36

Conclusion ...................................................................................................................... 39

# TABLE OF AUTHORITIES

**Cases**

*Matter of Alberga*,
10 I. & N. Dec. 764 (B.I.A. 1964) .......................................................................12

*\*Altman v. SEC*,
666 F.3d 1322 (D.C. Cir. 2011) ...............................................................10, 32, 33

*Am. Fed'n of Gov't Emps. v. Donovan*,
683 F.2d 511 (D.C. Cir. 1982) ...........................................................................25

*Ariz. DREAM Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) ...........................................................................23

*Barnhart v. Walton*,
535 U.S. 212 (2002)...........................................................................................13

*Bolden v. Blue Cross & Blue Shield Assoc.*,
848 F.2d 201 (D.C. Cir. 1988) ...........................................................................15

*Castro v. Att'y Gen. of U.S.*,
671 F.3d 356 (3d Cir. 2012)................................................................................25

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984)........................................................................................6, 33

*City of Arlington v. FCC*,
569 U.S. 290 (2013)......................................................................................34, 35

*\*Commodity Futures Trading Comm'n v. Schor*,
478 U.S. 883 (1986)................................................................................... passim

*Creekstone Farms Premium Beef, L.L.C. v. USDA*,
539 F.3d 492 (D.C. Cir. 2008) .....................................................................10, 32

*Diaz v. INS*,
648 F. Supp. 638 (E.D. Cal. 1986)......................................................................18

*Ferrans v. Holder*,
612 F.3d 528 (6th Cir. 2010) .............................................................................25

*Fox Television Stations, Inc. v. FilmOn X LLC*,
150 F. Supp. 3d 1 (D.D.C. 2015) .......................................................................15

*Grace v. District of Columbia*,
187 F. Supp. 3d 124 (D.D.C. 2016) ......................................................................8

*Gundy v. United States*,
139 S. Ct. 2116 (2019)........................................................................................25

*Matter of Gutierrez*,
15 I. & N. Dec. 727 (B.I.A. 1976) .......................................................................12

*Hoffman Plastic Compounds, Inc. v. NLRB*,
535 U.S. 137 (2002)...........................................................................................20

*Husan Wei v. Robinson*,
246 F.2d 739 (7th Cir. 1957) .............................................................................17

*International Longeshoremen's Union v. Meese*,
891 F.2d 1374 (9th Cir. 1989) ......................................................................35, 36

**Cases—continued**

*International Union of Bricklayers v. Meese*,
  616 F. Supp. 1387 (N.D. Cal. 1985) ...................................................35

*Koi Nation of N. Cal. v. U.S. Dep't of Interior*,
  361 F. Supp. 3d 14 (D.D.C. 2019) ......................................................8

*Matter of Lieu*,
  15 I. & N. Dec. 786 (Acting Dist. Dir., INS 1976) ..............................18

*Lorrilard v. Pons*,
  434 U.S. 575 (1978) ...........................................................................11

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
  456 U.S. 353 (1982) ...........................................................................11

*Narenji v. Civiletti*,
  617 F.2d 745 (D.C. Cir. 1979) ...........................................................32

*Nat. Res. Def. Council v. Browner*,
  57 F.3d 1122 (D.C. Cir. 1995) ...........................................................33

*Programmers Guild, Inc. v. Chertoff*,
  338 F. App'x 239 (3d Cir. 2009) ..........................................................9

*Pub. Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*,
  332 F.3d 654 (D.C. Cir. 2003) .....................................................13, 15

*Red Lion Broad. Co. v. FCC*,
  395 U.S. 367 (1969) ...........................................................................21

*Regents of Univ. of Cal. v. DHS*,
  908 F.3d 476 (9th Cir. 2018) ...............................................19, 24, 35

*Richmond v. Holder*,
  714 F.3d 725 (2d Cir. 2013) ..............................................................24

*Rivera v. United Masonry*,
  948 F.2d 774 (D.C. Cir. 1991) ...........................................................24

*Matter of S-*,
  8 I. & N. Dec. 574 (B.I.A. 1960) ........................................................18

*Sokoli v. Attorney Gen. of U.S.*,
  499 F. App'x 214 (3d Cir. 2012) ........................................................32

*Sorenson Commc'ns, LLC v. FCC*,
  897 F.3d 214 (D.C. Cir. 2018) .....................................................33, 34

*Matter of T-*,
  7 I. & N. Dec. 682 (B.I.A. 1958) ........................................................18

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) .............................................................24

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012) .........................................................25

*United States v. Mead Corp.*
  533 U.S. 218 (2001) ...........................................................................33

**Cases—continued**

*United States v. Munsingwear, Inc.*,
    340 U.S. 36 (1950) .................................................................................7

*Matter of Wang*,
    11 I. & N. Dec. 282 (B.I.A. 1965) .......................................................12

*Wash. All. of Tech. Workers v. DHS*,
    395 F. Supp. 3d 1 (D.D.C. 2019) ..........................................................7

*Wash. All. of Tech. Workers v. DHS*,
    156 F. Supp. 3d 123 (D.D.C. 2015) ............................................. *passim*

*Wash. All. of Tech. Workers v. DHS*,
    249 F. Supp. 3d 524 (D.D.C. 2017) .......................................................7

*Wash. All. of Tech. Workers v. DHS*,
    650 F. App'x 13 (D.C. Cir. 2016) ..........................................................7

*Wash. All. of Tech. Workers v. DHS*,
    74 F. Supp. 3d 247 (D.D.C. 2014) ........................................................6

*Wash. All. of Tech. Workers v. DHS*,
    892 F.3d 332 (D.C. Cir. 2018) .................................................2, 7, 35

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) .............................................................................25

*Yadidi v. I.N.S.*,
    2 F.3d 1159 (9th Cir. 1993) .................................................................32

*Matter of Yang*,
    15 I. & N. Dec. 147 (B.I.A. 1974) .......................................................12

*Matter of Yau*,
    13 I. & N. Dec. 75 (B.I.A. 1968) .........................................................12

**Statutes**

5 U.S.C.
    § 553(b)(B) ............................................................................................7
    § 706(2)(A) ...........................................................................................25
6 U.S.C.
    § 557 ................................................................................................2, 20
    § 202 ................................................................................................2, 20

**Statutes—continued**

8 U.S.C.

§ 1101(a)(15)(B) ...................................................................................35
§ 1101(a)(15)(F)(i) ...............................................................2, 9, 24, 25, 26
§ 1101(a)(15)(H)(i)(b) ...........................................................................34
§ 1103 .................................................................................... *passim*
§ 1103(a) ...........................................................................................19
§ 1103(a)(3) ...................................................................................17, 33
§ 1158(a) ............................................................................................18
§ 1184(a)(1) ............................................................................. *passim*
§ 1324a(1)(A)......................................................................................20
§ 1324a(a)(1)..........................................................................................2
§ 1324a(h)(3) ........................................................................... *passim*
§ 1621(a) ............................................................................................31

26 U.S.C.

§ 3306(b)(19) .....................................................................................23
§ 3121(b)(19) .....................................................................................23

28 U.S.C. § 1746.........................................................................................31

42 U.S.C. § 410(a)(19) ...............................................................................23

Pub. L. No. 68-139, 43 Stat. 153 (1924).......................................................10

Pub. L. No. 82-414, 66 Stat. 163 (1952)..................................................10, 14

Pub. L. No. 87-256, 75 Stat. 527 (1961).......................................................13

Pub. L. No. 100-525, 102 Stat. 2609 (1988)..................................................23

Pub. L. No. 101-649, 104 Stat. 4978 (1990)......................................13, 16, 23

Pub. L. No. 102-232, 105 Stat. 1733 (1991)..................................................23

Pub. L. No. 103-416, 108 Stat. 4305 (1994)..................................................23

Pub. L. No. 104-208, 110 Stat. 3009 (1996)............................................13, 23

Pub. L. No. 107-173, 116 Stat. 543 (2002)...................................................13

Pub. L. No. 108-390, 118 Stat. 2242 (2004)..................................................23

Pub. L. No. 111-306, 124 Stat. 3280 (2010)..................................................13

**Rules and Regulations**

8 C.F.R.

§ 109.1(b) ............................................................................................................19, 21

§ 214.2(c) .................................................................................................................18

§ 214.2(f)(5)(i) ...........................................................................................................5

§ 214.2(f)(5)(iii) ........................................................................................................27

§ 214.2(f)(5)(iv) .......................................................................................................27

§ 214.2(f)(10) .............................................................................................................4

§ 214.2(f)(10)(ii)(A) ...............................................................................................4, 30

§ 214.2(f)(10)(ii)(A)(3) ..............................................................................................4

§ 214.2(f)(10)(ii)(C) ...................................................................................................5

§ 214.2(f)(10)(ii)(C)(2) ..............................................................................................5

§ 214.2(f)(10)(ii)(C)(7) ..............................................................................................5

§ 214.2(f)(10)(ii)(C)(7)(i) .........................................................................................30

§ 214.2(f)(10)(ii)(C)(7)(ii) ........................................................................................30

§ 214.2(f)(10)(ii)(C)(7)(iii) .......................................................................................30

§ 214.2(f)(10)(ii)(C)(9)(i) .........................................................................................30

§ 214.2(f)(10)(ii)(C)(9)(ii) ........................................................................................30

§ 214.2(f)(10)(ii)(C)(10) .............................................................................................5

§ 214.2(f)(10)(ii)(D) ...............................................................................................5, 31

§ 214.2(f)(10)(ii)(E) ...................................................................................................8

§ 274a.12 ...............................................................................................................19, 22

§ 274a.12(c)(3) ...........................................................................................................4

§ 274a.12(c)(14) ........................................................................................................24

12 Fed. Reg. 5,355 (Aug. 7, 1947).................................................................3, 10, 18

18 Fed. Reg. 3,526  (June 19, 1953) ..................................................................3, 11

38 Fed. Reg. 35,425 (Dec. 28, 1973) ............................................................3, 11, 18

43 Fed. Reg. 33,229 (July 31, 1978) ........................................................................18

44 Fed. Reg. 43,480 (July 25, 1979).................................................................18, 19

46 Fed. Reg. 25,079 (May 5, 1981) ..........................................................................19

48 Fed. Reg. 14,575 (Apr. 5, 1983) ...................................................3, 11, 16, 18

51 Fed. Reg. 39,385 (Oct. 28, 1986)...................................................................18, 21

52 Fed. Reg. 8,762 (Mar. 19, 1987)...........................................................................18

52 Fed. Reg. 16,216 (May 1, 1987) ..........................................................................22

52 Fed. Reg. 46,092 (Dec. 4, 1987) .........................................................................22

53 Fed. Reg. 46,850 (Nov. 21, 1988).........................................................................22

55 Fed. Reg. 25,928 (June 25, 1990).........................................................................22

56 Fed. Reg. 55,608 (Oct. 29, 1991) .........................................................................22

57 Fed. Reg. 31,954 (July 20, 1992)....................................................................3, 11, 22

60 Fed. Reg. 44,260 (Aug. 25, 1995).........................................................................22

60 Fed. Reg. 66,062 (Dec. 21, 1995) ........................................................................22

63 Fed. Reg. 27,823 (May 21, 1998) .........................................................................22

## Rules and Regulations—continued

64 Fed. Reg. 25,756 (May 12, 1999) ...........................................................................22

67 Fed. Reg. 4,784  (Jan. 31, 2002) ...........................................................................22

67 Fed. Reg. 76,256 (Dec. 11, 2002)....................................................................11, 22

69 Fed. Reg. 45,555 (July 30, 2004) ..........................................................................22

73 Fed. Reg. 18,944 (April 8, 2008).............................................................4, 5, 12, 22

74 Fed. Reg. 26,514 (June 3, 2009) ............................................................................22

74 Fed. Reg. 46,938 (Sept. 14, 2009) .........................................................................22

75 Fed. Reg. 47,699 (Aug. 9, 2010)............................................................................22

75 Fed. Reg. 79,264 (Dec. 20, 2010) ..........................................................................22

79 Fed. Reg. 26,886 (May 12, 2014) ..........................................................................22

80 Fed. Reg. 10,284 (Feb. 25, 2015) ..........................................................................22

80 Fed. Reg. 63,376 (Oct. 19, 2015)...........................................................................22

81 Fed. Reg. 13,040 (Mar. 11, 2016) ................................................................... *passim*

## Other Authorities

*American Heritage Dictionary of the English Language* (4th ed. 2000).......................32

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) ...........................................20

Business Roundtable, *The Economic Impact of Curbing the Optional Practical
    Training Program* (Dec. 2018) .............................................................................38

1 Charles Gordon et al., Immigration Law & Procedure § 7.03[2][c] (2019) ..............23

James Bryan Conant, *General Education in a Free Society: Report of the Harvard
    Committee* (1955)..................................................................................................29

Jeremy L. Neufeld, *Optional Practical Training (OPT) and International Students
    After Graduation* (Mar. 2019)..............................................................................37

H.R. Rep. 97-264 .........................................................................................................16

*Illegal Aliens: Hearings Before Subcomm. No. 1 of the Comm. on the Judiciary,
    Pt. 1,* 92d Cong. (1971)........................................................................................14

*Immigration Reform: Hearing Before the Subcomm. on Immigration and Refugee
    Affairs of the S. Comm. on the Judiciary on S. 358 and S. 448,* 101st Cong.
    (1989)....................................................................................................................14

*Immigration Policy: An Overview: Hearing Before the Subcomm. on Immigration
    of the S. Comm. on the Judiciary,* 107th Cong. (2001)..........................................14

**Other Authorities—continued**

INS Operating Instructions
    214.1 (Jan. 26, 1966)............................................................................18
    214.2(a) (June 15, 1963) ....................................................................18
    214.2(e) (Feb. 28, 1968) .....................................................................18
    214.2(e) (Nov. 10, 1971).....................................................................18
    214.2(f) (Jan. 15, 1962).......................................................................18
    214.2(j)(1) (Nov. 15, 1963)..................................................................18
    214.2(j)(5) (April 14, 1965).................................................................18
    214.2(j)(5) (Jan. 17, 1973) ..................................................................18
    214.2(j)(5) (July 5, 1978).....................................................................18

48 Interpreter Releases (1971) ................................................................18

55 Interpreter Releases (1978) ................................................................19

Nick Wingfield, *The Disappearing American Grad Student*, N.Y. Times (Nov. 3, 2017) ...........37

*Random House Webster's Unabridged Dictionary* (2d ed. 2001)................................32

*Review of Immigration Problems: Hearings Before the Subcomm. on Immigration, Citizenship, and Int'l Law of the H. Comm. on the Judiciary,* 94th Cong. (1975) .......................................................................12, 14

S. Rep. No. 81-1515 (1950) ...........................................................3, 10, 15

S. Rep. No. 96-859 (1980) ......................................................................15

*Sizing Up the Gap in our Supply of STEM Workers: Data & Analysis*, New American Economy Research Fund (Mar. 29, 2017) ..........................................37

2B *Sutherland Statutes & Statutory Construction* § 49:9 (7th ed. 2018) .........................10, 23, 32

U.S. Dep't of Labor, *$100M in grants to transform apprenticeship for the 21st century by expanding training into new high-skilled, high-growth industries* (Nov. 12, 2014) ....................................................................30

U.S. Dep't of Labor & INS, *Report to Congress: An Evaluation of the Pilot Program of Off-Campus Work Authorization for Foreign Students* (1994) ..........................16

U.S. Immigration & Customs Enforcement, *2017 Total Number of Students with Curricular Prac-tical Training (CPT); Optional Practical Training (OPT); or Science, Technology, Engineering and Mathematics (STEM) OPT Authorization* .................36

U.S. S.J. Opp., *Washtech I*, No. 14-cv-529 (Apr. 6, 2015)..........................................27

*Webster's New International Dictionary of the English Language* (2d ed. 1947) .......................32

*Webster's New Twentieth Century Dictionary* (1967)...............................................32

*Webster's Third New International Dictionary* (1961) ...............................................32

## GLOSSARY

DHS ................ Department of Homeland Security

INA ................ Immigration and Nationality Act

INS ................. Immigration and Naturalization Service

IRCA .............. Immigration Reform and Control Act

OPT ................ Optional Practical Training

STEM ............. Science, Technology, Engineering, and Mathematics

## INTRODUCTION

Optional practical training (OPT) is a program that authorizes certain international students, who have entered the United States on F-1 student visas, to complete their education with term-limited employment opportunities directly related to their fields of study. Practical training programs like OPT have existed at least since 1947, and those regulations have survived through every upheaval in the immigration laws in the intervening decades. Today, hundreds of thousands of foreign students are participating in optional practical training, and it forms a cornerstone of the international student experience in America. For more than 70 years, OPT has rested on sound legal footing.

Plaintiff's challenge here is not novel. In earlier litigation, Plaintiff raised the same objections to regulations materially identical to the ones at issue here, and those objections were thoroughly rejected by Judge Huvelle. *See Wash. All. of Tech. Workers v. DHS*, 156 F. Supp. 3d 123 (D.D.C. 2015) (*Washtech I*). While that opinion was later vacated on mootness grounds, its reasoning remains sound. The OPT regulations represent a lawful exercise of executive branch authority.

Not only does OPT accord with governing law, but it is wise policy. The United States features many of the world's leading colleges and universities, which serve as a magnet to the best and brightest from around the globe. It is to America's significant economic and security advantage to provide an opportunity for these recent graduates to complete their education with American businesses. Absent this program, this huge pool of talent—more than a hundred thousand students each year—will take their ingenuity to foreign nations. The consequences would be severe. As a whole, these graduates *create* net jobs, providing significant benefits to all workers in the U.S. economy. And, absent OPT, businesses would have significant incentive to site critical research and development activities overseas. Not only would that adversely impact the American economy, but it would be detrimental to the nation's security interests, as U.S. law appropriately safeguards critical new technologies—so long as they are developed domestically.

# BACKGROUND

## A.      Statutory background

"The Immigration and Nationality Act ('INA') creates several classes of nonimmigrants who are permitted to enter the United States for a limited time and for a specific purpose." *Washtech I*, 156 F. Supp. 3d at 128. The optional practical training ("OPT") program at issue in this case is available to students in F-1 status, which may be obtained by

> an alien having a residence in a foreign country which he has no intention of aban-doning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pur-suing such a course of study . . . at an established . . . academic institution[.]

8 U.S.C. § 1101(a)(15)(F)(i).

The INA further provides that "[t]he admission to the United States of any alien as a nonim-migrant shall be for such time and under such conditions as the [Secretary of Homeland Security] may by regulations prescribe." 8 U.S.C. § 1184(a)(1).[1]

Finally, federal law identifies which noncitizens in the United States are authorized to work. It is unlawful for an employer to hire an "unauthorized alien." 8 U.S.C. § 1324a(a)(1). And the statute defines an "unauthorized alien" as one who is neither "lawfully admitted for permanent residence" nor "authorized to be so employed by this chapter or by the [Secretary of Homeland Security]." *Id*. § 1324a(h)(3).

## B.      The OPT program

Though the details have varied over the years, executive-branch programs permitting in-ternational students to accept education-related employment in the United States have existed for the better part of the last century. Indeed, "[f]or almost 70 years, DHS and its predecessor, the Immigration and Naturalization Service ('INS'), have interpreted the immigration laws to allow

---

[1]    The statute refers to the Attorney General, rather than the Secretary of Homeland Security; with the transfer of immigration authority to the Department of Homeland Security in 2003, that statutory reference is now "deemed to refer to the Secretary." 6 U.S.C. §§ 557, 202; *see Wash. All. of Tech. Workers v. DHS*, 892 F.3d 332, 337 n.1 (D.C. Cir. 2018) (*Washtech II*).

students to engage in employment for practical training purposes." *Washtech I*, 156 F. Supp. 3d at 129; *see infra* pp. 9-17.

That history dates back at least to 1947, before the enactment of the INA and the current statute authorizing the F-1 student visa. At that time, INS promulgated a regulation permitting "employment for practical training" if recommended by a foreign student's school. 12 Fed. Reg. 5,355, 5,357 (Aug. 7, 1947). In practice, this regulation allowed post-completion practical training, just like the OPT program. *See* S. Rep. No. 81-1515, at 503 (1950) ("[S]ince the issuance of the revised regulations in August 1947 . . . practical training has been authorized for 6 months *after completion of the student's regular course of study*.") (emphasis added). After the INA was enacted in 1952, requiring a new set of immigration regulations, the government issued a new practical training rule with nearly identical language. *See* 18 Fed. Reg. 3,526, 3,529 (June 19, 1953).

Additional regulations followed, all based on the conclusion that the immigration agency may authorize practical training opportunities for international students. *See, e.g.*, *Special Requirements for Admission, Extension, and Maintenance of Status*, 38 Fed. Reg. 35,425, 35,426 (Dec. 28, 1973) ("If a student requests permission to accept or continue employment in order to obtain practical training, an authorized school official must certify that the employment is recommended for that purpose and will provide the student with practical training in his field of study[.]"); *Nonimmigrant Classes; Change of Nonimmigrant Classification; Revisions in Regulations Pertaining to Nonimmigrant Students and the Schools Approved for Their Attendance*, 48 Fed. Reg. 14,575, 14,586 (Apr. 5, 1983) (allowing "[t]emporary employment for practical training" both "[a]fter completion of the course of study" and "[b]efore completion of the course of study during the student's annual vacation").

The current manifestation of this longstanding principle, optional practical training, was established by regulation in 1992, during the George H.W. Bush administration. *See Pre-Completion Interval Training; F-1 Student Work Authorization*, 57 Fed. Reg. 31,954 (July 20, 1992) (1992 Rule). Optional practical training "is a form of temporary employment available to F-1 students . . . that directly relates to a student's major area of study in the United States." STEM000056 (81

Fed. Reg. at 13,040). In 2008, during the George W. Bush administration, the Department of Homeland Security (DHS) promulgated a regulation that provided for an OPT extension of up to 17 months for students holding a STEM degree—that is, a degree in science, technology, engineering, or mathematics. *See* STEM000001-13 (*Extending Period of Optional Practical Training by 17 Months for F-1 Nonimmigrant Students With STEM Degrees and Expanding Cap-Gap Relief for All F-1 Students With Pending H-1B Petitions*, 73 Fed. Reg. 18,944 (April 8, 2008) (2008 Rule)). Subsequently, during the Obama administration, DHS expanded the STEM OPT extension to a maximum period of 24 months. *See* STEM000055-138 (*Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students With STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students*, 81 Fed. Reg. 13,040 (Mar. 11, 2016) (2016 Rule)).

The OPT program is premised on the widespread understanding that "practical training is an accepted and important part of international post-secondary education," and "such work-based learning is a continuation of the student's program of study." STEM000066-67 (81 Fed. Reg. at 13,050-13,051)). In the 2016 Rule, DHS explained:

> [T]he OPT program enriches and augments a student's educational experience by providing the ability for students to apply in professional settings the theoretical principles they learned in academic settings. By promoting the ability of students to experience first-hand the connection between theory in a course of study and practical application, including by applying abstract concepts in attempts to solve real-world problems, the OPT program enhances their educational experiences.

STEM000067 (81 Fed. Reg. at 13,051).

Current DHS regulations provide that an F-1 student "may apply to USCIS for authorization for temporary employment for optional practical training directly related to the student's major area of study." 8 C.F.R. § 214.2(f)(10)(ii)(A); *see also id.* § 274a.12(c)(3) (providing that "[i]f authorized" for OPT, an F-1 student "may accept employment subject to any restrictions stated in the regulations"). Any student may be authorized for up to 12 months of OPT, either while the student is enrolled in school or "after completion of the course of study." 8 C.F.R. § 214.2(f)(10), (f)(10)(ii)(A)(3).

Additionally, as a result of the 2016 Rule, students with degrees in "a field determined by the Secretary . . . to qualify within a science, technology, engineering, or mathematics field" may be granted a 24-month extension to post-completion OPT. 8 C.F.R. § 214.2(f)(10)(ii)(C), (C)(2). This STEM OPT extension is subject to additional procedural requirements, including that "each STEM OPT student [must] prepare and execute with their prospective employer a formal training plan that identifies learning objectives and a plan for achieving those objectives," and that the employer must "attest that (1) it has sufficient resources and trained personnel available to provide appropriate training in connection with the specified opportunity; (2) the student on a STEM OPT extension will not replace a full- or part-time, temporary or permanent U.S. worker; and (3) the opportunity helps the student attain his or her training objectives." STEM000057 (81 Fed. Reg. 13,041), *see* 8 C.F.R. § 214.2(f)(10)(ii)(C)(7), (10).

In addition to authorizing employment for training purposes, the regulations contain a corresponding extension of the duration of status—that is, the period during which a nonimmigrant may lawfully remain in the United States—for F-1 students pursuing post-completion OPT. "For a student with approved post-completion OPT, the duration of status is defined as the period beginning on the date that the student's application for OPT was properly filed . . . , including the authorized period of post-completion OPT, and ending 60 days after the OPT employment authorization expires." 8 C.F.R. § 214.2(f)(10)(ii)(D); *see also id.* § 214.2(f)(5)(i).

### C.     Plaintiff's legal challenges

#### 1.     *Washtech I*

As noted, in April 2008, DHS issued an interim rule implementing a prior version of the STEM OPT extension. This 2008 Rule allowed F-1 students with degrees in STEM fields to extend their post-completion OPT by 17 months. *See* STEM000001-13 (73 Fed. Reg. 18,944-18,956).

Nearly six years later, Plaintiff sued DHS, bringing substantive and procedural challenges to the validity of both the 12-month OPT program and the 17-month STEM extension. *See Washtech I*, 156 F. Supp. 3d at 130. The district court dismissed the challenges to the 12-month OPT program on standing and statute-of-limitations grounds, but allowed the challenges to the 17-

month STEM extension to proceed to summary judgment. *See Wash. All. of Tech. Workers v. DHS*, 74 F. Supp. 3d 247 (D.D.C. 2014).

On summary judgment, Plaintiff asserted that "DHS exceeded its statutory authority by issuing the 2008 Rule," since (in its view) "F-1 nonimmigrants engaging in post-completion OPT cannot be considered students because '[t]hey are not attending schools.'" *See Washtech I*, 156 F. Supp. 3d at 137, 139.[2] Judge Huvelle rejected that argument.

Judge Huvelle first held that, under the *Chevron* framework, the statutory definition of F-1 student visa eligibility is ambiguous as to "whether the scope of F-1 encompasses post-completion practical training related to the student's field of study." *Washtech I*, 156 F. Supp. 3d at 140; *see Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The lack of a statutory definition of "student," along with statutory context, Supreme Court precedent, and congressional acquiescence created an ambiguity for *Chevron* purposes. *Washtech I*, 156 F. Supp. 3d at 139-140 & n.6.

Moreover, DHS's interpretation of the INA as allowing OPT was reasonable "[i]n light of Congress' broad delegation of authority to DHS to regulate the duration of a nonimmigrant's stay and Congress' acquiescence in DHS's longstanding reading of F-1." *Washtech I*, 156 F. Supp. 3d at 145. In particular, Judge Huvelle held, "INS and DHS have interpreted the immigration laws to allow foreign students to engage in employment for practical training purposes" "[s]ince at least 1947," and "[b]y leaving the agency's interpretation of F-1 undisturbed for almost 70 years, . . . Congress has strongly signaled that it finds DHS's interpretation to be reasonable." *Id.* at 141-143. The court therefore upheld the 2008 Rule against Plaintiff's substantive *ultra vires* challenge—the same challenge Plaintiff renews here. *Washtech I*, 156 F. Supp. 3d at 145.

The court, however, ruled for Plaintiff on one of its procedural arguments. Unlike the 2016 Rule at issue here, the 2008 Rule was promulgated without notice and comment, and the court

---

[2]   These are the same arguments that Plaintiff now advances. *See* Pl. S.J. Mem. (Dkt. 56), at 9-10.

found that the Rule did not qualify for the good-cause exception to notice-and-comment rulemak-ing. *Washtech I*, 156 F. Supp. 3d at 145-147; *see* 5 U.S.C. § 553(b)(B). The court therefore vacated the 2008 Rule, but stayed the vacatur so that DHS could avoid the "serious[] disrupti[on]" that immediate invalidation would entail. *Id.* at 147-149. DHS then promulgated the 2016 Rule chal-lenged here, this time with full observance of notice and comment. *See* STEM000055-138 (81 Fed. Reg. 13,040-13,122).

After this regulatory change, the D.C. Circuit vacated *Washtech I* as "moot because the 2008 Rule is no longer in effect." *Wash. All. of Tech. Workers v. DHS*, 650 F. App'x 13, 14 (D.C. Cir. 2016) (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39-40 (1950)).

### 2.   *The current lawsuit*

DHS's 2016 Rule largely reinstated the provisions of the 2008 Rule through notice and comment, and Plaintiff filed this lawsuit, bringing the same substantive and procedural challenges to both the 2016 Rule and the 1992 rule that first established the OPT program. *See generally* Compl. (Dkt. 1). This Court initially dismissed the complaint on standing grounds and for failure to state a claim (*Wash. All. of Tech. Workers v. DHS*, 249 F. Supp. 3d 524 (D.D.C. 2017)), but the D.C. Circuit reversed in part. The court of appeals held that the challenge to the 1992 rule (Count I) was time-barred, and that Counts III and IV failed to state claims under procedural and arbitrary-and-capricious theories. *Wash. All. of Tech. Workers v. DHS*, 892 F.3d 332, 342, 346-348 (D.C. Cir. 2018) (*Washtech II*). However, the D.C. Circuit reversed this Court's dismissal on concession grounds of Plaintiff's statutory-authority claim (Count II), and remanded for this Court to consider whether the 2016 Rule "reopened the issue of whether the OPT program as a whole is statutorily authorized" so as to allow Count II to proceed despite the statute of limitations. *Id.* at 343-346.

On remand, this Court concluded that the 2016 Rule did "reopen[] the issue of the DHS's statutory authority to implement the OPT Program," and that therefore "Washtech's challenge to that authority is timely." *Wash. All. of Tech. Workers v. DHS*, 395 F. Supp. 3d 1, 15 (D.D.C. 2019). In the same order, the Court granted Intervenors' motion to intervene as of right. *Id.* at 15-21.

The sole remaining claim in this lawsuit is Count II, which asserts that the "DHS policy of allowing aliens to remain in the United States after completion of the course of study to work or be unemployed is in excess of DHS authority." Compl. ¶ 63.[3]

## ARGUMENT

## I. THE OPT PROGRAM IS A VALID EXERCISE OF EXECUTIVE AUTHORITY.

As Judge Huvelle already concluded when faced with materially identical facts and arguments, OPT is a lawful exercise of DHS authority.[4] The federal government has interpreted the immigration laws to permit programs like OPT for over 70 years, and, while repeatedly amending the immigration laws, Congress has never questioned the authority of the Executive Branch to implement this program. Indeed, OPT is an exercise of express powers that Congress has provided the Executive. At worst, the INA is ambiguous with respect to the question "whether the scope of F-1 encompasses post-completion practical training related to the student's field of study," and "DHS's longstanding reading of F-1 . . . is not unreasonable." *Washtech I*, 156 F. Supp. 3d at 140, 145.

Practical training programs like OPT have been a core part of America's immigration laws for more than 70 years. They even predate the enactment of the INA in 1952. Plaintiff's central contention—that the immigration authorities have, for more than seven decades, been acting in *ultra vires* fashion with respect to millions of international students—is flawed.

---

[3]  The OPT regulations provide that "[d]uring post-completion OPT, F-1 status is dependent upon employment." 8 C.F.R. § 214.2(f)(10)(ii)(E). To that end, "[s]tudents may not accrue an aggregate of more than 90 days of unemployment" during the standard 12-month OPT period, nor "an aggregate of more than 150 days of unemployment during a total OPT period, including" the 24-month STEM OPT extension. *Id.*

[4]  Although the *Washtech I* opinion was vacated by virtue of mootness, that does not undermine the validity of its reasoning. *See, e.g.*, *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 130 n.2 (D.D.C. 2016) (explaining that a vacated opinion "no longer has precedential value, but it nevertheless retains its persuasive authority") (citation omitted); *Koi Nation of N. Cal. v. U.S. Dep't of Interior*, 361 F. Supp. 3d 14, 52 n.17 (D.D.C. 2019) (similar).

OPT rests on two well-established powers that Congress has provided the Executive. *First*, Congress has provided the Executive discretionary authority to determine which categories of non-immigrant noncitizens within the United States are authorized to work. For decades, the federal immigration agencies have exercised this discretion, granting employment authorization via regulation to a diverse cross-section of individuals. Relevant here, DHS lawfully determined that certain international students in the United States in F-1 status may receive employment authorization.

*Second*, Congress has established that the immigration agencies may adopt regulations concerning what nonimmigrants may (and may not) do to remain within proper visa status. DHS thus has authority to determine the range of pursuits that are sufficiently related to a student's education, and thus appropriate for an F-1 student. To be sure, this authority—like any agency authority—cannot be exercised in an arbitrary and capricious manner. But Plaintiff does not argue that DHS's discretionary determination that term-limited practical training falls within the scope of an F-1 visa is arbitrary and capricious. Nor could Plaintiff make that showing.

Finally, while Plaintiff makes much of the existence of the H-1B program, nothing about that separate statutory scheme restricts the authority Congress has bestowed on DHS. Plaintiff's arguments focus on a supposed government *motivation*, but the proper interpretation of the INA does not turn on the agency's underlying intent. The question is whether the agency acted within the scope of its statutorily authorized discretion. It did so here.

### A.    Congress has accepted practical training as lawful agency action for more than 70 years.

OPT has a long pedigree. Plaintiff's fundamental contention—that the immigration agencies have been acting *ultra vires* for more than 70 years—is incorrect.

1.  As Judge Huvelle documented in great detail, "[s]ince at least 1947, INS and DHS have interpreted the immigration laws to allow foreign students to engage in employment for practical training purposes." *Washtech I*, 156 F. Supp. 3d at 141; *see also Programmers Guild, Inc. v. Chertoff*, 338 F. App'x 239, 244 (3d Cir. 2009) ("[A]t least since 1947, federal agencies dealing with immigration have interpreted § 1101(a)(15)(F)(i) to allow a student to engage in on-the-job

training to supplement his in-the-classroom training."). That history alone is enough to establish OPT's legality, for "when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'" *E.g.* *Altman v. SEC*, 666 F.3d 1322, 1326 (D.C. Cir. 2011) (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 883, 846 (1986)); *see also Creekstone Farms Premium Beef, L.L.C. v. USDA*, 539 F.3d 492, 500 (D.C. Cir. 2008) (same); 2B *Sutherland Statutes & Statutory Construction* § 49:9 (7th ed. 2018) ("[L]egislative action by amendment or appropriation of some parts of a law which has received a contemporaneous and practical construction may indicate approval of interpretations relating to the unchanged and unaffected parts.").

Indeed, that long history of administrative interpretation extends back even before the 1952 enactment of the INA. In 1947, the INS promulgated a regulation providing that "[i]n cases where employment for practical training is required or recommended by the school, the district director may permit the student to engage in such employment for a six-month period subject to extension for not over two additional six-month periods." 12 Fed. Reg. 5,355, 5,357 (Aug. 7, 1947).

The 1952 INA "radically changed the country's immigration system" (*Washtech I*, 156 F. Supp. 3d at 143), yet reenacted the operative language of the existing student-visa definition largely without change. *Compare* Immigration Act of 1924, Pub. L. No. 68-139, § 4(e), 43 Stat. 153, 155, *with* Immigration and Nationality Act, Pub. L. No. 82-414, § 101(a)(15)(F), 66 Stat. 163, 168 (1952). Congress was undoubtedly aware that the INS had interpreted the prior language to allow post-completion practical training; the Senate Judiciary Committee's comprehensive report on the pre-existing immigration system had made note of that interpretation just two years before. *See* S. Rep. No. 81-1515, at 503 ("[S]ince the issuance of the revised regulations in August 1947 . . . practical training has been authorized for 6 months after completion of the student's regular course of study."); *see also id.* at 1 (explaining that the report represented "a full and complete investigation of our entire immigration system.").

Even without the ample subsequent history of acquiescence detailed below, therefore, the passage of the INA compels affirming DHS's understanding of its authority, as "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 n.66 (1982) (quoting *Lorrilard v. Pons*, 434 U.S. 575, 580-581 (1978)).

What is more, immediately after the INA's passage, the INS reaffirmed its position that the government was empowered to authorize student employment for practical training purposes. *See* 18 Fed. Reg. 3,526, 3,529 (June 19, 1953) ("Whenever employment for practical training is required or recommended by the institution or place of study attended by the applicant, the district director or officer in charge . . . may permit such employment of the alien for a six-month period subject to extension for not over two additional six-month periods[.]").

Following the 1952 INA, the immigration agencies have time and again reiterated their authority to authorize post-completion practical training. *See, e.g.*, *Special Requirements for Admission, Extension, and Maintenance of Status*, 38 Fed. Reg. 35,425, 35,426 (Dec. 28, 1973) ("If a student requests permission to accept or continue employment in order to obtain practical training, an authorized school official must certify that the employment is recommended for that purpose and will provide the student with practical training in his field of study[.]"); *Nonimmigrant Classes; Change of Nonimmigrant Classification; Revisions in Regulations Pertaining to Nonimmigrant Students and the Schools Approved for Their Attendance*, 48 Fed. Reg. 14,575, 14,586 (Apr. 5, 1983) (allowing "[t]emporary employment for practical training" both "[a]fter completion of the course of study" and "[b]efore completion of the course of study during the student's annual vacation"); *Pre-Completion Interval Training; F-1 Student Work Authorization*, 57 Fed. Reg. 31,954, 31,956 (July 20, 1992) (establishing OPT program and providing for "temporary employment for practical training directly related to the student's major area of study," including "after completion of the course of study."); *Retention and Reporting of Information for F, J, and M Nonimmigrants; Student and Exchange Visitor Information System (SEVIS)*, 67 Fed. Reg. 76,256,

76,274 (Dec. 11, 2002) (same); STEM000011 (73 Fed. Reg. at 18,954) (2008 Rule); STEM000133 (81 Fed. Reg. at 13,117) (2016 Rule).

Beyond affirmative statements from the immigration agencies, many contemporaneous Board of Immigration Appeals decisions describe students being granted permission to engage in post-completion practical training, even prior to the 1983 regulations that made post-completion authorization explicit. *See, e.g.*, *Matter of Alberga*, 10 I. & N. Dec. 764, 765 (B.I.A. 1964) ("Upon completion of her last course," noncitizen student "applied for permission to engage in practical training" and "was granted permission to engage in two periods of such training."); *Matter of Wang*, 11 I. & N. Dec. 282, 283 (B.I.A. 1965) (noncitizen student "obtained a Master of Library Science Degree . . . which was followed by 18 months of practical training in Library Science[.]"); *Matter of Yau*, 13 I. & N. Dec. 75, 75 (B.I.A. 1968) (noncitizen student's "third and final period of practical training following graduation will expire August 8, 1968[.]"); *Matter of Yang*, 15 I. & N. Dec. 147, 148 (B.I.A. 1974) ("Upon completion of his course of study in electronics in January of 1971 [noncitizen student] was granted permission to engage in employment as practical train-ing[.]"); *Matter of Gutierrez*, 15 I. & N. Dec. 727, 727-728 (B.I.A. 1976) ("Subsequent to his graduation in 1972, [noncitizen student] was allowed eighteen additional months practical training on his nonimmigrant student visa.").

Similarly, in 1975, the INS Commissioner testified that student "[e]mployment for practical training may be engaged in full time" for up to eighteen months. *Review of Immigration Problems: Hearings Before the Subcomm. on Immigration, Citizenship, and Int'l Law of the H. Comm. on the Judiciary*, 94th Cong. 23 (1975) (testimony of INS Commissioner). Altogether, "several pieces of evidence strongly suggest" that the regulations dating back to 1947 in fact "allowed alien students to engage in full-time, post-completion employment without simultaneously attending classes." *Washtech I*, 156 F. Supp. 3d at 141 n.7.

2. In the face of these clear and repeated statements of administrative interpretation, "Congress has never repudiated INS or DHS's interpretation permitting foreign students to engage in post-completion practical training," even as it "amended the provisions governing nonimmigrant

students on several occasions." *Washtech I*, 156 F. Supp. 3d at 142-143 (citing Pub. L. No. 87-256, § 109(a), 75 Stat. 527, 534 (1961) (allowing an F-1 nonimmigrant's noncitizen spouse and minor children to accompany him); Immigration Act of 1990 § 221(a) (permitting F-1 nonimmigrants to engage in limited employment unrelated to their field of study); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 625, 110 Stat. 3009-546, 3009-699 (adding limitations related to F-1 nonimmigrants at public schools); Enhanced Border Security and Visa Entry Reform Act of 2002, Pub. L. No. 107-173, §§ 501-502, 116 Stat. 543, 560-63 (implementing monitoring requirements for foreign students); Pub. L. No. 111-306, § 1, 124 Stat. 3280, 3280 (2010) (amending F-1 with respect to language training programs)).[5] In other words, "Congress has repeatedly and substantially amended the relevant statutes without disturbing [the Executive's] interpretation." *Id.* at 143.

3.   Nor is there any lack of "evidence of (or reason to assume) congressional familiarity with the administrative interpretation at issue" throughout the intervening years. *Cf. Pub. Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*, 332 F.3d 654, 669 (D.C. Cir. 2003) (declining to rely on congressional acquiescence in the absence of such evidence). To begin, the age of the interpretation alone undercuts any suggestion that Congress was unaware of it. As Judge Huvelle put it, "[c]ongressional obliviousness of such an old interpretation of such a frequently amended statute strikes this Court as unlikely." *Washtech I*, 156 F. Supp. 3d at 143.[6]

---

[5]   *See also Washtech I*, 156 F. Supp. 3d at 142-143 (citing additional instances in which Congress enacted labor protections for domestic workers, but did nothing to prohibit OPT or other practical training programs).

[6]   The "longstanding duration" and consistent nature of the administrative construction at issue also counsel in favor of adopting that interpretation for reasons quite separate from the congressional acquiescence canon. *See Barnhart v. Walton*, 535 U.S. 212, 220 (2002) ("[T]his Court will normally accord particular deference to an agency interpretation of longstanding duration.") (quotation marks omitted); *see also Washtech I*, 156 F. Supp. 3d at 141, 142.

Moreover—and wholly apart from this commonsense judgment—Congress surely has known of DHS's interpretation for decades even apart from the enactment of the INA itself, because congressional hearing testimony has explicitly and repeatedly referenced that interpretation. As the Commissioner of the INS told a congressional subcommittee in 1975:

> There is no express provision in the law for an F-1 student to engage in employment. Nevertheless, for many years, the Service has permitted students to accept employment under special conditions which we believe to be consistent with the intent of the statute.

*Review of Immigration Problems: Hearings Before the Subcomm. on Immigration, Citizenship, and Int'l Law of the H. Comm. on the Judiciary*, 94th Cong. 21 (1975) (statement of Leonard F. Chapman, Jr., Comm'r, INS); *see also id.* (such conditions include "where the employment is recommended by the school in order for the student to obtain practical training in a field related to his course of study.").

Other examples abound. *See Immigration Policy: An Overview: Hearing Before the Subcomm. on Immigration of the S. Comm. on the Judiciary*, 107th Cong. 15-16 (2001) (statement of Warren R. Leiden, American Immigration Lawyers Association) ("Foreign students in F-1 status are eligible for two primary types of 'practical training' work authorization" including "optional practical training . . . which can be undertaken during studies or for one year after graduation"); *Immigration Reform: Hearing Before the Subcomm. on Immigration and Refugee Affairs of the S. Comm. on the Judiciary on S. 358 and S. 448*, 101st Cong. 485-486 (1989) (statement of Frank D. Kittredge, President, National Foreign Trade Council) ("Under current INS regulations, foreign students under § 101(a)(15)(F) of the Act are appropriately given the opportunity to engage in a brief period of practical training upon completion of their university education and in furtherance of their educational goals."); *Illegal Aliens: Hearings Before Subcomm. No. 1 of the Comm. on the Judiciary, Pt. 1*, 92d Cong. 265-266 (1971) (memorandum from Sam Bernsen, Assistant Commissioner, INS) (noting that "F-1 students . . . may, under certain circumstances be permitted to work," including "for practical training," and that "[t]he alien continues to retain his F-1 classification

during the time he is authorized to engage in practical training."). And again, a congressional committee *itself* noted the INS's interpretation of the statute as permitting post-completion practical training as early as 1950. S. Rep. No. 81-1515, at 503.

With all this evidence in mind, there can be no doubt that the immigration agencies' interpretation of the INA as allowing post-completion practical training was "fully brought to the attention" of Congress, whose decision not to override that interpretation thus indicates that "the legislative intent has been correctly discerned." *Fox Television Stations, Inc. v. FilmOn X LLC*, 150 F. Supp. 3d 1, 27 (D.D.C. 2015) (quoting *Bolden v. Blue Cross & Blue Shield Assoc.*, 848 F.2d 201, 208-209 (D.C. Cir. 1988)); *see Washtech I*, 156 F. Supp. 3d at 144 ("The Court finds this evidence more than sufficient to demonstrate 'congressional familiarity with the administrative interpretation at issue.'") (quoting *Pub. Citizen*, 332 F.3d at 669). By repeatedly amending the immigration laws without changing the Executive's longstanding and well known interpretation of its own authority, Congress has demonstrated that that administrative interpretation is correct. *See, e.g.*, *Schor*, 478 U.S. at 846. OPT is fully consistent with the INA.

4. Plaintiff raises two historical points in an attempt to combat this history of unbroken administrative interpretation and thorough congressional acquiescence. Neither argument withstands scrutiny.

First, Plaintiff points out that Congress in 1981 "limit[ed] [F-1 status] to study at [an] academic institution," and notes that "the purpose of this change was to 'specifically limit [F-1 status] to academic students.'" Pl. S.J. Mem. 10-11 (quoting S. Rep. No. 96-859, at 7 (1980)); *see also id.* at 3, 9. Plaintiff would infer from this amendment that Congress meant to foreclose OPT, because its participants (Plaintiff says) are not "academic students" after graduation. *Id.* at 11. But the very next sentence of the quoted Senate report makes clear that Congress did not mean to draw a line between "academic students" and graduates; rather, the 1981 amendments distinguished academic students from "*nonacademic or vocational* students," for whom Congress "create[d] a new nonimmigrant category, subparagraph (M)." S. Rep. No. 96-859, at 7 (emphasis added). In other words, the 1981 law simply split F-1—which had previously encompassed both academic and vocational

students—into two separate categories, one academic and one vocational. *See also* H.R. Rep. 97-264, at 18 ("Section 2(a) . . . limit[s] the 'F' nonimmigrant student visa to students in academic institutions and language training programs, and . . . create[s] a new 'M' nonimmigrant visa classification for students in nonacademic and vocational schools. The separation of students into two classifications will enable INS more closely to scrutinize length of stay and employment abuses by nonacademic students."). The 1981 amendments had nothing to do with the status of students after graduation.[7]

Second, Plaintiff mentions a 1990 pilot program that authorized employment for F-1 students, noting that "Congress allowed this work program to expire after the [INS] and the Department of Labor determined that it was inconsistent with the intent of the student visa." Pl. S.J. Mem. 3. Importantly, though—and in contrast to OPT—this trial program authorized employment "*unrelated* to the alien's field of study." Immigration Act of 1990, Pub. L. 101-649, § 221(a) (emphasis added), 104 Stat. 4978, 5027. That ability for *any* foreign student to obtain employment in *any* field is what caused the INS to deem the pilot program "inconsistent with the statutory intent of the F-1 nonimmigrant classification." U.S. Dep't of Labor & INS, *Report to Congress: An Evaluation of the Pilot Program of Off-Campus Work Authorization for Foreign Students* 7 (1994), Pl. App. C-19. Indeed, the very same report notes, as a reason for recommending that the trial program be discontinued, that "[p]rograms *already exist* that allow foreign students to work in the United States when it is compatible with their education . . . . When employment advances their education, foreign students may work for up to one year in practical training programs that are administered by" the INS. *Id.* (emphasis added); *see also id.* at 10, Pl. App. C-22 (noting the existence of "post-completion" OPT as a "Work Option[] for Foreign Students with F-1 Visas"). Only "[e]mployment programs that *further extend* off-campus work opportunities"—that is, beyond the existing

---

[7]    Indeed, the INS regulations implementing this statutory change authorized post-completion practical training for the new category of M-1 vocational students in addition to F-1 academic students. *See Nonimmigrant Classes; Change of Nonimmigrant Classification; Revisions in Regulations Pertaining to Nonimmigrant Students and the Schools Approved for Their Attendance*, 48 Fed. Reg. 14,575, 14,577, 14589 (Apr. 5, 1983).

OPT regulations—were thought to "detract from the F-1's educational goal." *Id.* at 7, Pl. App. C-19 (emphasis added).[8]

In short, nothing Plaintiff offers detracts from the conclusion that "[b]y leaving the agency's interpretation of F-1 undisturbed for almost 70 years, notwithstanding [multiple] significant overhauls, Congress has strongly signaled that it finds DHS's interpretation to be reasonable." *Washtech I*, 156 F. Supp. 3d at 143. Indeed, as we next describe, OPT reflects a permissible exercise of two powers the Executive has long held in the field of immigration.

### B.    OPT is a lawful exercise of the Executive's authority to grant noncitizens employment authorization.

The OPT regulations rest, in part, on the Executive's broad discretion to grant employment authorization to classes of noncitizens. Plaintiff's contention to the contrary—which asserts not just that OPT is illegal, but that DHS may not permit *any* noncitizens to work beyond those authorized by statute (*see* Pl. S.J. Mem. 12-15)—is incorrect.

1.    Section 1103 of Title 8, enacted as part of the 1952 INA, provides the Secretary of Homeland Security with broad, discretionary authority to "establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority under the provisions of [the INA]." 8 U.S.C. § 1103(a)(3). More specifically with regard to F-1 nonimmigrant students, Section 1184(a)(1) provides in addition that "[t]he admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe." *Id*. § 1184(a)(1).

From the start, courts have understood that Section 1103 provided the immigration agencies authority to permit noncitizens to work. *See, e.g.*, *Husan Wei v. Robinson*, 246 F.2d 739, 743

---

[8]    If anything, the 1990 pilot program is simply further evidence that Congress knew about the existence of post-completion OPT and acquiesced in its continuance. *See Washtech I*, 156 F. Supp. 3d at 143 ("Considered in isolation, this provision is perplexing—why would Congress only authorize foreign students to do work *unrelated* to their schooling? The answer, of course, is that INS's regulations already authorized student employment related to the student's field of study, and these regulations were explicit in permitting post-completion employment."); *see also* STEM000075 (81 Fed. Reg. at 13,059) (similar).

(7th Cir. 1957) (noting regulations prohibiting nonimmigrants from working "unless such employment . . . has first been authorized by the district director or the officer in charge"); *Diaz v. INS*, 648 F. Supp. 638, 646 (E.D. Cal. 1986) ("The Refugee Act does not address the question of whether political asylum applicants may work in the United States while their applications are in process," but "pursuant to 8 U.S.C. § 1158(a) and 8 U.S.C. § 1103, the Attorney General, through the Commissioner of the INS, has published two regulations permitting the district director of the INS to grant work authorization to those aliens awaiting the determination of their political asylum applications.").

The relevant federal agencies have long shared this understanding. For example, in 1960, the Board of Immigration Appeals noted, in a published opinion, that "the Immigration Service has issued printed material putting nonimmigrant aliens on notice that they may not engage in employment without permission of the Immigration Service." *Matter of S-*, 8 I. & N. Dec. 574, 575 (B.I.A. 1960). And, in dozens of separate actions, the Executive issued regulations or other regulatory statements exercising its authority to issue work authorization.[9]

---

[9]    *See*, *e.g.*, 12 Fed. Reg. at 5,357 (Aug. 7, 1947) (before the INA, F-1 students); 8 C.F.R. § 214.2(c) (1957); *Matter of T-*, 7 I. & N. Dec. 682 (B.I.A. 1958) (discussing employment of F-1 students); INS Operating Instructions 214.2(f) at 1124 (Jan. 15, 1962) (F-1 students); INS Operating Instructions 214.2(j)(1) at 1129-1130 (Nov. 15, 1963) (spouses of J-1 students); INS Operating Instructions 214.2(a) at 1121-1122 (June 15, 1963) (non-enforcement of A-1, A-2, and A-3 spouses); *id.* at 1129 (spouses of J-1 students); INS Operating Instructions 214.2(j)(5) at 1135-1136 (April 14, 1965) (J-1 students and J-2 spouses); INS Operating Instructions 214.1 at 1122.5 (Jan. 26, 1966) (F-1 students); INS Operating Instructions 214.2(e) at 1122.7 (Feb. 28, 1968); INS Operating Instructions 214.2(e) at 1122.9 (Nov. 10, 1971) (non-enforcement of E visa holders); INS Operating Instructions 214.2(j)(5) at 1161-1162 (Jan. 17, 1973) (spouses and children of J-1 nonimmigrants); 38 Fed. Reg. 35,425 (Dec. 28, 1973) (F-1 students); *Matter of Lieu*, 15 I. & N. Dec. 786 (Acting Dist. Dir., INS 1976) (certain refugees, before Refugee Act of 1980); INS Operating Instructions 214.2(j)(5) at 1162.1 (July 5, 1978) (spouses and children of J-1 nonimmigrants); 43 Fed. Reg. 33,229 (July 31, 1978) (G-4 spouses and dependent children); 44 Fed. Reg. 43,480 (July 25, 1979) (deferred action recipients); 48 Fed. Reg. 14,575 (Apr. 5, 1983) (F-1 Students); 51 Fed. Reg. 39,385 (Oct. 28, 1986) (deferred action recipients); 52 Fed. Reg. 8,762 (Mar. 19, 1987) (deferred action recipients); *see also* 48 Interpreter Releases (1971) at 168-174, Sam Bensen, Assistant Commissioner, Adjudications, Immigration and Naturalization Service, *Lawful Work for Nonimmigrants* (discussing A, B, D, E, G, H, I, K, L, F and J nonimmigrants and in some instances, their spouses and noting "that there is authorization for some kind of employment for all nonimmigrant classes except . . . B-2 visitors for pleasure . . . [and] 29-day transits and 10-day

In 1979, the INS confirmed that Section 1103 empowered it to authorize noncitizen employment. At that time, INS published a notice of proposed rulemaking to codify in a single location its previously internal employment-authorization procedures. *Proposed Rules for Employment Authorization for Certain Aliens*, 44 Fed. Reg. 43,480 (July 25, 1979). In the preamble to the proposed rule, the agency explained that "[t]he Attorney General's authority to grant employment authorization stems from section 103(a) of the [INA] [8 U.S.C. § 1103(a),] which authorizes him to establish regulations, issue instructions, and perform any actions necessary for the implementation and administration of the Act." *Id.* at 43,480. More generally, "[t]he authority of the Attorney General to authorize employment of aliens in the United States [is] a necessary incident of his authority to administer the Act." *Id.* That was—and remains—a correct statement of the law.

The final rule was promulgated in 1981. *Employment Authorization to Aliens in the United States*, 46 Fed. Reg. 25,079 (May 5, 1981). Notably, the regulations that emerged were not limited to the employment of noncitizens specifically authorized to work by the INA. Rather, the 1981 rule authorized the employment of several categories of noncitizens outside of the statutory scheme. *Id.* at 25,081 (codifying these regulations at 8 C.F.R. § 109.1(b)).[10] It even permitted employment of noncitizens benefitting from "deferred action"—that is, individuals who had no statutory basis even to be present in the country. *Id.*; *see Regents of Univ. of Cal. v. DHS*, 908 F.3d 476, 487 (9th Cir. 2018) ("[D]eferred action is not expressly grounded in statute."), *cert. granted on other grounds*, 139 S. Ct. 2779.

In previously holding that the OPT regulations are within the authority of DHS, Judge Huvelle concluded that "Congress has delegated substantial authority to DHS to issue immigration

---

transits without visas"); 55 Interpreter Releases (1978) at 267-269 (describing INS procedure for J-1 and J-2 nonimmigrants to secure work authorization); *id.* at 495 (describing work authorization for A-3 or G-5 domestic servants).

[10]   Currently, the regulation unifying those classes of noncitizens eligible for federal work authorization is located at 8 C.F.R. § 274a.12.

regulations." *WashTech I*, 156 F. Supp. 3d at 138. And the 2008 Rule, Judge Huvelle concluded, "was promulgated as an exercise of this delegated authority." *Id.*

2.  Any doubt about the scope of executive authority under Section 1103 is put to rest by additional, explicit authority Congress provided to the Executive in 1986 via the Immigration Control and Reform Act ("IRCA").

IRCA created a "comprehensive scheme" regulating the intersection of employment and immigration (including the employment of unauthorized individuals in the United States). *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002). IRCA rendered it a federal offense for an employer to knowingly hire "an unauthorized alien (as defined in subsection (h)(3))." 8 U.S.C. § 1324a(1)(A). The definition of an "unauthorized alien" is thus crucial: employers may not hire "*unauthorized* aliens," meaning that they may hire any *authorized* noncitizen.

Subsection (h)(3) in turn provides that, "[a]s used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General." 8 U.S.C. § 1324a(h)(3). Thus, under IRCA, there are three ways that a noncitizen may be authorized for employment and thus eligible to work—(1) the noncitizen may be lawfully admitted for permanent residence, (2) a statute may authorize the noncitizen's employment, *or* (3) the noncitizen may be "authorized to be so employed … *by the [Secretary of Homeland Security]*." *Id.*[11] Section 1324a(h)(3) thus recognizes that the Secretary of Homeland Security *has the power to authorize employment*. That is the necessary result of the statute's use of the disjunctive "or." *See, e.g.*, Antonin Scalia & Bryan A. Garner, *Reading Law* 116 (2012) ("*[A]nd* combines items while *or* creates alternatives.").

Through Section 1324a, Congress ratified the Executive's longtime understanding that the INA empowered the immigration agencies to authorize the employment of noncitizens. And

---

[11]  Again, while the statute references the "Attorney General," this language is now "deemed to refer to the Secretary" of Homeland Security. 6 U.S.C. §§ 557, 202; *see supra* note 1.

"[w]here, as here, 'Congress has not just kept its silence by refusing to overturn [an] administrative construction, but has ratified it with positive legislation,' [the Court] cannot but deem that construction virtually conclusive." *Schor*, 478 U.S. at 846 (quoting *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381-382 (1969)).

Plaintiff's only argument against this straightforward reading of IRCA's text is the clause of Section 1324a(h)(3) explaining that it defines "unauthorized alien" "[a]s used in this section." Pl. S.J. Mem. 13. But Section 1324a is the operative portion of IRCA—it is the section that determines, as a matter of federal law, which noncitizens in the United States are (and are not) authorized to work. Thus, in delineating the meaning of "unauthorized alien" for purposes of Section 1324a, subsection (h)(3) necessarily informs the scope of executive authority to issue employment authorization to categories of noncitizens within the United States.

Moreover, INS adopted this same interpretation of Section 1324a in a Federal Register notice immediately after passage of IRCA in 1986. Prior to IRCA, the Federation for American Immigration Reform ("FAIR") had petitioned INS for a rulemaking to rescind 8 C.F.R. § 109.1(b), the provision INS had adopted summarizing work authorization. *See Employment Authorization*, 51 Fed. Reg. 39,385 (Oct. 28, 1986). FAIR advanced the same argument that Plaintiff makes here[12]—that Congress had not authorized the Executive to determine that categories of noncitizens are eligible for work authorization. Following the adoption of IRCA, the Reagan administration responded that Section 1324a undoubtedly provides the Executive this authority:

> Assuming for the sake of argument that [Section 1103] did not vest in the Attorney General the necessary authority to promulgate [noncitizen-employment regulations], such authority is apparent in the new [Section 1324a,] which was created by the Immigration Reform and Control Act of 1986.
> . . .

---

[12]   Plaintiff's counsel, the Immigration Reform Law Institute, is FAIR's affiliated legal organization.

> *[T]he only logical way to interpret* [Section 1324a] is that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined 'unauthorized alien' in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the regulatory process, in addition to those who are authorized employment by statute.

*Employment Authorization; Classes of Aliens Eligible*, 52 Fed. Reg. 46,092, 46,093 (Dec. 4, 1987) (emphasis added).

Since IRCA's adoption, the immigration agencies across multiple administrations of both political parties have time and again relied on Section 1324a as authority for allowing the employment of noncitizens not statutorily authorized to work. As the United States has cataloged in previous briefs defending this authority, immigration agencies have cited this provision at least twenty times when identifying classes of noncitizens authorized to work in the United States.[13] Plaintiff's argument would render each of these substantial programs unlawful. Plaintiff is simply mistaken in its suggestion that the immigration agencies have been acting lawlessly for decades.

What is more, Congress has frequently amended Section 1324a's unauthorized-employment scheme since the INS announced its interpretation of that provision, and it has never objected

---

[13]   *See, e.g.*, 52 Fed. Reg. 16,216, 16,221 (May 1, 1987) ("Control of Employment of Aliens"); 53 Fed. Reg. 46,850, 46,850 (Nov. 21, 1988) (authorization "for dependents of certain foreign government and international organization officials classified as A-1, A-2 and G-4 nonimmigrants"); 55 Fed. Reg. 25,928, 25,931 (June 25, 1990) (technical and substantive amendments to section 274a.12); 56 Fed. Reg. 55,608, 55,616 (Oct. 29, 1991) (F-1 students); 57 Fed. Reg. 31,954, 31,956 (July 20, 1992) (same); 60 Fed. Reg. 44,260, 44,271 (Aug. 25, 1995) (Witnesses and Informants; Nonimmigrant S Classification); 60 Fed. Reg. 66,062, 66,069 (Dec. 21, 1995) (EADs under "family unity program" and voluntary departure); 63 Fed. Reg. 27,823, 27,833 (May 21, 1998) (EADs under Nicaragua Adjustment and Central American Relief Act); 64 Fed. Reg. 25,756, 25,773 (May 12, 1999) (Haitian adjustment of status); 67 Fed. Reg. 4,784, 4,803 (Jan. 31, 2002) (immediate family members of T-1 nonimmigrants); 67 Fed. Reg. 76,256, 76,280 (Dec. 11. 2002) (work authorization for F, J, and M nonimmigrants); 69 Fed. Reg. 45,555, 45,557 (July 30, 2004) (general EAD revisions); 73 Fed. Reg. 18,944, 18,956 (April 8, 2008) (F-1 students); 74 Fed. Reg. 26,514, 26,515 (June 3, 2009) (same); 74 Fed. Reg. 46,938, 46951 (Sept. 14, 2009) (E2 investors in CNMI); 75 Fed. Reg. 47,699, 47,701 (Aug. 9, 2010) (spouses and dependents of foreign officials classified as A-1, A-2, G-1, G-3, and G-4 nonimmigrants); 75 Fed. Reg. 79,264, 79,277-79,278 (Dec. 20, 2010) (CNMI E-2 investors' spouses); 79 Fed. Reg. 26,886, 26,900-26,901 (May 12, 2014) (H-4 spouses); 80 Fed. Reg. 10,284, 10,294, 10,311 (Feb. 25, 2015) (same); 80 Fed. Reg. 63,376, 63,404 (Oct. 19, 2015) (F-1 students).

to the Executive Branch's claim of authority.[14] That is, Congress has continually "revisit[ed]" the statute giving rise to DHS's "longstanding administrative interpretation" that it is broadly empowered to authorize employment, and the "congressional failure to revise or repeal" that interpretation is thus "persuasive evidence that the interpretation is the one intended by Congress." *Schor*, 478 U.S. at 846; *accord, e.g.*, 2B *Sutherland Statutes & Statutory Construction* § 49:9. Again, Congress has acquiesced in the government's interpretation of its authority (which was itself based on Congress's ratification of the government's earlier consistent position).

Taking all this together, the Ninth Circuit recently observed that "Congress has given the Executive Branch broad discretion to determine when noncitizens may work in the United States." *Ariz. DREAM Act Coal. v. Brewer*, 757 F.3d 1053, 1062 (9th Cir. 2014). And, as a leading immigration law treatise put it, "[w]hether or not the immigration agency earlier had the implied authority to issue such work authorization, [Section 1324a], in its definition of 'unauthorized alien,' has now implicitly granted such authority to the Attorney General." 1 Charles Gordon et al., *Immigration Law & Procedure* § 7.03[2][c] (2019).

3.   Beyond this broad discretion held by the Executive, Congress has specifically ratified the provision of work authorization to international students via the federal tax code. Congress excluded from the definition of "employment" any "[s]ervice which is performed by a nonresident alien individual for the period he is temporarily present in the United States as a nonimmigrant under subparagraph (F), (J), (M), or (Q) of section 101(a)(15) of the Immigration and Nationality Act." 26 U.S.C. § 3121(b)(19). Congress further recognized that such service may be "performed to carry out the purpose specified in subparagraph (F), (J), (M), or (Q)." *Id. See also* 42 U.S.C. § 410(a)(19) (same); 26 U.S.C. § 3306(b)(19) (same regarding "wages"). As Judge Huvelle con-

---

[14]   *See, e.g.*, Pub. L. No. 100-525, § 2, 102 Stat. 2609, 2609-10 (1988); Pub. L. No. 101-649, §§ 521(a), 538(a), 104 Stat. 4978, 5053, 5056 (1990); Pub. L. No. 102-232, §§ 306(b)(2), 309(b)(11), 105 Stat. 1733, 1752, 1759 (1991); Pub. L. No. 103-416, §§ 213, 219(z)(4), 108 Stat. 4305, 4314, 4318 (1994); Pub. L. No. 104-208, §§ 379, 411-412, 110 Stat. 3009, 3009-649 to -650, 3009-666 to -668 (1996); Pub. L. No. 108-390, 118 Stat. 2242 (2004).

cluded, this is evidence "that Congress understood F-1 to permit at least some period of employ-ment" (*Washtech I*, 156 F. Supp. 3d at 139-140), confirming that the Executive has authority to grant noncitizens work authorization in these circumstances.

4.   Plaintiff relies on the Fifth Circuit's decision in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), asserting that that court rejected the same claim of authority DHS makes here. *See* Pl. S.J. Mem. 14. But *Texas* said nothing about the question implicated by this case: whether DHS has authority to provide work authorization to individuals *already lawfully present in the United States*. In *Texas*, the court was of the view that it was beyond DHS's power to grant deferred action—that is, "a decision . . . not to pursue deportation proceedings against an individual or class of individuals otherwise eligible for removal" (*Regents*, 908 F.3d at 487)—to 4.3 million undocu-mented individuals. 809 F.3d at 179-186. Because preexisting DHS regulations provided work authorization for deferred action recipients (see 8 C.F.R. § 274a.12(c)(14)), the court also touched on DHS's powers regarding employment. But to the extent it did so, the court's conclusion was that those powers could not be used to authorize work for millions of undocumented immigrants, because to do so would "undermin[e] Congress's stated goal" of "preserving jobs for those *lawfully in the country*." *Texas*, 809 F.3d at 181 (emphasis added); *see also id.* at 184 (finding "untenable" an interpretation that "would allow [DHS] to grant lawful presence and work authorization to any illegal alien in the United States").

That conclusion has no application here, where F-1 students are by definition lawfully pre-sent in the United States. *See* 8 U.S.C. § 1101(a)(15)(F)(i). The reasoning in *Texas* is thus inappli-cable to the significantly more modest assertion of Executive authority underlying OPT. Nor do Plaintiff's other cases stand even remotely for the proposition that Section 1324a(h)(3) is some-thing other than a recognition of the Executive's authority to authorize employment. *Cf.* Pl. S.J. Mem. 14-15 (collecting cases). These authorities simply confirm that Section 1324a more gener-ally "proscribes the employment of unauthorized aliens" (*Richmond v. Holder*, 714 F.3d 725, 728 n.1 (2d Cir. 2013))—a point no one disputes. The question is *who* may do the authorizing, and Plaintiff's cases do not address that question. *See id.*; *Rivera v. United Masonry*, 948 F.2d 774,

776 (D.C. Cir. 1991); *Castro v. Att'y Gen. of U.S.*, 671 F.3d 356, 369 n.9 (3d Cir. 2012); *Ferrans v. Holder*, 612 F.3d 528, 532 (6th Cir. 2010); *United States v. Alabama*, 691 F.3d 1269, 1289 (11th Cir. 2012).

5.   In the course of its contentions about DHS's authority to authorize employment, Plaintiff offers a brief constitutional-avoidance argument, asserting that "any interpretation of § 1324a(h)(3) that is broad enough to permit OPT's work authorizations makes that provision a glaring violation of the nondelegation doctrine," and should therefore be avoided. Pl. S.J. Mem. 15. But under present law that is plainly not so. There is no serious constitutional question under current doctrine that Section 1324a(h)(3)—as interpreted for decades—satisfies the criteria set forth by the Supreme Court. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001); *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (Opinion of Kagan, J.).

### C.      OPT is consistent with the F-1 statute.

The OPT regulations also reflect the Executive's broad authority to issue regulations delineating the range of appropriate conduct for noncitizens within a specific class. Plaintiff errs by myopically evaluating the text of 8 U.S.C. § 1101(a)(15)(F)(i) (*see* Pl. S.J. Mem. 9-12), without addressing the broad powers that the Executive holds with respect to immigration.  Rather, Section 1184(a)(1) empowers the Executive to define a noncitizen's permissible scope of conduct. The limitation on that authority is the well-trodden arbitrary-and-capricious standard: DHS may not deploy its authority in a way that violates the strictures of the Administrative Procedure Act. *See, e.g.*, *Am. Fed'n of Gov't Emps. v. Donovan*, 683 F.2d 511, 516 n.16 (D.C. Cir. 1982) ("[P]ermissive statutory language only affects the scope of an agency's discretion; it does not constitute a license to undertake actions that are 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.'") (quoting 5 U.S.C. § 706(2)(A)). But Plaintiff makes no such argument here—and for good reason. OPT is carefully tied to an international student's education in the United States.

Regardless of whether this issue is analyzed at *Chevron* step one or step two, the result is the same—DHS acted within the scope of authority that Congress has expressly delegated to it.

### 1.   OPT is consistent with the statute's plain text.

Plaintiff's argument stems from a misapprehension of the governing statutes. "The obvious problem with the OPT program," Plaintiff says, "is that its participants are not students." Pl. S.J. Mem. 9. That is wrong.

To begin with, Plaintiff incorrectly assumes that the conditions for the *issuance* of an F-1 visa described in Section 1101(a)(15)(F) circumscribe DHS's authority to set the conditions under which an F-1 student may *remain* in the country. To the contrary, the INA provides that "[t]he admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe." 8 U.S.C. § 1184(a)(1). As the United States explained in *Washtech I*, "the INA definition of 'student' is only the definition of what is required to be proven at the time of admission to obtain a student visa. . . . [T]he INA leaves the determination as to what conduct a nonimmigrant student must comply with post-admission to maintain their F-1 status to the discretion of the Secretary." U.S. S.J. Opp. 21, *Washtech I*, No. 14-cv-529 (Apr. 6, 2015), Dkt. 36; *see also id.* at 22 ("Specifically, the statute does not define the parameters of a foreign student's permitted course of study, or whether hands-on training or employment—such as a paid internship—may accompany or follow the course of study as practical part of the student's education in the United States."). This interpretation flows directly from the text of the F-1 definition, which describes "an alien . . . who is a bona fide student . . . who *seeks to enter* the United States." 8 U.S.C. § 1101(a)(15)(F)(i) (emphasis added). That is, the statute is aimed at the individual's qualifications and characteristics at the time he or she is granted the F-1 visa and "seeks to enter" the country.

Judge Huvelle agreed: "[T]his clause [in the F-1 definition] could sensibly be read as an *entry requirement*. This reading is bolstered by Congress' delegation of the power to prescribe regulations related to a nonimmigrant's duration of stay." *Washtech I*, 156 F. Supp. 3d at 139 (citation omitted). And when the statute is read in this "sensibl[e]" manner, Plaintiff's case evaporates, for "[n]o one disputes that all F-1 aliens enter the United States as 'students' under any conceivable definition." *Id.* at 139, 140.

DHS must have authority to issue regulations identifying what activities render an individual properly within the "status" conferred by an F visa. 8 U.S.C. § 1184(a)(1). Plaintiff asserts that, once an individual has "graduated," he or she is no longer a "student" and thus cannot be on F-1 status. Pl. S.J. Mem. 10. Yet that contention, stated as such, would lead to incredible and illogical results. It would mean, for example, that the *day after graduation*, an F-1 student would be out-of-status and thus not lawfully present in the United States. But DHS regulations provide a "60-day period to prepare for departure from the United States." 8 C.F.R. § 214.2(f)(5)(iv). During summer break, when an individual is not "pursuing a full course of study" (Pl. S.J. Mem. 10), Plaintiff apparently believes that the noncitizen is not properly within F-1 status. But DHS regulations authorize an individual to take "the annual (or summer) vacation if the student is eligible and intends to register for the next term." 8 C.F.R. § 214.2(f)(5)(iii). DHS *must* have authority to authorize F-1 students to remain in status, even when they are not presently undertaking a full course of study— and Section 1184(a)(1) is the source of that regulatory authority. *See*, *e.g.*, STEM000029 (identifying Section 1184(a)(1) as part of the authority authorizing OPT); *see also* STEM000011; STEM000031; STEM000050; STEM000061; STEM000062; STEM000075; STEM000133.[15]

Section 1184(a)(1) thus confers on DHS authority to promulgate regulations determining how and when nonimmigrant students remain in status. So long as DHS acts in a way that is neither arbitrary nor capricious, it properly exercises the authority Congress has bestowed to it. Plaintiff does not assert that DHS's use of Section 1184(a)(1) here is arbitrary and capricious. Nor could it, as it was reasonable for DHS to exercise its discretion under this statute to conclude that an individual remains in lawful F-1 status during a time-limited period following graduation, when that individual engages in practical training directly tied to his or her principal field of study.

---

[15]   Plaintiff contends that OPT is inconsistent with DHS's obligation to "insure that . . . upon failure to maintain the status under which he was admitted . . . [a nonimmigrant] alien will depart from the United States." 8 U.S.C. § 1184(a)(1); *see* Pl. S.J. Mem. 12. But that argument assumes the conclusion: As Judge Huvelle noted, the issue posed here is "*whether* the scope of F-1 encompasses post-completion practical training related to the student's field of study." *Washtech I*, 156 F. Supp. 3d at 140. Plaintiff cannot answer a question about the proper scope of the F-1 visa category by pointing to an obligation to enforce that scope, whatever it may be.

To begin with, it has long been understood that practical training can be an integral part of a student's education, capping off classroom learning through in-field experience. As DHS concluded in promulgating the 2016 Rule, "the STEM OPT extension rule is grounded in the long-standing recognition by DHS and its predecessor agency that . . . experiential learning and practical training are valuable parts of any post-secondary educational experience." STEM000066 (81 Fed. Reg. at 13,050). DHS credited a comment letter from "[t]welve higher education associations—representing land-grant universities, research universities, human resource professionals at colleges and universities, registrars, graduate schools, international student advisors, and religious colleges and universities, among others." *Id*. This comment stated, and DHS agreed, "that 'experiential learning is a key component of the educational experience.'" *Id*. In particular, "OPT allows students to take what they have learned in the classroom and apply 'real world' experience to enhance learning and creativity while helping fuel the innovation that occurs both on and off campus. . . . Learning through experience is distinct from learning that takes place in the classroom. Experiential learning opportunities have become an integral part of U.S. higher education." *Id*.

DHS continued:

> Universities individually made similar points, emphasizing the value of experiential learning. DHS received comments on this point from a range of public and private institutions of higher education. For example, one university stated that experiential learning opportunities are particularly critical in "STEM fields where hands on work supplements classroom education." Another university stated that "experiential learning fosters the capacity for critical thinking and application of knowledge in complex or ambiguous situations." Other university commenters stated that experiential learning "is a necessary component of a 21st century education, especially in the STEM fields."

> A national organization of graduate and professional students stated that offering a STEM OPT extension after bachelor's level studies allowed individuals to "identify research interests and develop skills" that they later can expand upon in their graduate studies when they focus on solving concrete problems. An organization representing international educators stated that the OPT program appropriately focuses on the critical part of an education that occurs in partnership with employers.

STEM000066 (81 Fed. Reg. at 13,050); *see also, e.g.*, Comment ICEB-20015-0002-29742, at 2 ("Learning through experience is distinct from rote or didactic learning that takes place in the

classroom. Experiential learning opportunities have become an integral part of U.S. higher educa-tion in all fields of study[.]"); Comment ICEB-2015-0002-40908, at 2 ("Experiential learning op-portunities have become an integral part of U.S. higher education in all fields of study, and espe-cially the STEM fields where hands on work supplements classroom education. . . . This is a nec-essary component of a 21st century education[.]"); Comment ICEB-2015-0002-17760 ("Most en-gineering knowledge comes from practice not books."). As DHS further explained:

> Consistent with many of the comments received from academic associations, edu-cational institutions, and F-1 students, DHS agrees that the OPT program enriches and augments a student's educational experience by providing the ability for stu-dents to apply in professional settings the theoretical principles they learned in ac-ademic settings. By promoting the ability of students to experience firsthand the connection between theory in a course of study and practical application, including by applying abstract concepts in attempts to solve real-world problems, the OPT program enhances their educational experiences. A well-developed capacity to work with such conceptualizations in the use of advanced technology, for example, is critical in science-based professions. Practical training programs related to STEM fields also build competence in active problem solving and experimentation, critical complements to academic learning in STEM fields. As many commenters attested, practical training is an important avenue for enhancing one's educational experience, particularly for STEM students.

STEM000067 (81 Fed. Reg. at 13,051).

DHS ultimately concluded: "The Department agrees with the many U.S. universities and educational- and international-exchange organizations that provided comments stating that STEM OPT extensions would enhance the educational benefit provided to eligible students through prac-tical training. DHS agrees that practical training is an accepted and important part of international postsecondary education." STEM000066 (81 Fed. Reg. at 13,050).

That determination was well-founded, as experiential learning tied to a student's education has historically been understood as important means by which students continue their education. *See, e.g.*, James Bryan Conant, *General Education in a Free Society: Report of the Harvard Com-mittee* 54 (1955), available at https://archive.org/details/generaleducation013127mbp/page/n199. And the administrative record here contains robust evidence regarding the value of experiential learning. *See, e.g.*, STEM000067, STEM001841, STEM002082, STEM002345, STEM002876,

STEM003023, STEM003064, STEM003075, STEM003080, STEM003085, STEM003090 (citing, in part, U.S. Dep't of Labor, *$100M in grants to transform apprenticeship for the 21st century by expanding training into new high-skilled, high-growth industries* (Nov. 12, 2014)).

What is more, DHS ensured that the post-completion practical training is tethered directly to the education that the student received in the United States. To qualify for optional practical training, a student must apply for permission and demonstrate that the employment at issue is "directly related to the student's major area of study." 8 C.F.R. § 214.2(f)(10)(ii)(A). If the practical training is not directly related to the individual's principal studies in the United States, the employment is not authorized. *Id.*

To obtain a 24-month STEM OPT extension, moreover, a student must complete a "training plan" via a Form I-983. 8 C.F.R. § 214.2(f)(10)(ii)(C)(7)(i).[16] This training plan contains significant information certifying how the individual's employment relates to his or her learning: "The training plan described in the Form I-983 . . . must identify goals for the STEM practical training opportunity, including specific knowledge, skills, or techniques that will be imparted to the student, and explain how those goals will be achieved through the work-based learning opportunity with the employer; describe a performance evaluation process; and describe methods of oversight and supervision." *Id.* § 214.2(f)(10)(ii)(C)(7)(ii). And "[t]he training plan . . . must explain how the training is directly related to the student's qualifying STEM degree." *Id.* § 214.2(f)(10)(ii)(C)(7)(iii).

To ensure satisfaction of the training plan, a student must "submit[] a self-evaluation of the student's progress toward the training goals described" in the training plan. 8 C.F.R. § 214.2(f)(10)(ii)(C)(9)(i). Students also must report changes to or deviations from the training plan to the government. *Id.* § 214.2(f)(10)(ii)(C)(9)(ii).

---

[16] A copy of the Form I-983 is available at STEM017753-58, as well as at https://www.ice.gov/doclib/sevis/pdf/i983.pdf.

The Form I-983 requires a student to extensively attest to his or her compliance with these requirements—all under the penalty of perjury. *See* STEM017753 (Form I-983, at 1). An individual commits a *federal crime* if he or she falsely certifies on a Form I-983 that, for example, the "practical training opportunity is directly related to the STEM degree that qualifies me for the STEM OPT extension." *Id. See* 8 U.S.C. § 1621(a), 28 U.S.C. § 1746 (together, rendering a federal crime any false statement in a federal document that is affirmed under penalty of perjury). Likewise, the employer is obligated to make extensive certifications, explaining how the employment is directly related to the student's degree and continuing learning. *See* STEM017754 (Form I-983, at 2).

If a student satisfies these OPT requirements, then the government deems the student within "the duration of status." 8 C.F.R. § 214.2(f)(10)(ii)(D). "For a student with approved post-completion OPT, the duration of status is defined as the period beginning on the date that the student's application for OPT was properly filed and pending approval, including the authorized period of post-completion OPT, and ending 60 days after the OPT employment authorization expires." *Id*.

Because this period of training is tied directly to the student's studies in the United States, it is a lawful exercise of the government's authority under Section 1184 to delineate the "conditions" under which an F-1 student may hold status. 8 U.S.C. § 1184(a)(1). Just as it is a reasonable exercise of this authority for the government to grant a student 60 days to depart the country following graduation and the ability to remain in the United States during school vacations, it is a reasonable application of this authority to provide time-limited occupational training that is carefully connected to the course of study. Plaintiff does not attempt to show that this is an arbitrary or capricious exercise of agency authority.

Separately, Plaintiff is incorrect in its apparent assumption that the ordinary meaning of the statutory term "student" requires current enrollment at a college or university. Indeed, most dictionaries impose no such requirement. *Washtech I*, 156 F. Supp. 3d at 140 (while "some definitions of the word 'student' require school attendance," "[m]ost . . . include broader notions of

studying and learning") (citing dictionaries); *see also, e.g.*, *Webster's New International Dictionary of the English Language* (2d ed. 1947) ("1. A person engaged in study; one devoted to learning; a learner; a scholar; esp., one who attends a school, or who seeks knowledge from teachers or books; . . . 3. One who studies or examines in any manner[.]"); *Webster's Third New International Dictionary* (1961) ("a person engaged in study: one devoted to learning: as . . . one who independently carries on a systematic study or detailed observation of a subject"); *Webster's New Twentieth Century Dictionary* (1967) ("a person who studies, or investigates"); *American Heritage Dictionary of the English Language* (4th ed. 2000) ("One who studies something"); *Random House Webster's Unabridged Dictionary* (2d ed. 2001) ("any person who studies, investigates, or examines thoughtfully").[17]

If any doubt remained, it would be removed by reference to the "well established" canon of statutory construction discussed above: "[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'" *Altman*, 666 F.3d at 1326 (quoting *Schor*, 478 U.S. at 846 ); *see also, e.g.*, *Creekstone Farms*, 537 F.3d at 500; 2B *Sutherland Statutes & Statutory Construction* § 49:9. As we have already described at length (*supra* pp. 9-17), Congress has long acquiesced in this regulatory construction of the F-1 statute and Section 1184(a)(1). As Judge Huvelle concluded, "[b]y leaving the agency's interpretation of F-1 undisturbed for almost 70 years . . . Congress has strongly signaled that it finds DHS's interpretation to be reasonable." *Washtech I*, 156 F. Supp. 3d at 141, 143; *see generally id.* at 140-144 & n.7.[18]

---

[17]   Plaintiff's authorities do not address whether an individual who complies with regulations governing F-1 status is properly within the scope of the F-1 statute. *See Sokoli v. Attorney Gen. of U.S.*, 499 F. App'x 214, 215 (3d Cir. 2012); *Yadidi v. I.N.S.*, 2 F.3d 1159 (9th Cir. 1993) (explaining that the individual there was *not* compliant with the student-visa regulation); *Narenji v. Civiletti*, 617 F.2d 745, 753 (D.C. Cir. 1979) (Opinion of MacKinnon, J.).

[18]   While Judge Huvelle applied the congressional acquiescence canon in the context of *Chevron* step two (*Washtech I*, 156 F. Supp. 3d at 140-144; *see infra* pp. 35-36), it is equally relevant when analyzing the statute on its face. Before moving on to considering the reasonableness of an agency

2.      *In any event, OPT is within the scope of DHS's lawful discretion.*

For reasons explained above, OPT accords with the plain terms of the statute. But even if there were doubt on that score, the OPT regulations nevertheless are within the scope of the agency's permissible discretion—precisely as Judge Huvelle held in *Washtech I.*

Plaintiff concedes the applicability of the *Chevron* framework to the question of DHS's legal authority for OPT. *See* Pl. S.J. Mem. 8. As the Supreme Court explained in *United States v. Mead Corp.*, an "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." 533 U.S. 218, 226-227 (2001).

Here, the INA empowers DHS "to make rules carrying the force of law" (*Mead*, 533 U.S. at 226-227), both generally and with respect to the duration and conditions of a nonimmigrant's admission to the United States. *See* 8 U.S.C. § 1103(a)(3) ("The Secretary of Homeland Security . . . shall establish such regulations . . . as he deems necessary for carrying out his authority under the provisions of [the INA]."); *id.* § 1184(a)(1) ("The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the [Secretary of Homeland Security] may by regulations prescribe[.]"). And the 2016 Rule challenged here was issued in the exercise of that delegated lawmaking authority. *See* STEM000055-138 (81 Fed. Reg. 13,039-13,122) (promulgating the 2016 Rule through notice-and-comment rulemaking).

The question under "the familiar *Chevron* framework" is whether "the agency's interpretation is . . . unambiguously foreclosed by the statute." *Sorenson Commc'ns, LLC v. FCC*, 897 F.3d 214, 223-224 (D.C. Cir. 2018) (quotation marks omitted). The lawfulness of OPT is certainly not "unambiguously foreclosed" by the INA. *Id.* at 224. If anything, once all "the ordinary tools

---

interpretation under *Chevron*, "the court must first exhaust the 'traditional tools of statutory con-struction' to determine whether Congress has spoken to the precise question at issue." *Nat. Res. Def. Council v. Browner*, 57 F.3d 1122, 1125 (D.C. Cir. 1995) (quoting *Chevron*, 467 U.S. at 843 n.9). The "well established" acquiescence canon (*Altman*, 666 F.3d at 1326) is certainly a tradi-tional tool of construction.

of statutory construction" are brought to bear at *Chevron* step one (*City of Arlington v. FCC*, 569 U.S. 290, 296 (2013)), the INA unambiguously permits DHS to authorize post-completion practical training for F-1 students. *See supra* pp. 10-17.

Indeed, all the same points urged as reasons for OPT's legality on the face of the statute— the F-1 definition's nature as a set of entry requirements; DHS's authority to authorize employment and define the duration and conditions of a nonimmigrant's stay in this country; and Congress's decades-long acquiescence in the Executive's consistently repeated interpretation—are equally compelling reasons to reject Plaintiff's contention that, "unambiguously, Congress has . . . set clear limits on student visa eligibility that OPT transgresses." Pl. S.J. Mem. 11. If the INA does not unambiguously permit OPT, it is at least not plainly foreclosed by the statute, and "[i]n light of Congress' broad . . . authority to DHS to regulate the duration of a nonimmigrant's stay and Congress' acquiescence in DHS's longstanding reading of F-1, . . . the agency's interpretation is not unreasonable." *Washtech I*, 156 F. Supp. 3d at 140, 145. Those two conclusions are sufficient under *Chevron* to reject Plaintiff's challenge. *See, e.g.*, *Sorenson Commc'ns*, 897 F.3d at 224. Whether decided at step one or step two of *Chevron*, OPT is consistent with the immigration laws, and Plaintiff's challenge must fail.

### D.      OPT does not unlawfully "circumvent" the H-1B program.

Against the clear backdrop authorizing the Executive to broadly grant employment authorization, Plaintiff suggests that OPT is unlawful because it supposedly "thwart[s] the statutory alien employment scheme through the use of administrative action," particularly with respect to the H-1B visa category for workers in specialty occupations. Pl. S.J. Mem. 15-17; *see generally* 8 U.S.C. § 1101(a)(15)(H)(i)(b) (describing category). *Washtech I* rejected this argument:

> H-1B—which applies to aliens seeking to work in a "specialty occupation"—is far broader than the employment permitted by the OPT program. DHS's interpretation of the word "student" does not render any portion of H-1B, or its related restrictions, surplusage. Congress has tolerated practical training of alien students for almost 70 years, and it did nothing to prevent a potential overlap between F-1 and H-1B when it created the modern H1-B category in 1990. *See* Immigration Act of 1990 § 205(c). As such, the Court does not believe that DHS's interpretation is unreasonable merely because of its limited overlap with H-1B.

*Washtech I*, 156 F. Supp. 3d at 144 (citation omitted).

What is more, Plaintiff's argument turns on what it asserts was the government's "*motivation*" in promulgating the OPT regulations (Pl. S.J. Mem. 16 (emphasis added)), but Plaintiff does not cite any legal authority for its suggestion that the government's "motivation" is relevant to the agency's statutory *authority* to adopt OPT. *Cf. City of Arlington v. FCC*, 569 U.S. 290, 301 (2013) ("[T]he question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority, or not."). The statutory-authority question is, of course, the only claim left at issue. *See Washtech II*, 892 F.3d at 348. To the extent that Plaintiff faults DHS for seeking a result through administrative rulemaking that was unforthcoming from Congress (*see* Pl. S.J. Mem. 17), "[t]here is nothing inherently problematic about an agency addressing a problem for which Congress has been unable to pass a legislative fix, so long as the particular action taken is properly within the agency's power" (*Regents*, 908 F.3d at 506). As described at length above, OPT is indeed within that power.

Plaintiff's reliance on *International Union of Bricklayers v. Meese*, 616 F. Supp. 1387 (N.D. Cal. 1985), and *International Longshoremen's Union v. Meese*, 891 F.2d 1374 (9th Cir. 1989) is unavailing. *Bricklayers* was decided prior to IRCA, and thus did not involve the critical grant of authority contained in Section 1324a(h)(3). Moreover, *Bricklayers* addressed whether an individual on a B-1 visa, provided to business visitors, could perform skilled or unskilled labor while in the United States. 616 F. Supp. at 1398. That was an easy question for the court, because the text of the B-1 statute "expressly excluded" from its ambit "'one coming for the purpose of . . . performing skilled or unskilled labor.'" *Id.* (quoting 8 U.S.C. § 1101(a)(15)(B)) (emphasis omitted). Of course, Congress may *restrict* the authority it has broadly provided the DHS Secretary in Sections 1103 and 1324a. But the F visa statute has no comparable "express[] exclu[sion]" from its scope.

Similarly, *Longshoremen's* addressed the scope of a "crewman," as that term is used in the D-1 visa statute, to determine whether such a visa-holder could operate a crane on shore. *See* 891

F.2d at 1381. *Longshoremen's* does not address the issue present here, because no regulation expressly extended work authorization to crewmen in the circumstances at issue. The result in the *absence* of a regulatory scheme says nothing whatever about the ability of the government to promulgate regulations that address the issue.

As we have explained, DHS acted within its authority in adopting the OPT regulations and providing work authorization to certain international students in F-1status. Because these regulations are a lawful exercise of agency authority, Plaintiff's challenge must fail.

## II.     OPT PROMOTES AMERICAN COMPETITIVENESS AND ECONOMIC GROWTH.

In addition to being a lawful exercise of administrative discretion, OPT is a wise policy for DHS to adopt. Many of the world's leading colleges and universities are based in the United States, drawing extraordinarily bright students from around the globe. These U.S.-educated individuals represent a critical talent pool—many will be future leaders in science, technology, engineering, and mathematics fields over the coming decades. This case addresses whether those individuals will find opportunities to collaborate with, and learn from, American businesses—or whether they will be shut out of the United States upon graduation, forcing them to take their ingenuity to foreign nations.

Countless American enterprises—particularly those in the STEM fields—rely on OPT. In 2017 (the most recent year for which data is available), over 320,000 foreign students were authorized for OPT. U.S. Immigration & Customs Enforcement, *2017 Total Number of Students with Curricular Practical Training (CPT); Optional Practical Training (OPT); or Science, Technology, Engineering and Mathematics (STEM) OPT Authorization*, https://www.ice.gov/doclib/sevis/pdf/data-OPT-STEM-OPT-CPT_2017.pdf (visited Oct. 10, 2019). And because OPT is a short-duration program, that 320,000 is not a static population; rather, millions of students have likely cycled through the program over the past decade.

The inclusion of these high-skilled foreign students is critical to the success of American industry, and to the economy as a whole. To take the example of just a single firm, Intel Corporation—a member of all three Intervenors—"seek[s] U.S. workers first when we need to fill U.S. positions," but nevertheless finds itself hiring "1,400 to 1,700 Master's- and Ph.D.-level foreign-national college hires *a year*," "substantially all" of whom "have work authorization because of OPT or STEM OPT." Duffy Decl. (Dkt. 37-3) at ¶¶ 7, 18 (emphasis added); *see also id.* ¶ 10 (noting that "[a]ny request to hire a foreign national for a U.S.-based position must go through our Foreign National Offer Justification process to confirm that the position is a skills-shortage position at Intel.").

Intel's experience brings into focus the reality that, for many STEM positions, there simply are not enough sufficiently qualified domestic workers to fill the demand of U.S. employers. *See, e.g.*, *Sizing Up the Gap in our Supply of STEM Workers: Data & Analysis*, New American Economy Research Fund (Mar. 29, 2017) (noting that in 2016, "13 STEM jobs were posted online for each unemployed worker that year—or roughly 3 million more jobs than the number of available, trained professionals who could potentially fill them."), https://research.newamericaneconomy.org/report/sizing-up-the-gap-in-our-supply-of-stem-workers/. This is particularly apparent for positions requiring Master's or graduate degrees: Although some 90% of undergraduate computer science students at U.S. universities are Americans, domestic students make up *less than a third* of Master's candidates in the same field. Nick Wingfield, *The Disappearing American Grad Student*, N.Y. Times (Nov. 3, 2017), https://perma.cc/46ZR-9REW. It should come as no surprise, then, that over seventy percent of OPT participants hold a Master's degree or higher. Jeremy L. Neufeld, *Optional Practical Training (OPT) and International Students After Graduation* 3 (Mar. 2019), https://www.niskanencenter.org/wp-content/uploads/old_uploads/2019/03/OPT.pdf.

With this backdrop, the effects on the economy of suddenly removing hundreds of thousands of high-skilled recent graduates from the workforce would be significant. A group of economists recently modeled the effects of a 60% reduction in OPT participation, and found that such

a decline would "slow real U.S. GDP growth by about *$5 billion* annually over the next 10 years." Business Roundtable, *The Economic Impact of Curbing the Optional Practical Training Program* 7 (Dec. 2018) (emphasis added), https://www.businessroundtable.org/policy-perspectives/immigration/economic-impact-curbing-optional-practical-training-program. That decrease in productivity would be accompanied by the "loss of 443,000 jobs over the next decade—including 255,000 jobs *held by native-born workers*." *Id.* at 1 (emphasis added). Meanwhile, Plaintiff asks this Court to slash OPT participation not by 60%, but by 100%.

Not only would eliminating OPT harm the American economy, such a move would actively benefit the nations with which the United States competes on the global stage. The hundreds of thousands of bright, enterprising young students participating in OPT each year would not simply stop innovating if the program were discontinued. Rather, they would take their innovations elsewhere. As the 2016 Rule itself noted, "research has shown that international students who earn a degree and remain in the United States are more likely than native-born workers to engage in activities, such as patenting and the commercialization of patents, that increase U.S. labor productivity," and that "foreign-born workers patent at twice the rate of U.S.-born workers." STEM000064 (81 Fed. Reg. at 13,048). If OPT is discontinued, the technological innovations represented by that patenting activity will accrue to foreign nations rather than to the United States. This outcome is particularly troubling in STEM fields like computer science and engineering that are critical not only to economic security, but to the national defense and homeland security as well. If innovation occurs abroad, U.S. laws regulating sensitive technology will generally not apply, damaging our economic and security interests.

Innovation is going to occur, and students completing their training in F-1 status are—and will continue to be—integral components of it. The question is whether that innovation will occur in the United States, where Americans can reap the benefits—or whether it will occur overseas, to the advantage of foreign nations.

Finally, the relief that Plaintiff seeks—setting aside the OPT regulations—would have profound consequences for the hundreds of thousands of individuals currently participating in the

OPT program. In the main, these are recent graduates of colleges and universities, with bachelors, Master's, or PhD degrees. Setting aside these regulations would, as Judge Huvelle earlier recognized, "force thousands of foreign students with work authorizations to scramble to depart the United States." *WashTech I*, 156 F. Supp. 3d at 148-149 (quotation marks and alteration omitted). This would "caus[e] substantial hardship for foreign students and a major labor disruption for the technology sector." *Id*. at 149.

In short, OPT is not only lawful—it is also good policy. The Court should reject Plaintiff's effort to destroy it.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for summary judgment and enter summary judgment in favor of Defendants.

Dated: November 25, 2019

Peter C. Tolsdorf (D.C. Bar. No. 503476)
Manufacturers' Center for Legal Action
733 10th Street NW, Suite 700
Washington, DC 20001
(202) 637-3000

*Counsel for the National Association of*
*Manufacturers*

Steven P. Lehotsky (D.C. Bar. No. 992725)
U.S. Chamber Legal Center
1615 H Street NW
Washington, DC 20062
(202) 463-5337

*Counsel for the Chamber of Commerce of*
*the United States of America*

Jason Oxman (D.C. Bar No. 460740)
Information Technology Industry Council
700 K Street NW, Suite 600
Washington, DC 20001
(202) 737-8888

*Counsel for the Information Technology*
*Industry Council*

Respectfully submitted,

/s/ *Paul W. Hughes*

Paul W. Hughes (D.C. Bar No. 997235)
    phughes@mwe.com
Michael B. Kimberly (D.C. Bar No. 991549)
Andrew A. Lyons-Berg (D.C. Bar No. 230182)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, D.C. 20001
(202) 756-8000 (office)
(202) 756-8087 (facsimile)

*Counsel for All Intervenors*