**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

WASHINGTON ALLIANCE OF TECHNOLOGY WORKERS,

Plaintiff,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,

Defendants,

and

NATIONAL ASSOCIATION OF MANUFACTURERS, et al.,

Intervenor-Defendants.

Civil Action No. 16-1170 (RBW)

# MEMORANDUM OPINION

The plaintiff, the Washington Alliance of Technology Workers ("Washtech"), a collective-bargaining organization representing science, technology, engineering, and mathematics ("STEM") workers, brings this action against the defendants, the United States Department of Homeland Security ("DHS"), the Secretary of DHS, the United States Immigration and Customs Enforcement ("ICE"), the Director of ICE, the United States Citizenship and Immigration Services ("Citizenship and Immigration Services"), and the Director of Citizenship and Immigration Services (collectively, the "Government"), and the intervenor-defendants, the National Association of Manufacturers, the Chamber of Commerce of the United States of America, and the Information Technology Industry Council (collectively, the "Intervenors"), see Complaint ("Compl.") ¶¶ 8, 10–15, challenging, pursuant to the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06 (2012), (1) DHS's 1992 regulation creating a twelve-month optional practical training ("OPT") program (the "OPT Program") for nonimmigrant foreign nationals admitted into the United States with an F-1 student visa, see Pre-Completion Interval Training; F-1 Student Work Authorization, 57 Fed. Reg. 31,954 (July 20, 1992) (codified at 8 C.F.R. pts. 214 & 274a) (the "1992 OPT Program Rule"); see Compl. ¶¶ 54–61; and (2) DHS's 2016 regulation permitting eligible F-1 student visa holders with STEM degrees to apply for extensions of their participation in the OPT Program for up to an additional twenty-four months, see Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students With STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students, 81 Fed. Reg. 13,040 (Mar. 11, 2016) (codified at 8 C.F.R. pts. 214 & 274a) (the "2016 OPT Program Rule"), see Compl. ¶¶ 62–84. Currently pending before the Court are (1) the Plaintiff's Motion for Summary Judgment ("Pl.'s Mot."); (2) the Defendants' Opposition and Cross-Motion for Summary Judgment ("Defs.' Mot."); (3) the Intervenors' Motion for Summary Judgment ("Intervenors' Mot."); and (4) the Plaintiff's Motion to Strike the Brief Amici Curiae of Institutions of Higher Education and Objections to Evidence Submitted in the Brief ("Pl.'s Mot. to Strike"). Upon careful consideration of the parties' submissions,[1] the Court concludes for the following reasons that it must deny Washtech's motion for summary judgment, grant the

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Memorandum in Support of Defendants' Opposition and Cross-Motion for Summary Judgment ("Defs.' Mem."); (2) the Statement of Points and Authorities in Support of Intervenors' Combined Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Intervenors' Mem."); (3) the Brief of Amici Curiae of Institutions of Higher Education in Support of Intervenors ("Amici Br."); (4) the Plaintiff's Reply on its Motion for Summary Judgment and Response to Defendant[]s['] and Intervenors' Cross Motions for Summary Judgment ("Pl.'s Reply"); (5) the Defendants' Reply in Support of Cross-Motion for Summary Judgment ("Defs.' Reply"); (6) the Reply in Support of Intervenors' Motion for Summary Judgment ("Intervenors' Reply"); (7) the Memorandum of Points and Authorities in Support of Plaintiff's Motion to Strike the Brief Amici Curiae of Institutions of Higher Education and Objections to Evidence Submitted in the Brief ("Pl.'s Mot. to Strike Mem."); (8) the Amici Curiae Institutions of Higher Education's Opposition to Plaintiff's Motion to Strike ("Amici's Opp'n"); and (9) the Reply in Support of Plaintiff's Motion to Strike the Brief Amici Curiae of Institutions of Higher Education and Objections to Evidence Submitted in the Brief ("Pl.'s Mot. to Strike Reply").

Government's and the Intervenors' motions for summary judgment, and deny Washtech's motion to strike.[2]

## I. BACKGROUND

### A. Statutory and Legal Background

An F-1 visa provides foreign national students valid immigration status for the duration of a full course of study at an approved academic institution in the United States. See 8 U.S.C. § 1101(a)(15)(F)(i). Since 1947, F-1 visa students, in conjunction with pursuing a course of study, have been able to engage in some version of OPT during their studies or on a temporary basis after the completion of their studies. See 8 C.F.R. § 125.15(b) (1947). And since 1992,

[2] The Court concludes that the intervenors' Brief Amici Curiae of Institutions of Higher Education in Support of Intervenors (the "Amici Curiae Brief") "present[s] ideas, arguments, theories, insights, facts[,] or data that are not . . . found in the parties' briefs." N. Mariana Islands v. United States, No. 08-CV-1572, 2009 WL 596986, at *1 (D.D.C. Mar. 6, 2009) (internal quotation marks omitted). Therefore, this "unique information or perspective [ ] can help the [C]ourt beyond the help that the lawyers for the parties are able to provide." Hard Drive Prods. Inc. v. Does 1–1,495, 892 F. Supp. 2d 334, 337 (D.C. Cir. 2012) (internal quotation marks omitted); see Ellsworth Assocs. v. United States, 917 F. Supp. 841, 846 (D.D.C. 1996) (granting "the non-party movants' [m]otions to participate as amicus curiae" because the Court found that the "non-party movants [had] a special interest in th[e] litigation as well as a familiarity and knowledge of the issues raised therein that could aid in the resolution of this case"). Accordingly, the Court will exercise its broad "discretion to determine 'the fact, extent, and manner' of participation by the amicus[,]" Hard Drive Prods., 892 F. Supp. 2d at 337, and therefore deny Washtech's motion to strike. See id. (noting that "[a]n amicus curiae, defined as 'friend of the court,' does not represent the parties but participates only for the benefit of the Court[,]" and that "it is solely within the Court's discretion to determine 'the fact, extent, and manner' of participation by the amicus"). Washtech's arguments in support of its motion to strike are unavailing. Washtech asserts that the Amici Curiae Brief "go[es] beyond attempting to supplement the record" and instead "tries to introduce outside statements as evidence that would not be admissible under any circumstances." Pl.'s Mot. to Strike at 3 (asserting, inter alia, that the anecdotal statements contained in the Amici Curiae Brief "are made without oath or affirmation[,]" "are inadmissible hearsay[,]"and "lack relevance"). However, as the Intervenors correctly note, "[a]mici are not parties to this action, and they are not seeking to supplement the administrative record at issue here[,]" Amici's Opp'n at 3 n.1, but rather, they are "supply[ing] the [Court] with [an] important perspective as [it] evaluate[s] the administrative record against the applicable legal standard[,]" id. at 3. Additionally, Washtech's "reliance on cases addressing the evidentiary standards for sworn testimony is misplaced[,]" id. at 5, and "[Washtech] fails to provide a single example where those standards have been applied to amicus briefs[,]" id. Indeed, this Circuit has previously considered amicus briefs that contain anecdotal statements, including anonymous accounts. See, e.g., Br. of American Veterans Alliance, et al. as Amici Curiae in Supp. of Pls.-Appellees at 8–21, 23–25, Doe 2 v. Shanahan, 755 F. App'x 19 (D.C. Cir. 2019) (No. 1:17-cv-01597) (amicus brief containing several quoted statements from anonymous veterans and service members to advise the Court about the impact of the challenged Department of Defense policy barring openly transgender individuals from serving in the military); Br. of Immigrant Rights Advocates as Amici Curiae Supporting Pls.-Appellees at 12–14, Jane Doe v. Azar, 925 F.3d 1291 (D.C. Cir. 2019) (No. 18-5093) (amicus brief recounting experiences of individuals affected by the challenged Office of Refugee Resettlement policy precluding unaccompanied alien minors from obtaining an abortion).

F-1 visa students have been allowed to apply for up to twelve months of OPT, to be used either during or following the completion of their degree requirements. See 8 C.F.R. § 214.2(f)(10).

**1. 2008 OPT Program Rule**

In April 2008, DHS issued an interim final rule with request for comments that extended the period of OPT in which a student could participate by seventeen months for F-1 nonimmigrants with a qualifying STEM degree. See Extending Period of Optional Practical Training by [Seventeen] Months for F-1 Nonimmigrant Students with STEM Degrees and Expanding Cap-Gap Relief for All F-1 Students with Pending H-1B Petitions, 73 Fed. Reg. 18,944 (Apr. 8, 2008) (to be codified at 8 C.F.R. pts. 214 & 274a) (the "2008 OPT Program Rule"). The goal of this extension was to help alleviate a "competitive disadvantage" for United States employers recruiting STEM-skilled workers educated in the United States under the H-1B visa program. See 73 Fed. Reg. 18,944. H-1B visas are temporary employment visas granted annually to foreign nationals in "specialty occupations," including many occupations in the STEM field. 8 C.F.R. § 214.2(h)(1)(ii)(B). The number of H-1B visas issued on an annual basis is limited, and the program is oversubscribed. See 73 Fed. Reg. at 18,946. The extension provided by the 2008 OPT Program Rule sought to "expand the number of alien STEM workers that could be employed in the [United States]," Compl. ¶ 46; see also 73 Fed. Reg. at 18,953, and explicitly referenced the specific concern regarding the rigidity of the H-1B visa program, see 73 Fed. Reg. at 18,946–47.

In 2014, Washtech filed suit, challenging on procedural and substantive grounds, both the underlying twelve-month 1992 OPT Program Rule and the seventeen-month extension added by the 2008 OPT Program Rule. See Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec. ("Washtech I"), 74 F. Supp. 3d 247, 251–52 (D.D.C. 2014). There, another member of this

Court found that Washtech lacked standing to challenge the 1992 OPT Program Rule, see id. at 252–53, but did have standing to challenge the 2008 OPT Program Rule, see id. at 253. The Court vacated the 2008 OPT Program Rule because it had been promulgated without notice and comment, see Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec. ("Washtech II"), 156 F. Supp. 3d 123, 149 (D.D.C. 2015), judgment vacated, appeal dismissed, 650 Fed. App'x 13 (D.C. Cir. 2016) ("Washtech II Appeal"), and stayed vacatur of the rule to allow DHS to promulgate a new rule, see id. On appeal of that decision to the District of Columbia Circuit, Washtech alleged that the Court "had improperly allowed DHS to continue the policies unlawfully put in place in the 2008 OPT [Program] Rule" and that "the OPT program was not within DHS's authority." Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec. ("Washtech III"), 249 F. Supp. 3d 524, 531–33 (D.D.C. 2017) (Walton, J.) (internal quotation marks and alterations omitted), aff'd in part, rev'd in part, 892 F.3d 332 (D.C. Cir. 2018) ("Washtech III Appeal").

**2. 2016 OPT Program Rule**

In response to the ruling issued by this Court's colleague, DHS issued a notice of proposed rulemaking on October 19, 2015, requesting the submission of public comments prior to November 18, 2015. See Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees, 80 Fed. Reg. 63,376 (Oct. 19, 2015). While the 2008 OPT Program Rule had extended the OPT Program tenure by seventeen months for eligible STEM students, this notice instead proposed extending the OPT Program tenure by twenty-four months. See id. (explaining that "[t]his [twenty-four] month extension would effectively replace the [seventeen] month STEM OPT [Program] extension currently available to certain STEM students"). The notice also deviated from the 2008 OPT Program Rule in several other respects.

See id. at 63,379–94 (discussing the proposed changes in detail). Namely, the notice contained a distinct change in tone—it dropped all references to the H-1B visa program that had been in the 2008 OPT Program Rule and instead explained that its purpose was to "better ensure that students gain valuable practical STEM experience that supplements knowledge gained through their academic studies, while preventing adverse effects to [United States] workers." Id. at 63,376.

On March 11, 2016, after the expiration of the public notice-and-comment period, DHS issued the final version of the 2016 OPT Program Rule. See Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees, 81 Fed. Reg. 13,040 (Mar. 11, 2016) (codified at 8 C.F.R. §§ 214 and 274a). The District of Columbia Circuit then dismissed as moot Washtech's appeal challenging the 2008 OPT Program Rule and vacated the judgment issued by this Court's colleague in its entirety. See Washtech II Appeal, 650 Fed. App'x at 14.

**B. This Case**

On June 17, 2016, Washtech initiated this action. See Compl. at 1. As previously noted by this Court,

> Washtech allege[d] that the 1992 OPT Program Rule and the 2016 OPT Program Rule exceed[ed] the authority of DHS [under] several provisions of the Immigration and Nationality Act ("INA")[, Pub. L. No. 82-414, 66 Stat. 163 (1952),] (Counts I and II); that the 2016 OPT Program Rule was issued in violation of the Congressional Review Act . . . because of non-compliance with the notice and comment and incorporation by reference requirements of the statute (Count III); and that the 2016 OPT Program Rule [was] arbitrary and capricious (Count IV).

Washtech III, 249 F. Supp. 3d at 533 (third alteration in original) (citations and internal quotation marks omitted), aff'd in part, rev'd in part, Washtech III Appeal, 892 F.3d 332. Thereafter, the Government moved to dismiss "the Complaint on the grounds that this Court lacks subject matter

jurisdiction . . . and Washtech [ ] failed to state a claim upon which relief may be granted." Id. at 521. On April 19, 2017, the Court granted the Government's motion to dismiss and dismissed Washtech's Complaint in its entirety. See id. at 556. Specifically, the Court dismissed Count I of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) "for lack of standing to challenge the 1992 OPT Program Rule," and dismissed Counts II through IV pursuant to Federal Rule of Civil Procedure 12(b)(6) "due to Washtech's failure to plausibly state claims that are entitled to relief." Id.

On appeal, the District of Columbia Circuit "affirm[ed] th[is] [ ] [C]ourt's dismissal of Counts I, III[,] and IV," but "reverse[d] its dismissal of Count II." Washtech III Appeal, 892 F.3d at 348. With respect to Count II, the Circuit reasoned that "whether Count II may proceed remains in question" because, although "the six-year statute of limitations on . . . [Washtech's] challenge closed in 1998[,] Washtech asserts[] [ ] that it may still [raise its] challenge . . . under the reopening doctrine," id. at 345, and "if [ ] DHS reopened the issue of whether the OPT [P]rogram as a whole is statutorily authorized in its notice of proposed rulemaking vis-à-vis the 2016 [OPT Program] Rule, its renewed adherence is substantively reviewable, and the challenge to the entire program may proceed," id. at 346 (citation and internal quotation marks omitted). The Circuit "decline[d] to address the question in the first instance [of whether the reopening doctrine is applicable] and le[ft] it for th[is] [ ] Court to address on remand." Id.

On remand, this Court ordered the Government to file a renewed motion to dismiss addressing the issue of whether the reopening doctrine applies to Washtech's challenge to the OPT Program. See Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec. ("Washtech IV"), 395 F. Supp. 3d 1, 8 (D.D.C. 2019) (Walton, J.). On October 18, 2018, the

Government filed its renewed motion to dismiss, seeking dismissal of Count II of Washtech's Complaint pursuant to Rules 12(b)(1) and 12(b)(6), and the Intervenors filed their motion to intervene in this case. See id. On July 1, 2019, the Court denied the Government's renewed motion to dismiss, concluding that the 2016 OPT Program Rule "reopened the issue of [] DHS's statutory authority to implement the OPT Program[,]" and that therefore "Washtech's challenge to that authority is timely." Id. at 15. In that same Order, the Court granted the Intervenors' motion to intervene as of right. See id. at 15–21.

On September 25, 2019, Washtech filed its motion for summary judgment on Count II of its Complaint, asking the Court "to . . . hold that [the 2016 OPT Program Rule] is in excess of agency authority and [to] set it aside pursuant to the [APA.]" Pl.'s Mot. at 1. On November 25, 2019, the Government filed its opposition and cross-motion for summary judgment. See Defs.' Mot. at 1. On that same date, the Intervenors filed their motion for summary judgment. See Intervenors' Mot. at 1–2. These motions are the subjects of this Memorandum Opinion.

## II. STANDARD OF REVIEW

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the APA context, summary judgment is the mechanism for deciding whether, as a matter of law, an agency action is supported by the administrative record and is otherwise consistent with the standard of review under the APA. See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415–16 (1971). But, because the district court's role is limited to reviewing the administrative record, the typical summary judgment standards set forth in Federal Rule of Civil Procedure 56 are not applicable. See Stuttering Found. of Am. v. Springer, 498 F. Supp. 2d 203, 207 (D.D.C. 2007). Rather, "[u]nder the APA,

it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" Id. (quoting Occidental Eng'g Co. v. Immigr. & Naturalization Serv., 753 F.2d 766, 769–70 (9th Cir. 1985)). In other words, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal[,]" and "[t]he 'entire case' on review is a question of law." Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness[.]" Fed. Commc'ns Comm'n v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009). It requires a district court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law[,]" 5 U.S.C. § 706(2)(A); "contrary to constitutional right, power, privilege, or immunity[,]" id. § 706(2)(B); or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[,]" id. § 706(2)(C). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Id. (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962). However, the district "[c]ourt[] 'will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" Pub. Citizen, Inc. v. Fed.

Aviation Admin., 988 F.2d 186, 197 (D.C. Cir. 1993) (quoting Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)).

## III. ANALYSIS

Washtech argues that it is entitled to summary judgment because the OPT 2016 Program Rule is "contrary to law and in excess of DHS authority." Pl.'s Mot. at 11. The Government responds that it is entitled to summary judgment because "Washtech lacks Article III standing to challenge the 2016 OPT [Program] Rule[,]" Defs.' Mem. at 1, and alternatively, because "DHS possesses statutory authority to authorize post-graduation [OPT] for F-1 students[,]" id. at 2. While the Intervenors do not dispute Washtech's standing to challenge the 2016 OPT Program Rule, they join the Government in asserting that they are entitled to summary judgment because "the OPT regulations represent a lawful exercise of executive branch authority." Intervenors' Mem. at 1. The Court will first address whether Washtech has demonstrated that it has Article III standing to bring this case, and if it concludes that it does, then it will address whether the 2016 OPT Program Rule exceeds DHS's statutory authority.

### A. Article III Standing

The Circuit has already concluded, at least at the motion-to-dismiss stage of this litigation, that "Washtech has standing [to challenge the 2016 Program Rule] under the competitor standing doctrine." Washtech III Appeal, 892 F.3d at 339. However, the Government now argues that "[t]he Court should grant summary judgment to DHS because Washtech has failed to establish, using the proof required at the summary judgment stage, that it has standing to maintain this lawsuit."[3] Defs.' Mem. at 10. Specifically, the Government asserts

[3] As noted above, the Intervenors do not contest that Washtech has standing to bring this case. See generally Intervenors' Mem.

that "Washtech has failed to provide specific, particularized evidence demonstrating that its three identified members are in direct and current competition for jobs with students engaged in OPT." Id. Washtech, however, contends that it has standing to maintain this action pursuant to the competitor standing doctrine, because it allegedly suffers "increased competition injury from alien guestworkers on OPT." Pl.'s Mot. at 9. Additionally, Washtech asserts in support of its summary judgment motion that it has "submitted updated standing evidence . . . containing facts that support the allegations made related to standing in the Complaint as well as affidavits of its members." Pl.'s Reply at 21.

The "irreducible constitutional minimum" of standing contains three elements: (1) an injury-in-fact; (2) causation; and (3) the likely possibility of redress by a favorable decision. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992). "The party invoking federal jurisdiction bears the burden of establishing standing[,]" Clapper v. Amnesty Int'l USA, 568 U.S. 398, 412 (2013) (internal quotation marks omitted), and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation[,]" Lujan, 504 U.S. at 561. "[A]t the summary judgment stage, such a party 'can no longer rest on [] mere allegations[] but must set forth by affidavit or other evidence 'specific facts.'" Clapper, 568 U.S. at 412 (quoting Lujan, 504 U.S. at 561).

Additionally, an association seeking to establish standing to sue on behalf of its members must further show that "(1) at least one of its members would have standing to sue in his [or her] own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." Chamber of Com. v. Envtl. Prot. Agency, 642 F.3d 192,

199 (D.C. Cir. 2011) (quoting Sierra Club v. Envtl. Prot. Agency, 292 F.3d 895, 898 (D.C. Cir. 2002)). Here, the focus of the parties' dispute is whether any of the named Washtech members would have standing to sue in his or her own right, therefore providing Washtech standing to pursue the claims it has asserted.[4] See generally Pl.'s Mot. at 9; Defs.' Mem. at 10–18. And, considering the requirements for satisfying the competitor standing doctrine,[5] the Court concludes for the reasons that follow that Washtech has standing to bring this case.

First, Washtech has established that it has suffered an injury-in-fact under the competitor standing doctrine. Washtech asserts that its members have been injured by the OPT 2016 Program Rule because the program "increase[s] competition injury from alien guestworkers on OPT." Pl.'s Mot. at 9. "The doctrine of competitor standing addresses the first requirement [of standing] by recognizing that economic actors 'suffer [an] injury[-]in[-]fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition' against them." Sherley v. Sebelius, 610 F.3d 69, 72 (D.C. Cir. 2010) (second alteration in original) (quoting La. Energy & Power Auth. v. Fed. Energy Regul. Comm'n, 141 F.3d 364, 367 (D.C. Cir. 1998)). To establish competitor standing, a party in a particular market must "show an

[4] Because the Government does not appear to dispute the second and third prongs of the associational standing test in its opposition and cross-motion for summary judgment, see generally Defs.' Mem. at 10–18, the Court concludes that the Government has conceded the satisfaction of these two prongs. See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (Walton, J.) ("It is well understood in this Circuit that when a [party] files an opposition to a dispositive motion and addresses only certain arguments raised by the [moving party], a court may treat those arguments that the [party] failed to address as conceded."). Therefore, the Court will solely address the first prong of the associational standing test—whether "at least one of [Washtech's] members would have standing to sue in his [or her] own right," Chamber of Com., 642 F.3d at 199—which in turn depends on whether Washtech has satisfied the requirements of competitor standing. Accordingly, this question will be the sole focus of the Court's standing analysis.

[5] Because the Government disputes only the injury and causation elements of standing for Washtech's individual members, the Court will address only these two elements in determining whether Washtech has established standing on the basis of the competitor standing doctrine. See Defs.' Reply at 11, 16 (asserting that the plaintiff must "affirmatively demonstrate [] causation" and that "no concrete injury has been shown at this stage"). Moreover, the Court notes that the Circuit has already determined that "Washtech's injury is redressable by a favorable decision[,]" as "[a] court order invalidating the [OPT] 2016 [Program] Rule would eliminate workers from the STEM job market and therefore decrease competition for the STEM jobs pursued by Washtech's members." Washtech III Appeal, 892 F.3d at 341.

actual or imminent increase in competition" in the relevant market, id. at 73, and "demonstrate that it is a direct and current competitor whose bottom line may be adversely affected by the challenged government action[,]" Mendoza v. Perez, 754 F.3d 1002, 1013 (D.C. Cir. 2014) (quoting KERM, Inc. v. Fed. Commc'ns Comm'n, 353 F.3d 57, 60 (D.C. Cir. 2004) (emphasis in original)); see also Arpaio v. Obama, 797 F.3d 11, 23 (D.C. Cir. 2015) ("Plaintiffs may claim predictable economic harms from the lifting of a regulatory restriction on a direct and current competitor, or regulatory action that enlarges the pool of competitors, which will almost certainly cause an injury[-]in[-]fact to participants in the same market. But [this Circuit] ha[s] not hesitated to find competitor standing lacking where the plaintiff's factual allegations raised only some vague probability that increased competition would occur." (internal citations and quotation marks omitted)).

Here, Washtech has presented specific facts, through affidavits and other evidence, to establish that its members are direct and current competitors with F-1 student visa holders who are working in the OPT program pursuant to DHS's regulations. See Clapper, 568 U.S. at 412. As Washtech correctly notes, "[f]or its summary judgment motion, [it] has submitted affidavits from its members showing that they have worked in the computer job market for years and continue to be active in that market[,]" Pl.'s Reply at 21; see Pl.'s Mot., Exhibit ("Ex.") 5 (Declaration of Douglas J. Blatt) ("Blatt Decl."); id., Ex. 6 (Declaration of Caesar Smith) ("Smith Decl."); id., Ex. 7 (Declaration of Rennie Sawade) ("Sawade Decl."). Moreover, as Washtech also correctly notes, "the OPT program increases the amount of foreign labor in the [STEM] job market because that was DHS's intent in creating the OPT extension for STEM . . . graduates." Pl.'s Reply at 21 (citing the 2008 OPT Program Rule) (stating that the changes made by this rule were expected to increase the attractiveness of the OPT program, and that the size of

the increase could not be precisely estimated)); see also Press Release, The White House, Impact Report: 100 Examples of President Obama's Leadership in Science, Technology, and Innovation (June 21, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/06/21/impact-report-100-examples-president-obamas-leadership-science (last visited Jan. 5, 2021) (noting that, as of June 2016, DHS estimated that there were 34,000 STEM students already participating in the OPT Program as a result of the now-defunct 2008 OPT Program Rule and expected an estimated growth to 92,000 participants within ten years). Accordingly, Washtech has demonstrated that its members are "participating in the [STEM] labor market" in competition with OPT workers, Mendoza, 754 F.3d at 1013, and that the OPT program "increase[s] [the] supply of labor—and thus competition—in that market," id. at 1011.

Consequently, Washtech has sufficiently demonstrated that DHS's regulations "allow increased competition against" Washtech's members, Sherley, 610 F.3d at 72, such that its members' "bottom line[s] may be adversely affected by the challenged government action[,]" Mendoza, 754 F.3d at 1013. And, by establishing that DHS's regulations "have the clear and immediate potential" to subject Washtech's members to increased workforce competition in the STEM labor market, La. Energy & Power Auth., 141 F.3d at 367 (emphasis in original), Washtech has demonstrated that its members suffer a concrete injury-in-fact. See Mendoza, 754 F.3d at 1011 ("[A]n individual in the labor market for open-range herding jobs would have standing to challenge [agency] rules that lead to an increased supply of labor—and thus competition—in that market."); Save Jobs USA v. Dep't of Homeland Sec., 942 F.3d 504, 510–11 (D.C. Cir. 2019) (holding that the plaintiffs established standing at the summary judgment stage, where the administrative record reflected an increase in labor, and the affidavits of

association members demonstrated that they competed with specialty occupation visa holders in the same job market).

The Government's arguments to the contrary are not convincing. The Government asserts that "[b]ecause . . . [the] most recent factual attestation [in the declarations from Washtech's members] is from June 2018, the[] [declarations] do not establish that Washtech's members are actually competing with F-1 students receiving OPT." Defs.' Mem. at 12. Specifically, the Government asserts that the declarations do not indicate that Washtech's members "are currently searching for any new programmer-type job[,]" id. at 14 (emphasis in original), but rather, the declarations merely "show that Washtech's members work in software engineering, computer systems and network administration, and computer programming, and that they have held jobs or previously applied for jobs in these fields[,]" id. at 12–13. However, the Circuit has previously rejected similar arguments. See Save Jobs USA, 942 F.3d at 511 (concluding that the plaintiff association had demonstrated that its members were direct and current competitors with H-1B visa holders, even though the H-1B visa holders "by definition are already employed[,]" because "H-1B visa holders have competed with [the association's] members in the past, and . . . nothing prevents them from doing so in the future" (internal quotation marks omitted)); Washtech III Appeal, 892 F.3d at 340 (concluding that "Washtech's members [ ] [were] not removed from the STEM labor market simply because they ha[d] not filled out formal job applications since the 2016 [OPT Program] Rule took effect[,]" in light of the facts that they "[were] currently employed on a full- or part-time basis in STEM positions," "they ha[d] affirmed their desire to work[,]" and "their job searches [were] constant[ ] and continuous") (last alteration in original) (internal quotation marks and citations omitted)). Therefore, contrary to the Government's assertions that "no concrete injury has been shown at

this stage" and that Washtech's "declarations simply highlight [its members'] general opposition to the 2016 OPT [Program] Rule[,]" Defs.' Mem. at 16 (internal quotation marks omitted), Washtech has established with particularized evidence that its members are direct and current competitors with the F-1 student visa holders in the OPT program, and therefore, its members have suffered a concrete injury-in-fact.

Second, Washtech has demonstrated that its injury is caused by the 2016 OPT Program Rule. As already noted, it is undisputed that the OPT program increases the amount of foreign labor in the STEM labor market, as evidenced by the Government's stated expectation in creating the OPT extension for STEM graduates. See 73 Fed. Reg. at 18,951 (stating that the changes made by the 2008 OPT Program Rule rule were expected to increase the attractiveness of the OPT program, and that the size of the increase could not be precisely estimated). And, as this Circuit noted when considering the Government's motion to dismiss previously filed in this case, "[t]he increase in competition is directly traceable to [ ] DHS because [ ] DHS's regulations authorize work for the OPT participants with whom Washtech members compete for jobs." Washtech III Appeal, 892 F.3d at 341;[6] see New World Radio, Inc. v. Fed. Commc'ns Comm'n, 294 F.3d 164, 172 (D.C. Cir. 2002) (noting that an agency action "imposes a competitive injury" by "provid[ing] benefits to an existing competitor or expand[ing] the number of entrants in the [plaintiff's] market"); Honeywell Int'l Inc. v. Envtl. Prot. Agency, 374 F.3d 1363, 1369 (D.C.

[6] Although the Circuit in the Washtech III Appeal was assessing Washtech's standing to bring this action at the motion-to-dismiss stage of the proceedings, which has a different burden of proof than that at the summary judgment stage, the Circuit's conclusion that Washtech's injury is "directly traceable to [DHS]," 892 F.3d at 341, still remains true at this stage of the proceedings. As this Court has already concluded, see supra pp. 13–17, Washtech has presented specific facts, through affidavits and other evidence, to establish that DHS's regulations "allow increased competition against" Washtech's members, Sherley, 610 F.3d at 72, which constitutes a concrete injury-in-fact. And, because DHS's regulations, including the 2016 OPT Program Rule, authorized this increased competition in the STEM labor market, see Tel. & Data Sys., Inc. v. Fed. Commc'ns Comm'n, 19 F.3d 42, 47 (D.C. Cir. 1994) ("[I]njurious private conduct is fairly traceable to the administrative action contested in [a] suit if that action authorized the conduct or established its legality"), Washtech has "demonstrate[d] a causal relationship between the final agency action and the alleged injur[y,]" Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d 1152, 1160 (D.C. Cir. 2005). See infra p. 17.

Cir. 2004) (concluding that an agency regulation that "legalizes the entry of a product into a market in which [the plaintiff] competes" causes the plaintiff injury), as amended by, 393 F.3d 1315 (D.C. Cir. 2005) (per curiam). Accordingly, the Court concludes that Washtech has satisfied the causation element of competitor standing.

Although the Government asserts that the evidence presented by Washtech does not establish "the necessary nexus between the 2016 OPT [Program] Rule's effect on non-party F-1 students and Washtech's members" to demonstrate causation, Defs.' Mem. at 11–12, that finding is not necessary for Washtech to satisfy the causation element of standing. Rather, this Circuit has held that "injurious private conduct is fairly traceable to the administrative action contested in the suit if that action authorized the conduct or established its legality[,]" Tel. & Data Sys., Inc. v. Fed. Commc'ns Comm'n, 19 F.3d 42, 47 (D.C. Cir. 1994); see also Simon v. E. Ky. Welfare Rts. Org., 426 U.S. 26, 45 n.25 (1976) (identifying its prior cases providing that privately inflicted injury is traceable to government action if the injurious conduct "would have been illegal without that action"). Here, Washtech has met its burden by demonstrating that the 2016 OPT Program Rule authorized the injury-in-fact suffered by Washtech's members—namely, increased competition in the STEM labor market. See Sherley, 610 F.3d at 72 ("Because increased competition almost surely injures a seller in one form or another, he [or she] need not wait until 'allegedly illegal transactions . . . hurt [him] [or her] competitively' before challenging the regulatory . . . governmental decision that increases competition." (second alteration in original) (quoting La. Energy, 141 F.3d at 367)). Accordingly, Washtech has "'demonstrate[d] a causal relationship between the final agency action and the alleged injur[y].'" Washtech III Appeal, 892 F.3d at 341 (quoting Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d 1152, 1160 (D.C. Cir. 2005)) (alterations in original).

Based on these findings, the Court concludes that Washtech has demonstrated that "at least one of its members would have standing to sue in his [or her] own right" under the competitor standing doctrine by satisfying the three elements of standing—injury-in-fact, causation, and redressability. Sierra Club, 292 F.3d at 898. Moreover, because Washtech has satisfied its burden at the summary judgment stage by setting forth specific facts that demonstrate that its members would otherwise have standing to sue, and because it is uncontested that Washtech satisfies the other prongs of the associational standing test, Washtech has satisfied the associational standing requirements to survive the Government's motion for summary judgment. See id. The Court will therefore proceed to address the parties' arguments on the merits regarding whether the adoption of the 2016 OPT Program Rule exceeded DHS's statutory authority.

**B. Whether the 2016 OPT Program Rule Exceeds DHS's Statutory Authority**

Washtech's primary argument on the merits is that DHS exceeded its statutory authority by issuing the 2016 OPT Program Rule. See Pl.'s Mot. at 9–15. Specifically, Washtech asserts that "Congress has [not] authorized DHS to allow aliens to remain in student[-]visa status when they are no longer students" and "Congress has [not] authorized DHS to allow such non-students to work while in student[-]visa status." Id. at 1. In response, the Government asserts that "DHS did not exceed its statutory authority in issuing the 2016 OPT [Program] Rule" because "[t]he 2016 OPT [Program] Rule accords with the agency's reasonable and longstanding interpretation of its statutory authority, and Congress has ratified—or at least acquiesced in—that interpretation." Defs.' Mem. at 18. Similarly, the Intervenors argue that "OPT is a lawful exercise of DHS['s] authority" because "[t]he federal government has interpreted the immigration laws to permit programs like OPT for over [seventy] years, and, while repeatedly

amending the immigration laws, Congress has never questioned the authority of the Executive Branch to implement this program." Intervenors' Mem. at 8.

As an initial matter, the Court notes that another member of this Court has previously addressed this same issue in response to "regulations materially identical to the ones at issue here[.]" Id. at 1; see Washtech II, 156 F. Supp. 3d at 137–45. Specifically, the Court in Washtech II analyzed whether DHS exceeded its statutory authority by issuing the 2008 OPT Program Rule, see 156 F. Supp 3d at 137–45, which "extended the period of OPT [during which a student could participate] by [seventeen] months for F[-]1 nonimmigrants with a qualifying STEM degree[,]" id. at 129 (citing 2008 OPT Program Rule, 73 Fed. Reg. 18,944). The parties do not dispute that "[t]he 2016 OPT [Program] Rule is effectively the same as the 2008 OPT [Program] Rule[,] except that the [seventeen]-month STEM exception was increased to [twenty-four] months." Pl.'s Mot. at 7; see Defs.' Mem. at 6; Intervenors' Mem. at 7. The Washtech II Court concluded that DHS did not exceed its statutory authority by issuing the 2008 OPT Program Rule because the F-1 statute was ambiguous, see 156 F. Supp. 3d at 140, and DHS's interpretation of that statute was not unreasonable "[i]n light of Congress'[s] broad delegation of authority to DHS to regulate the duration of a nonimmigrant's stay and Congress'[s] acquiescence in DHS's longstanding reading of F[-]1," id. at 145. However, the Washtech II Court invalidated the 2008 OPT Program Rule for failure to comply with notice-and-comment procedures and stayed vacating the rule to allow DHS to issue a new rule following adherence with the notice and comment requirement. See id. at 147–49.

After the notice-and-comment process was completed in this case, DHS issued the 2016 OPT Program Rule. The Circuit therefore vacated Washtech II as moot "because the 2008 [OPT Program] Rule [wa]s no longer in effect." Washtech II Appeal, 650 F. App'x at 14. However,

the Circuit's vacatur of the Washtech II opinion "does not undermine the validity of its reasoning[ in the opinion,]" Intervenors' Mem. at 8 n.4, because, although a vacated opinion is "no longer the law of the case, [it] may serve as a valuable source of guidance on the legal issues raised in the absence of contrary authority." Boehner v. McDermott, 332 F. Supp. 2d 149, 156 (D.D.C. 2004) (citing Christianson v. Colt Indus. Operating Corp., 870 F.2d 1292, 1298 (7th Cir. 1989)). Accordingly, because Washtech II was vacated for reasons unrelated to the underlying merits of the opinion, this Court concludes that Washtech II remains "appropriate for consideration and citation" as persuasive authority. Koi Nation of N. Cal. v. U.S. Dep't of Interior, 361 F. Supp. 3d 14, 52 n.17 (D.D.C. 2019) (citing Action All. of Senior Citizens of Greater Phila. v. Sullivan, 930 F.2d 77, 83 (D.C. Cir. 1991)).

This Court therefore begins its analysis by first determining the appropriate standard under which to evaluate the reasonableness of the 2016 OPT Program Rule, which interprets 8 U.S.C. §§ 1103(a)(1),[7] 1103(a)(3),[8] 1184(a)(1),[9] and 1324a(h)(3).[10] See 2016 OPT Program Rule, 81 Fed. Reg. at 13,045. "In reviewing an agency's interpretation of the laws it administers, [a reviewing court] appl[ies] the principles of Chevron[,] U.S.A.[,] Inc. v. Natural Resources

[7] See 8 U.S.C. § 1103(a)(1) ("The Secretary of Homeland Security shall be charged with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens[.]").

[8] See 8 U.S.C. § 1103(a)(3) ("[The Secretary of Homeland Security] shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of [the INA].").

[9] See 8 U.S.C. § 1184(a)(1) ("The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe, including when [the Attorney General] deems necessary the giving of a bond with sufficient surety in such sum and containing such conditions as the Attorney General shall prescribe, to insure that at the expiration of such time or upon failure to maintain the status under which [the alien] was admitted, . . . such alien will depart from the United States.").

[10] See 8 U.S.C. § 1324a(h)(3) ("As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General.").

Defense Council, Inc., 467 U.S. 837 (1984)." Mount Royal Joint Venture v. Kempthorne, 477 F.3d 745, 754 (D.C. Cir. 2007). "If the agency enunciates its interpretation through notice-and-comment rule[]making or formal adjudication, [the reviewing court] give[s] the agency's interpretation Chevron deference." Id. Here, the Department promulgated the 2016 OPT Program Rule pursuant to notice-and-comment rulemaking. See Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students, 80 Fed. Reg. 63,376, 63,376 (Oct. 19, 2015); see also 2016 OPT Program Rule, 81 Fed. Reg. at 13,041. Accordingly, the Court must proceed in accordance with the two-part test adopted in Chevron.

"Pursuant to Chevron [s]tep [o]ne, if the intent of Congress is clear, the reviewing court must give effect to that unambiguously expressed intent." Animal Legal Def. Fund v. Perdue, 872 F.3d 602, 610 (D.C. Cir. 2017) (quoting Edwards, Elliot, & Levy, Federal Standards of Review 166–67 (2d ed. 2013)). In determining whether "Congress has directly spoken to the precise question at issue," Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth., 414 F.3d 50, 57 (D.C. Cir. 2005) (internal quotation marks omitted), a reviewing court "us[es] the traditional tools of statutory construction[,]" Cal. Indep. Sys. Operator Corp. v. Fed. Energy Reg. Comm'n, 372 F.3d 395, 400 (D.C. Cir. 2004), including "evaluation of the plain statutory text at issue, the purpose and structure of the statute as a whole, while giving effect, if possible, to every clause and word of a statute, and—where appropriate—the drafting history[,]" Pharm. Rsch. & Mfrs. of Am. v. Fed. Trade Comm'n, 44 F. Supp. 3d 95, 112 (D.D.C. 2014), aff'd, 790 F.3d 198 (D.C. Cir. 2015). However, "[i]f Congress has not directly addressed the precise question at issue, the reviewing court proceeds to Chevron [s]tep [t]wo." Ass'n of Priv. Sector Colls. & Univs. v. Duncan, 681 F.3d 427, 441 (D.C. Cir. 2012) (quoting Harry T. Edwards & Linda A. Elliot,

Federal Standards of Review—Review of District Court Decisions and Agency Actions 141 (2007)). At step two, "the [reviewing] court defers to the [agency]'s interpretation so long as it is 'based on a permissible construction of the statute.'" Nat'l Treasury Emps. Union, 414 F.3d at 57 (quoting Chevron, 467 U.S. at 842–43). The Court will therefore first address Chevron step one, and then, if necessary, address Chevron step two.

**1. Chevron Step One**

As to Chevron step one, Washtech asserts that "unambiguously, Congress has not authorized OPT, and indeed has set clear limits on student visa eligibility that OPT transgresses." Pl.'s Mot. at 11. Specifically, Washtech argues that "alien guestworkers in the OPT program do not conform to the requirements for student[-]visa status in 8 U.S.C. § 1101(a)(15)(F)(i)[,]" [11] id., because, according to Washtech, this statute "requires the alien to be a bona fide student, solely pursuing a course of study at an approved academic institution that will report termination of attendance[,]" id. at 9, whereas "[i]n contrast, the OPT program allows aliens to remain in student[-]visa status after they have graduated [and] are no longer students[,]" id. The Government responds that because "[t]he statute is silent as to the meaning of the terms 'student' and 'course of study[,]'" the statute "leaves a gap for DHS to resolve [ ] the question of whether an F-1 nonimmigrant may engage in practical training as part of his [or her] educational program while holding F-1 status in the United States." Defs.' Mem. at 19. Additionally, the Intervenors respond that "the INA unambiguously permits DHS to authorize post-completion practical training for F-1 students[,]" but that even "[i]f the INA does not unambiguously permit

[11] See 8 U.S.C. § 1101(a)(15)(F)(i) (noting that an F-1 visa provides entry for an individual who qualifies as "an alien having a residence in a foreign country which he [or she] has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study . . . at an established . . . academic institution").

[the] OPT [Program], it is at least not plainly foreclosed by the statute[.]" Intervenors' Mem. at 34.

This Court agrees with the conclusion reached by the Court in Washtech II that "the statute's lack of a definition for the term 'student' creates ambiguity." 156 F. Supp. 3d at 139; see Chevron, 467 U.S. at 843 ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the [C]ourt is whether the agency's answer is based on a permissible construction of the statute."). By failing to define this statutory language, Congress has not "directly addressed the precise question at issue," Chevron, 467 U.S. at 843, namely, "whether the scope of F-1 encompasses post-completion practical training related to the student's field of study[,]" Washtech II, 156 F. Supp. 3d at 140. Cf. Mayo Found. for Med. Educ. & Rsch. v. United States, 562 U.S. 44, 52 (2011) (holding that, in the context of a tax statute, the word "student" was ambiguous with respect to medical students because "the statute does not define the term 'student,' and does not otherwise attend to the precise question whether medical residents are subject to" the statute). As the Washtech II Court noted, although the F-1 visa statute provides entry for nonimmigrant[s] "who [are] [] bona fide student[s] qualified to pursue a full course of study and who seek[] to enter the United States temporarily and solely for the purpose of pursuing such a course of study . . . at an established . . . academic institution[,]" 156 F. Supp. 3d at 128 (quoting 8 U.S.C. § 1101(a)(15)(F)(i)) (fifth and sixth alterations in original), "this clause could sensibly be read as an entry requirement[,]" id. at 139 (emphasis in original); see Defs.' Mem. at 20 ("[T]his text is best read to impose an initial requirement for admission[,] particularly given the textual focus on the 'purpose' for which one 'seek[s] to enter[,]' rather than a continuing requirement that persists throughout the nonimmigrant's time in the United States." (third alteration in original)); Intervenors' Mem. at 26 ("[T]he statute is aimed at the

individual's qualifications and characteristics at the time he or she is granted the F-1 visa and 'seeks to enter' the country."). Additionally, "[t]his reading is bolstered by Congress'[s] delegation of the power to prescribe regulations related to a nonimmigrant's duration of stay." Washtech II, 156 F. Supp. at 139; see 8 U.S.C. § 1184(a)(1) (noting that "[t]he admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe[.]").[12]

Moreover, as the Court in Washtech II correctly noted, "several pieces of evidence indicate that Congress understood F-1 to permit at least some period of employment." Washtech II, 156 F. Supp. 3d at 139–40. For example, "Congress implemented a pilot program that allowed F-1 students to work up to [twenty] hours per week in a job unrelated to their field of study[,]" id. (citing Immigration Act of 1990, Pub. L. No. 101-649, 194 Stat. 4978), and "F-1 nonimmigrants are explicitly exempted from several wage taxes[,]" id. (citing 26 U.S.C. §§ 3121(b)(19), 3306(c)(19); 42 U.S.C. § 410(a)(19)). "These statutory provisions lend credence to [the Government's and the Intervenors'] argument that the clause in F-1—'solely for the purpose of pursuing such a course of study'—does not foreclose employment[,]" Washtech II, 156 F. Supp. 3d at 140, and, because "F-1 does not bar all foreign student employment, it is not clear what employment the statute does permit[,]" id. (emphasis in original). Accordingly, the Court concludes that "the statute's text is ambiguous as to whether such employment may extend for a period of time after [F-1 students] complete their studies." Id.

[12] Washtech contends that "the definition of student[-]visa status uses the qualifier 'solely' to exclude all other activities, including OPT, as qualifying an alien for student[-]visa status." Pl.'s Mot. at 11. However, this argument is unavailing in light of the Court's conclusion that "this clause could sensibly be read as an entry requirement[,]" Washtech II, 156 F. Supp. 3d at 139 (emphasis omitted), "rather than a continuing requirement that persists throughout the foreign student's time of study in the United States for the purposes of his [or her] education[,]" Defs.' Mem. at 27. As the Washtech II Court correctly notes, "[n]o one disputes that all F-1 aliens enter the United States as 'students' under any conceivable definition, since they must enroll at a qualifying academic institution[,]" but "[t]he ambiguity is whether the scope of F-1 encompasses post-completion practical training related to the student's field of study." 156 F. Supp. 3d at 140.

Washtech's arguments to the contrary are unpersuasive. Washtech first contends that "[t]he obvious problem with the OPT program is that its participants are not students," and "when aliens stop attending school, they no longer maintain student[-]visa status." Pl.'s Mot. at 9–10. After analyzing various dictionary definitions, however, the Court in Washtech II observed that while "some definitions of the word 'student' require school attendance[,]" "[m]ost . . . include broader notions of studying and learning." 156 F. Supp. 3d at 140; see, e.g., Student, Merriam-Webster Dictionary Online, www.merriam-webster.com/dictionary/student (last visited Jan. 10, 2021) ("SCHOLAR, LEARNER, especially: one who attends a school[.] . . . [O]ne who studies: an attentive and systematic observer[.]"); Student, Oxford English Dictionary, http://www.oed.com (last visited Jan. 10, 2021) ("A person engaged in or dedicated to the pursuit of knowledge, esp. in a particular subject area[.] . . . A person studying at a university or other place of higher education.").[13] Therefore, "[d]ictionary definitions are [ ] unhelpful in clarifying this statutory ambiguity[,]" as they "do not address the fundamental ambiguity presented by this case"—i.e., "whether the scope of F-1 encompasses post-completion practical training related to the student's field of study." Washtech II, 156 F. Supp. 3d at 140.

[13] Washtech cites limited case authority to support its assertion that "[w]hen aliens stop attending school, they no longer maintain student[-]visa status." Pl.'s Mot. at 9–10 (citing Sokoli v. Att'y Gen. of U.S., 499 F. App'x 214, 215 (3d Cir. 2012); Yadidi v. Immigr. & Naturalization Serv., 2 F.3d 1159 (9th Cir. 1993); Narenji v. Civiletti, 617 F.2d 745, 753 (D.C. Cir. 1980) (MacKinnon, J., concurring in denial of reheating en banc)). However, as the Intervenors correctly note, the authorities cited by Washtech "do not address whether an individual who complies with regulations governing F-1 status is properly within the scope of the F-1 statute." Intervenors' Mem. at 32 n.17; see Sokoli, 499 F. App'x at 215–16 (explaining that the nonimmigrant student "received a [n]otice to [a]ppear charging her with a failure to maintain [student-visa] status" when she "did not immediately depart from the country after graduation" and that she "[s]he conceded removability but requested asylum, withholding of removal, and protection under the Convention Against Torture"); Yadidi, 2 F.3d at 1 (affirming the Board of Immigration Appeals' deportation order of a nonimmigrant student who "admitted that he had graduated from high school" because he "ha[d] not suggested to [the court], nor did he suggest to the [Board of Immigration Appeals], that he had complied with the transfer procedures . . . or was in any other way eligible to remain in the United States"); Narenji, 617 F.2d at 747 (concluding that a "regulation [that] provides that [the] failure to comply with [a] reporting requirement . . . will subject [a nonimmigrant] to deportation proceedings" was "within the authority delegated by Congress to the Attorney General under the [INA]").

Washtech also argues that the term "student" is unambiguous because the F-1 statute only includes "alien[s who are] bona fide student[s], solely pursuing a course of study at an approved academic institution that will report termination of attendance." Pl.'s Mot. at 9 (paraphrasing 8 U.S.C. § 1101(a)(15)(F)(i)). While Washtech is correct that the statute states that the relevant "institution or place of study shall have agreed to report to the Attorney General the termination of attendance of each nonimmigrant student, and if any such institution of learning or place of study fails to make reports promptly[,] the approval shall be withdrawn[,]" 8 U.S.C. § 1101(a)(15)(F)(i), that language merely "reflects congressionally mandated reporting requirements for schools certified to enroll[] F-1 nonimmigrant and the consequences for schools that fail to report that important data point[,]" Defs.' Mem. at 25–26. Accordingly, this text does not require the conclusion "that Congress imposed a continuing academic-institution-attendance requirement after entry and thereby barred any practical training that occurred after a student graduated from an academic institution." Id. at 26; see Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."). Moreover, the Court does not find persuasive Washtech's suggestion that the inclusion of the term "bona fide" in the phrase "bona fide student" means that the phrase is strictly limited to individuals who are currently enrolled at academic institutions. Rather, as the Government correctly notes, "bona fide" simply "reflects a basic requirement of good faith—that a foreign student must be in the United States truly to engage in learning." Defs.' Mem. at 26; see United States ex rel. Antonini v. Curran, 15 F.2d 266, 267 (2d Cir. 1926) (concluding that a foreign "student can . . . alternat[e] [ ] periods of work outside of the college with periods of academic study within the college . . . not only [as] a means of self-support during the college

years, but [as] a fundamental principle of education" and that, "[d]espite work of this kind during the time of study[,] . . . the [foreign national] is and remains a bona fide student").

Furthermore, Washtech asserts that "DHS has no authority to allow aliens to remain in the United States in student[-]visa status after graduation" because to do so would contravene the "statutory requirements of 8 U.S.C. § 1184(a)(1) that non-immigrant aliens must leave the country when they do not conform to the status under which they were admitted[.]" Pl.'s Mot. at 12. However, as the Intervenors correctly note, Washtech's "argument assumes the conclusion" that F-1 students are no longer eligible for protection under the F-1 visa category when they are participating in post-graduation practical training. Intervenors' Mem. at 27 n.15. Here, the relevant issue is "whether the scope of F-1 encompasses post-completion practical training related to the student's field of study[,]" Washtech II, 156 F. Supp. 3d at 140, and Washtech "cannot answer a question about the proper scope of the F-1 visa category by pointing to an obligation to enforce that scope, whatever it may be[,]" Intervenors' Mem at 27 n.15.

Finally, Washtech argues that, even if Congress "has somehow conferred on DHS the authority to allow aliens to maintain student[-]visa status when they are no longer students, the 2016 OPT Program Rule faces the insurmountable problem that Congress has not authorized DHS to permit such non-students to engage in employment." Pl.'s Mot. at 12. To support its argument, Washtech relies on Texas v. United States, 809 F.3d 134 (5th Cir. 2015), and asserts that the Texas Court held that DHS does not have "the power to authorize alien employment independently of Congress." Pl.'s Reply at 9. However, that case does not support Washtech's position. As the Intervenors correctly note, "Texas said nothing about the question implicated by this case: whether DHS has authority to provide work authorization to individuals already lawfully present in the United States." Intervenors' Mem. at 24. Rather, the Court concluded

that it was beyond DHS's power to grant deferred action—"a decision . . . not to pursue deportation proceedings against an individual or class of individuals otherwise eligible for removal[,]" Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec., 908 F.3d 476, 487 (9th Cir. 2018), rev'd in part, vacated in part, 140 S. Ct. 1891 (2020)—to 4.3 million undocumented individuals. See Texas, 809 F.3d at 178–86. Accordingly, the Texas Court concluded that DHS regulations that provide work authorization for deferred action recipients, see 8 C.F.R. § 274a.12(c)(14), could not be utilized to authorize work for these undocumented immigrants, because this would "undermin[e] Congress's stated goal of . . . preserving jobs for those lawfully in the country." Texas, 809 F.3d at 181; see also id. at 184 (rejecting as "untenable" the agency's interpretation, which "would allow [DHS] to grant lawful presence and work authorization to any illegal alien in the United States"). Here, however, F-1 students are "lawfully present in the United States[,]" id. at 181 (emphasis in original), and the 2016 OPT Program Rule does not purport to reclassify individuals who were originally unlawfully present in the United States as lawfully present, cf. id. at 184 (noting that "the INA flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization"). Instead, the 2016 OPT Program Rule only grants work authorization to nonimmigrant foreign nationals who are already legally present in the United States under the F-1 student visa program. See 8 C.F.R. § 214.2(f)(10) (stating that OPT "may be authorized to an F-1 student who has been lawfully enrolled on a full[-]time basis, in a [s]ervice-approved college, university, conservatory, or seminary for one full academic year"). Accordingly, F-1 students are outside of the scope of the Fifth Circuit's holding in Texas, and it would be improper to glean any authority from that case that could apply to this case.

Having concluded that 8 U.S.C. § 1101(a)(15)(F)(i) is ambiguous and that Congress has not "directly addressed the precise question at issue," Chevron, 467 U.S. at 843, the Court proceeds to the second step of the Chevron analysis.

**2. Chevron Step Two**

As to Chevron step two, Washtech argues that "OPT does not reflect a reasonable interpretation of the law[,]" Pl.'s Reply at 17, because "[i]n order for OPT to survive Chevron [s]tep [t]wo, this Court must hold that aliens who have finished school and are either working in [the STEM] industry or are employed are students[,] [b]ut to do so makes hash of the language[,]" id. (internal quotation marks omitted). Additionally, Washtech asserts that "[u]sing student visas to supply labor to [an] industry is not a longstanding policy[,]" id., and "[the Government] cannot show congressional approval of the current student visa work policy that is at issue[,]" id. at 19. In response, the Government contends that because DHS was "[f]aced with the statutory gap in the F-1 provision, in the 2016 OPT [Program] Rule, DHS adopted a reasonable and longstanding interpretation that the F-1 student provision allows for employment of students after graduation and during a period of practical training." Defs.' Mem. at 20. Similarly, the Intervenors contend that "it was reasonable for DHS to exercise its discretion under this statute to conclude that an individual remains in lawful F-1 status during a time-limited period following graduation, when that individual engages in practical training directly tied to his or her principal field of study." Intervenors' Mem. at 27.

"An agency receives deference at Chevron step two if it has 'offered a reasoned explanation for why it chose [its] interpretation." Athenex Inc. v. Azar, 397 F. Supp. 3d 56, 63 (D.D.C. 2019) (alteration in original) (quoting Village of Barrington, Ill. v. Surface Transp. Bd.,

636 F.3d 650, 660 (D.C. Cir. 2011)), appeal dismissed sub nom. Athenex Pharma Sols., LLC v. Azar, No. 19-5223, 2019 WL 5394642 (D.C. Cir. Oct. 1, 2019).

> As in step one, this requires application of the traditional tools of statutory interpretation, including reviewing the text, structure, and purpose of the statute. The difference at this stage, however, is the criteria—i.e., whereas step one asked whether Congress require[d] a certain interpretation, step two asks whether the same statutory text, history, and purpose permit the interpretation chosen by the agency.

Ass'n for Cmty. Affiliated Plans v. U.S. Dep't of Treasury, 392 F. Supp. 3d 22, 42 (D.D.C. 2019) (alteration and emphasis in original) (citation and internal quotation marks omitted). "[I]n order to withstand judicial scrutiny, the [agency's] actions need not be [ ] the only permissible construction that [it] might have adopted, nor may the [C]ourt substitute its own judgment for that of the [agency]." United Farm Workers v. Solis, 697 F. Supp. 2d 5, 11 (D.D.C. 2010) (fourth alteration in original) (citation and internal quotation marks omitted). Rather, in determining whether the agency's policy is reasonable under Chevron step two, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." Fox Television Stations, Inc., 556 U.S. at 515 (emphasis in original).

Here, too, this Court agrees with the Washtech II Court in concluding that DHS's interpretation is not unreasonable, "[i]n light of Congress' broad delegation of authority to DHS to regulate the duration of a nonimmigrant's stay and Congress' acquiescence in DHS's longstanding reading of F-1[.]" 156 F. Supp. 3d at 145.

As a preliminary matter, the Court notes that "Congress has delegated substantial authority to DHS to issue immigration regulations[,]" including "broad powers to enforce the INA and a narrower directive to issue rules governing nonimmigrants." Id. at 138; see 8 U.S.C. § 1103(a)(1) ("The Secretary of Homeland Security shall be charged with the administration and

enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens . . . ."); id. § 1103(a)(3) ("[The Secretary of Homeland Security] shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of [the INA]."); id. § 1184(a)(1) ("The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe, including when he deems necessary the giving of a bond with sufficient surety in such sum and containing such conditions as the Attorney General shall prescribe, to insure that at the expiration of such time or upon failure to maintain the status under which [the alien] was admitted, . . . such alien will depart from the United States."). Accordingly, "DHS has been broadly delegated the authority to regulate the terms and conditions of a nonimmigrant's stay, includ[ing] its duration[,]" Washtech II, 156 F. Supp. 3d at 144, and matters addressed by the 2016 OPT Program Rule plainly falls within the scope of this delegated authority.

Not only does DHS enjoy broad, delegated authority to enforce the INA and issue rules governing nonimmigrants, but "DHS's interpretation of F-1—inasmuch as it permits employment for training purposes without requiring ongoing school enrollment—is 'longstanding' and entitled to deference." Id. at 143. "Since at least 1947, [the Immigration and Naturalization Service ("INS")] and DHS have interpreted the immigration laws to allow foreign students to engage in employment for practical training purposes." Id. at 141; see 12 Fed. Reg. 5355, 5357 (Aug. 7, 1947) ("In cases where employment for practical training is required or recommended by the school, the district director may permit the student to engage in such employment for a six-month period subject to extension for not over two additional six-month

periods[.]"). And, in 1952, after "Congress overhauled the immigration laws with the [INA], which created the modern category of student nonimmigrants[,]" Washtech II, 156 F. Supp. 3d. at 141 (citing INA, § 101(a)(15)(F)), "INS continued to interpret the law to permit foreign students to engage in practical training[,]"[14] id.; see, e.g., Special Requirements for Admission, Extension, and Maintenance of Status, 38 Fed. Reg. 35,425, 35,426 (Dec. 28, 1973) (allowing foreign students to secure "employment in order to obtain practical training . . . in his [or her] field of study" for a maximum of eighteen months, if such training "would not be available to the student in the country of his [or her] foreign residence"). Moreover, "at least as early as 1983, INS explicitly authorized post-completion practical training." Washtech II, 156 F. Supp. 3d at 142; see Nonimmigrant Classes; Change of Nonimmigrant Classification; Revisions in Regulations Pertaining to Nonimmigrant Students and the Schools Approved for Their

[14] As the Washtech II Court explained in detail, "[w]hile the 1947 and 1973 regulations do not explicitly authorize post-completion practical training, several pieces of evidence strongly suggest that these provisions allowed alien students to engage in full-time, post-completion employment without simultaneously attending classes." 156 F. Supp. 3d at 141 n.7. First, the Court noted that while "both the 1947 and 1973 regulations, in addition to permitting students to engage in practical training, allowed students to work out of financial necessity, but only if the employment would not interfere with the student's ongoing course of study[,]" id. (citing 12 Fed. Reg. at 5357; Special Requirements for Admission, Extension, and Maintenance of Status, 38 Fed. Reg. 35,425, 35,426 (Dec. 28, 1973)), "[t]he practical training subsections included no similar limitation[,]" id. Second, the Court explained how "contemporary documents demonstrate an understanding that those practical training regulations allowed full-time, post-completion employment." Id.; see Matter of T–, 7 I. & N. Dec. 682, 684 (B.I.A. 1958) (noting that the "length of authorized practical training should be reasonably proportionate to the period of formal study in the subject which has been completed by the student" and that only "[i]n unusual circumstances[ would] practical training [ ] be authorized before the beginning of or during a period of formal study"); Matter of Yau, 13 I. & N. Dec. 75, 75 (B.I.A. 1968) (noting that an alien student "ha[d] been in student status continuously[,]" including during a "period of practical training following graduation"). Third, the Court noted that "a 1950 Report by the Senate Committee on the Judiciary, in describing foreign student employment, stated that 'practical training has been authorized for [six] months after completion of the student's regular course of study.'" Washtech II, 156 F. Supp. 3d at 141 n.7 (citing S. Rep. No. 81-1515, at 505 (1950) (noting a "suggestion that the laws . . . be liberalized to permit foreign students to take practical training before completing their formal studies")). Fourth, the Court explained that "a House Report from 1961 disclosed that, on April 24, 1959, the Department of State, acting in concert with INS, issued a notice to its officers that '[s]tudents whom the sponsoring schools recommend for practical training should be permitted to remain for such purposes up to [eighteen] months after receiving their degrees or certificates.'" Id. (citing H.R. Rep. No. 87-721, at 15 (1961)) (first alteration in original). Fifth and finally, the Court observed that "in a 1975 statement to Congress on the subject of foreign students, the Commissioner of INS noted that, although there 'is no express provision in the law for an F[-]1 student to engage in employment,' such a student could engage in practical training on a full-time basis for up to eighteen months." Id. (citing Review of Immigration Problems: Hearings Before the Subcomm. on Immig., Citizenship, and Int'l Law of the H. Comm. on the Judiciary, 94th Cong. 21, 23 (1975) (statement of Hon. Leonard F. Chapman, Jr., Comm'r of Immigr. & Naturalization Serv.)).

Attendance, 48 Fed. Reg. 14,575, 14,586 (Apr. 5, 1983) (allowing students to engage in practical training "[a]fter completion of the course of study"); Retention and Reporting Information for F, J, and M Nonimmigrants; Student and Exchange Visitor Information System (SEVIS), 67 Fed. Reg. 76,256, 76,274 (Dec. 11, 2002) (same).

This longstanding interpretation by DHS is further bolstered by the fact that "Congress has repeatedly and substantially amended the relevant statutes without disturbing [DHS's] interpretation" permitting post-graduation practical training. Washtech II, 156 F. Supp. 3d at 143. "Since 1952, Congress has amended the provisions governing nonimmigrant students on several occasions." Id. at 142; see, e.g., Accreditation of English Language Training Programs, Pub. L. No. 111-306, § 1, 124 Stat. 3280, 3280 (2010) (amending F-1 with respect to English language training programs); Enhanced Border Security and Visa Entry Reform Act of 2002, Pub. L. No. 107-173, §§ 501–02, 116 Stat. 543, 560–63 (implementing monitoring requirements for foreign students); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 625, 110 Stat. 3009-546, 3009-699 (adding limitations related to F-1 nonimmigrants at public schools); Immigration Act of 1990 § 221 (permitting F-1 nonimmigrants to engage in limited employment unrelated to their field of study). And, "[d]uring that time, Congress has also imposed various labor protections for domestic workers[,]" yet "Congress has never repudiated INS['s] or DHS's interpretation permitting foreign students to engage in post-completion practical training." Washtech II, 156 F. Supp. 3d at 142–43 (citing Immigration Act of 1990 § 205 (requiring a labor condition certification for H-1B nonimmigrants from the employer attesting that the alien will be paid the prevailing wage and that the employer "will provide working conditions for [the] alien[] that will not adversely affect the working conditions of workers similarly employed"); id. § 221 (requiring similar

certification for F-1 nonimmigrants working in a position unrelated to their field of study); American Competitiveness and Workforce Improvement Act of 1998, Pub. L. No. 105-277, § 412, 112 Stat. 2681-641, 2681-642 (requiring employers of H-1B nonimmigrants to certify that they "did not displace and will not displace a United States worker")).

Accordingly, this Court agrees with the Court's conclusion in Washtech II that "[b]y leaving the agency's interpretation of F-1 undisturbed for almost [seventy] years, notwithstanding these significant overhauls, Congress has strongly signaled that it finds DHS's interpretation to be reasonable." Id. at 143; see Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 846 (1986) ("[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." (internal quotation marks omitted)); Barnhart v. Walton, 535 U.S. 212, 220 (2002) ("Court[s] will normally accord particular deference to an agency interpretation of 'longstanding' duration."). And, although "the so-called 'legislative reenactment' doctrine is of 'little assistance' when Congress 'has simply enacted a series of isolated amendments to other provisions[,]'" Washtech II, 156 F. Supp. 3d at 131 (quoting Pub. Citizen, Inc. v. U.S. Dep't of Health & Hum. Servs., 332 F.3d 654, 668 (D.C. Cir. 2003)), here the amendments made by Congress to the provisions governing nonimmigrant students "have not been 'isolated[,]'" id. at 143 (quoting Pub. Citizen, Inc., 332 F.3d at 668). Rather, "[t]he Immigration and Nationality Act of 1952 . . . radically changed the country's immigration system[,]" and "the Immigration

Act of 1990 imposed a host of new protections for domestic workers and explicitly authorized F-1 students to engage in certain forms of employment."[15] Id.

Washtech's arguments to the contrary are not convincing. Washtech first asserts that "[u]sing student visas to supply labor to [an] industry is not a longstanding policy[,]" and that the legislative history instead reflects "a constantly changing policy in regard to student visa employment." Pl.'s Reply at 17. Specifically, Washtech contends that "[t]he policy of allowing aliens to work on student visas in a training program for six months that is required by their school is entirely different from the policy of allowing aliens to work on student visas for years after graduation[.]" Id. (citation omitted). The Court disagrees. As the Government correctly notes, "[t]hat the specifics of the F-1 student visa program have changed does not alter the conclusion that Congress ratified the Executive Branch's general authority over this area[,]" Defs.' Reply at 13 (emphasis in original), and these modifications do not undermine the Court's conclusion that "Congress has acquiesced in DHS's interpretation that F-1 can cover students post-[graduation,]" Washtech II, 156 F. Supp. 3d at 136 n.3.

Washtech also argues that DHS "cannot show congressional approval of the current student visa work policy that is at issue" and that "[t]he constant change in student[-]visa work

---

[15] Washtech contends that the application of the legislative reenactment doctrine is inapposite in this case because "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change[,] not when it enacts a statute with the same basic parameters." Pl.'s Reply at 20 (internal quotation marks omitted) (emphasis in original). According to Washtech, "the [INA] of 1952 brought a major change to student visas[,]" because "[u]nder the Immigration Act of 1924, alien students were 'immigrants' and under the [INA] of 1952, students are admitted as 'nonimmigrants.'" Id. at 21. However, Washtech fails to explain why this shift in terminology undermines the application of the legislative reenactment doctrine. Rather, as the Intervenors correctly note, "[s]tudents admitted as non-quota immigrants under the 1924 Act were required to 'maintain the status under which [they were] admitted' just like nonimmigrant students under the 1952 Act[,]" Intervenors' Reply at 12 (citing Immigration Act of 1924, Pub. L. No. 68-139, § 15, 43 Stat. 153, 163), and "the 1952 INA switched the student visa from the non-quota immigrant category to the nonimmigrant category precisely because 'the term 'immigrant' is somewhat inappropriate' given the term-limited nature of student status even under the 1924 Act[,]" id. at 12–13 (citing H.R. Rep. No. 82-1365, at 40 (1952) (reproducing letter from John L. Thurston, Acting Adm'r, Fed. Sec. Agency)). Accordingly, this change "was merely an updating of terminology—not a change in the substance of the student definition—and does not undermine the application of the [ ] reenactment canon." Id. at 13.

policy undercuts any congressional ratification or acquiescence argument because it is impossible to identify any specific policy [to which] Congress acquiesced or [that it] ratified." Pl.'s Reply at 19. However, as explained previously, "DHS's interpretation of F-1 clearly dates back to 1982, and likely to 1947[,]" and "[c]ongressional obliviousness of such an old interpretation of such a frequently amended statute str[uck the Washtech II Court] as unlikely." Washtech II, 156 F. Supp. 3d at 143; see supra note 14, at p. 32. Moreover, "ample evidence indicates congressional awareness" of DHS's interpretation. Washtech II, 156 F. Supp. 3d at 143. For example, in 1990, Congress amended the INA and "included a three-year pilot program authorizing F-1 student employment for positions that were 'unrelated to the alien's field of study.'" Id. (citing Immigration Act of 1990 § 221(a)). Although "[c]onsidered in isolation," it may seem "perplexing" that Congress would "only authorize foreign students to do work unrelated to their schooling[,]" id., this provision demonstrates Congress's understanding that "INS's regulations already authorized student employment related to the student's field of study, and these regulations were explicit in permitting post-completion employment." Id. (citing 8 C.F.R. § 214.2(f)(10) (1989) (authorizing F-1 students to engage in "[p]ractical training prior to completion of studies" or "after completion of studies" upon certification that "the proposed employment . . . is related to the student's course of study")). This 1990 pilot program therefore provides "further evidence that Congress knew about the existence of post-completion [practical training] and acquiesced in its continuance." Intervenors' Mem. at 17 n.8. Additionally, "[s]everal other pieces of legislative history suggest that Congress was aware of the practical training program[,]" as "[t]he program was described at length in a 1950 Senate Report, a 1961 House Report, and 1975 congressional testimony by the Commissioner of INS." Id. at 143; see also supra note 15, at p. 35. Accordingly, "[t]he Court finds this evidence more than sufficient to

demonstrate 'congressional familiarity with the administrative interpretation at issue.'" Washtech II, 156 F. Supp. 3d at 144 (citing Pub. Citizen, Inc, 332 F.3d at 669).

Finally, Washtech argues that the 2016 OPT Program Rule is unreasonable because allowing post-graduation practical training "circumvent[s] the statutory alien employment scheme[,]" Pl.'s Mot. at 15, and "the annual quotas on H-1B visas[,]" id. at 16. See generally id. at 15–17. However, "H-1B—which applies to aliens seeking to work in a 'specialty occupation,' 8 U.S.C. § 1101(a)(15)(H)(i)(b)—is far broader than the employment permitted by the OPT program[,]" and therefore "DHS's interpretation of the word 'student' does not render any portion of H-1B, or its related restrictions, surplusage." Washtech II, 156 F. Supp. 3d at 144 (noting that "Congress has tolerated practical training of alien students for almost [seventy] years, and it did nothing to prevent a potential overlap between F-1 and H-1B when it created the modern H-1B category in 1990"). Accordingly, the Court concludes that "DHS's interpretation is [not] unreasonable merely because of its limited overlap with [the] H-1B [visa program]."[16] Id.

Accordingly, "the [C]ourt determines that [DHS] 'has offered an explanation that is reasonable and consistent with the regulation[]s['] language and history,' thus supporting [DHS's] objectives." United Farm Workers, 697 F. Supp. 2d at 10 (quoting Trinity Broad. of

[16] Washtech also relies on Int'l Union of Bricklayers & Allied Craftsmen v. Meese, 616 F. Supp. 1387 (N.D. Cal. 1985), as support for its position that "the OPT regulations [ ] violate both the terms of the F-1 visa . . . being used to admit [ ] foreign labor and the provisions of the H-1B visa . . . that should be used to admit such labor." Pl.'s Mot. at 16 (citing Bricklayers, 616 F. Supp. at 1398–99). However, that case is not analogous to this case. In Bricklayers, the Court concluded that an individual on a B-1 visa—a visa provided to business visitors—could not perform skilled or unskilled labor while in the United States, because "an alien coming to the United States for the purpose of 'performing skilled or unskilled labor' is expressly excluded from the [class of business visitors able to obtain B-1 visas]." 616 F. Supp. at 1398 (citing 8 U.S.C. § 1101(a)(15)(B) (emphasis omitted)). The F-1 visa statute, however, contains no such "express[] exclu[sion]" from its scope. Id.; see Defs.' Mem. at 29 ("The F-1 provision is silent on the parameters of a foreign student's permitted course of study, or whether hands-on training or employment may accompany or follow the academic-institution portion of a course of study as a practical part of the student's education in the United States." (citing 8 U.S.C. § 1101(a)(15)(F)(i))). This distinction defeats Washtech's argument that the Bricklayers case supports its position.

Fla., Inc. v Fed. Commc'ns Comm'n, 211 F.3d 618, 627 (D.C. Cir. 2000)). The Court therefore concludes that the 2016 OPT Program Rule is a reasonable interpretation of the F-1 statute and that the DHS's interpretation is entitled to substantial deference under Chevron step two.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that Washtech has Article III standing to bring this action, and that DHS did not exceed its statutory authority in issuing the 2016 OPT Program Rule. Accordingly, the Court denies Washtech's motion for summary judgment, grants the Government's and the Intervenors' motions for summary judgment, and denies Washtech's motion to strike.

**SO ORDERED** this 28th day of January, 2021.[17]

REGGIE B. WALTON
United States District Judge

[17] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.